RECEIPT #_____
AMOUNT $____2 5 0____
SUMMONS ISSUED Y / 8
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. M
DATE____7-27-05

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN AUFIERO, NEIL F. COLLINS, ROBYN L. DEFRANZO, DANIEL HYDE, PATRICK J. IRVING, THOMAS A. LEYNE, JOHN MAHONEY, JOSEPH E. MCCAIN, WILLIAM MCCARTHY, TIMOTHY MITSAKIS, LOUIS M. REMIGIO, SUSAN J. DESOUSA, Individually & Next Friend of CAMERON A. DESOUSA, JOHN DOE and JANE DOE, **Plaintiffs** | ) ) ) ) ) ) ) ) ) ) ) ) |
| **v.** | ) **C.A. No.:** ) |
| CITY OF SOMERVILLE, JOSEPH CURTATONE, as Somerville Mayor, DONALD CALIGURI, as former Somerville Police Chief, GEORGE MCLEAN, as Former Somerville Police Chief, ROBERT TRAHAN, Individually and as Former Head of Department of Public Works, ROBERT BRADLEY, as Somerville Police Chief, MITT ROMNEY, JOAN LANGSAM, as Former City Solicitor, PAUL ZIRPOLO, as DPW Project Manager, DOROTHY KELLY GAY, as Former Somerville Mayor, ROBERT J. PREZIOSO, SIMPSON GUMPERTZ & HEGER, INC., ENVIROTECH, VITHAL DESHPANDE, as Environmental Protection Engineer and ANGELO R. BUONOPANE, **Defendants** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**05 1157 ⋄ ⋄⋄⋄**

**MAGISTRATE JUDGE Alexander**

## VERIFIED COMPLAINT AND REQUEST FOR JURY TRIAL

This is a Civil Action brought in the United States District Court for the District of Massachusetts by the Plaintiffs, John Aufiero, Neil F. Collins, Robyn L. DeFranzo, Daniel Hyde, Patrick J. Irving, Thomas A. Leyne, John Mahoney, Joseph E. McCain, William McCarthy, Timothy Mitsakis, Louis M. Remigio, Susan J. DeSousa, Individually and as Next Friend of Cameron A. DeSousa, John Doe and Jane Doe (hereinafter collectively referred to as "Plaintiffs") to recover damages sustained by them as a consequence of the reckless indifference and wanton disregard for their safety by the City of Somerville, Joseph Curtatone, Donald Caliguri, George McLean, Robert Trahan, Robert Bradley, Mitt Romney, Joan Langsam, Paul Zirpolo, Dorothy Kelly Gay, Robert J. Prezioso, Simpson Gumpertz & Heger, Inc., Envirotech, Vithal Deshpande, and Angelo R. Buonopane (hereinafter collectively referred to as "Defendants"). The

Defendants deprived the Plaintiffs of substantive rights granted under 42 U.S.C. § 1983 and further failed to warn the Plaintiffs of a known hazard, provide the Plaintiffs a safe work place, give the Plaintiffs a warning of dangers of which the Plaintiffs might reasonably be expected to remain ignorant, honor contractual obligations with the Plaintiffs, and maintain the Plaintiffs' workplace.

## I. Introduction

A. The Plaintiffs' claims arise through their employment with the Somerville Police Department and/or their association with the building located at 220 Washington Street, Somerville, Massachusetts (hereinafter "220 Washington Street") as identified by context herein. The severity of this matter extends well beyond the Plaintiffs named herein. Since 1986, more than one hundred Police and Fire Department employees, 911 dispatchers, and other administrative personnel and their children have occupied 220 Washington Street. Many have developed symptoms associated with long-term exposure to environmental toxins. The present litigants herein represent a small percentage of the potential number of people effected by this sick building. Numerous individuals who are present and past occupants of 220 Washington Street are communicating their serious health issues which are currently being evaluated.

B. The ensuing claim arose from moderate to severe health problems suffered by the occupants of 220 Washington Street and Plaintiffs named within this Complaint. The toxic environment within 220 Washington Street includes, but is not limited to chronic dampness, water intrusion, questionable structural integrity, existence of bird feces, elevated levels of carbon dioxide, inadequate or inoperative ventilation systems, and the presence of dangerous molds, bacteria, fungi and sulfur trioxide.

C. Health problems now attributed to the Plaintiffs' association with 220 Washington Street include the development of pulmonary diseases and asthma, flu-like symptoms, allergy symptoms, acquired leukemia, and the diagnosis of sarcoidosis, a rare disease associated with damp buildings diagnosed in three police officers.

D. 220 Washington Street is a building which was built in 1927 and has housed the Somerville Police Department since 1986. The Somerville Fire Department also was housed in the building from 1986 through 1999 when it was forced to evacuate the building due to flooding. 220 Washington Street has a long history of state sanitary code violations.

E. Despite repeated notices, complaints, and reports regarding the unsanitary conditions within 220 Washington Street, those in charge of maintaining the structure of 220 Washington Street as well as determining the location and placement of the Somerville Police Department, including the named

2

Defendants herein, Joseph Curtatone, Donald Caliguri, George McLean, Robert Bradley, Robert Trahan, Joan Langsam, Paul Zirpolo, and Dorothy Kelly Gay, improperly handled or failed to remediate the hazardous environment within the building. The deliberate indifference of city officials and their failure to warn of the hazards, evacuate personnel from the contaminated building and failure to remediate said conditions within 220 Washington Street has caused the occupants of 220 Washington Street, including the named Plaintiffs herein, to be deprived of their civil rights and suffer damages related to their exposure to the environment within 220 Washington Street.

F.  Numerous and continuous complaints regarding the unsafe and unhealthy environment within 220 Washington Street were made to the Massachusetts Department of Occupational Safety who then began an investigation. As part of the investigation an engineering firm named Simpson, Gumpertz & Heger, Inc. was retained to investigate and evaluate the condition of the environment within 220 Washington Street. Although the investigation uncovered the presence of many dangerous toxins as well as raise questions regarding the structural integrity of the building, neither Simpson, Gumpertz & Heger, Inc., nor the Department of Occupational Safety recommended evacuation of the building. The only action that was taken was to instruct, via correspondence, that certain remedies take effect by November 30, 2004.

G.  Defendant Envirotech was retained to conduct a remediation of 220 Washington Street. Although Envirotech may have represented that some service was performed, the problems sited by Simpson, Gumpertz & Heger, Inc. and the Department of Occupational Safety remained at 220 Washington Street. No remedial action took place. In April, 2005, the current mayor, Joseph Curtatone, informed the Department of Occupational Safety that due to financial reasons no further work was to be performed. Mr. Curtatone promised in a letter dated April 19, 2005 that the building would be evacuated by the end of the "fiscal year" which was June 30, 2005. No evacuation has taken place to date.

## II. Parties

1.  Plaintiff, John Aufiero, is a police officer for the City of Somerville.

2.  Plaintiff, Neil F. Collins, is a police officer for the City of Somerville.

3.  Plaintiff, Robyn L. DeFranzo, is a dispatcher with the Somerville Police Department.

4.  Plaintiff, Daniel Hyde, is a police officer for the City of Somerville.

5.  Plaintiff, Patrick J. Irving, is a police officer for the City of Somerville.

3

6.    Plaintiff, Thomas A. Leyne, is a police officer for the City of Somerville.

7.    Plaintiff, John Mahoney, is a police officer for the City of Somerville.

8.    Plaintiff, Joseph E. McCain, is a police officer for the City of Somerville.

9.    Plaintiff, William McCarthy, is a police officer for the City of Somerville.

10.   Plaintiff, Timothy Mitsakis, is a police officer for the City of Somerville.

11.   Plaintiff, Louis M. Remigio, is a police officer for the City of Somerville.

12.   Plaintiff, Susan J. DeSousa, is a dispatcher with the Somerville Police
      Department and parent and next friend of Plaintiff Cameron A. DeSousa, a
      minor.

13.   Plaintiff, Cameron A. DeSousa, is a minor and child of Plaintiff Susan J.
      DeSousa.

14.   Plaintiff, John Doe, as an occupant of 220 Washington Street, Somerville,
      Massachusetts.

15.   Plaintiff, Jane Doe, as an occupant of 220 Washington Street, Somerville,
      Massachusetts.

16.   Defendant, Joseph Curtatone, is the Mayor of the City of Somerville.

17.   Defendant, Donald Caliguri, is the former Chief of Police for the Somerville
      Police Department.

18.   Defendant, George McLean, is the former Chief of Police for the Somerville
      Police Department.

19.   Defendant, Robert Bradley, is the current Chief of Police for the Somerville
      Police Department.

20.   Defendant, Bob Trahan, was at times relevant to this Complaint, the former
      head of the Department of Public Works in the City of Somerville.

21.   Defendant, Mitt Romney is the Governor of the Commonwealth of
      Massachusetts.

22.   Defendant, Joan Langsam, was, at times relevant to this Complaint, the City
      Solicitor for the City of Somerville.

4

23.  Defendant, Paul Zirpolo, was, at times relevant to this Complaint, a City of Somerville-Department of Public Works project manager.

24.  Defendant, Dorothy Kelly Gay, was, at times relevant to this Complaint, the Mayor of the City of Somerville.

25.  Defendant, Robert J. Prezioso, was, at times relevant to this Complaint, the Commissioner of the Division of Occupational Safety in the Commonwealth of Massachusetts.

26.  Defendant, Simpson, Gumpertz & Heger, Inc. is an engineering firm responsible for the investigation and evaluation of 220 Washington Street, Somerville, MA in 1998-1999.

27.  Defendant, Envirotech is a Massachusetts company located at 10 Spring Street, Stoneham, MA, that provided remediation services at 220 Washington Street, Somerville, MA.

28.  Defendant, Vithal Deshpande was at times relevant to this Complaint, the Environmental Protection Engineer for the City of Somerville, MA.

29.  Defendant Angelo R. Buonopane, was at times relevant to this Complaint, the Director of the Department of Labor within the Commonwealth of Massachusetts.

### III. Demand for Trial by Jury

30.  The Plaintiffs demand a TRIAL BY JURY upon each and every count of this Complaint and all triable issues in this Federal Civil Action and hereby give Notice of their Claim for a Trial by Jury in United States District Court pursuant to Federal Rules of Civil Procedure 38 and as declared by the 7th Amendment of the United States Constitution. Plaintiffs further request interest, costs and attorney's fees pursuant to 42 U.S.C. §1983 and the Americans with Disabilities Act.

### IV. Jurisdiction and Venue

31.  This claim is brought in Federal Court as a result of Federal subject matter jurisdiction under 28 U.S.C. § 1331 due to direct violations of the laws of the United States by the Defendants, including, 42 U.S.C. § 1983, deprivation of rights granted by the United States Constitution, Amendment 14 and Article 10 of the Massachusetts Declaration of Rights and violation of the Americans with Disabilities Act.

32.  The Plaintiffs' causes of action against all Defendants arise from the relationship between those in control of the building located at 220

Washington Street, the placement of the Somerville Police and Fire Departments within 220 Washington Street, and the resultant deception by public officials causing the occupants to suffer damages. The named Defendants are responsible, through reckless indifference, acts, or omissions while acting under the color of law.

## V. Background Facts

33. The building located at the street address of 220 Washington Street, Somerville, Massachusetts was originally built in 1927 and used as an MBTA 'car barn'. It has been well known throughout both the Somerville Police and Fire Departments that for years prior to 1986 batteries were split and drained within the building. One such area of concern is Room 107, otherwise known as the "Battery Room". Such action has left unknown amounts of hazardous toxins within the building and surrounding grounds.

34. In 1986 both the Somerville Police and Fire Departments moved into the building. Employees immediately began to complain to their supervisors and city government officials about the indoor air quality at 220 Washington Street. Between 1986 and 1990, many occupants of 220 Washington Street suffered from a scabies outbreak, a microscopic parasitic mite, leading to extended sick-time leave for those infected occupants.

35. Major floods occurred in 1996 and 1999 at 220 Washington Street causing the Somerville Fire Department (located in the basement) to evacuate the building in 1996 and move into a trailer in the parking lot behind 220 Washington Street where they remain to this date.

36. Despite ongoing issues at 220 Washington Street regarding structural integrity, water intrusion, and complaints about the indoor air quality inside of 220 Washington Street, the Somerville Police Department continues to be housed primarily on the first and second floors of 220 Washington Street.

37. Certain police officers, while on patrol in the City of Somerville, have refused to arrest and detain individuals in the holding cells at 220 Washington Street for infractions of the law (which would otherwise prompt an arrest) because when the outside temperature exceeds 85 degrees it is their belief that the such a detention would be inhumane when those detainees are held in the jail facilities at 220 Washington Street. The temperature inside of the holding area has been measured in excess of 100 degrees. It has become the custom and practice to place detainees in the State Police facility at Wellington Circle instead of the 220 Washington Street location.

38. On July 20, 2005, the temperature was measured at 101 degrees/Fahrenheit in the cell block area of 220 Washington Street. There is no ventilation or cooling system in the cell block/booking area of 220 Washington Street.

6

Detainees are held behind plexi-glass and not able to be cooled down through the use of fans. In the past, detainees have had to be removed from their cells and showered in order to cool down their body temperatures. On several occasions paramedics have been called to provide medical assistance to detainees.

39. Employees of both the Somerville Police and Fire Departments have complained of and been diagnosed with adverse health affects related to their exposure to the poor indoor air quality including, but not limited to, reactive airway disease, chronic fatigue, severe headaches, upper respiratory illnesses, bronchitis, asthma, bird-flu disease, Acquired Leukemia, Legionnaires Pneumonia, lung cancer, and sarcoidosis.

## VI. Counts of the Complaint

### COUNT I
### *(Injunctive Relief for all Plaintiffs)*

40. Plaintiffs repeat and re-allege each statement in paragraphs one (1) through thirty-nine (39) above, as fully as if expressly rewritten herein.

41. During the period of time beginning in 1986 through the present time, many individuals including visitors, arrestees, police officers, administration staff, dispatchers, fire department personnel, and other occupants of 220 Washington Street have made complaints about the poor air quality within the building. Occupants of 220 Washington Street have also made many complaints about the infestation of insects and rodents throughout the building. There is a history of several suspected toxins being dumped on-site including but not limited to sulfuric acid, sulfuric acid-lead salt, and sulfur trioxide, as well as, waste oil and diesel fuel. The MBTA, the previous owner of the property, once housed its maintenance operation at the location. In order to dispose of old batteries, the fluid had to be removed before the battery could be thrown away. The procedure was to split the battery in two and let the contents drain into the ground. Said chemicals are considered to be hazardous and present a danger to the occupants of 220 Washington Street (See 105 C.M.R. 110, 670 as promulgated pursuant to M.G.L. c. 111F §2). Whenever 220 Washington Street floods, as it recently did in July 2005, these toxins are disturbed and the smell similar to rotten eggs is very conspicuous. The site has been visited on multiple occasions by the Department of Environmental Protection since 1999.

42. In 1996, there occurred an intrusion of water into 220 Washington Street as great or greater than any other previous flood. The Somerville Fire Department, previously stationed in the lower floor of 220 Washington Street, had to evacuate and move their offices into the back of trailers located behind 220 Washington Street, where they continue to remain today.

43.    In or about August 1998, Simpson, Gumpertz & Heger, Inc., an engineering
       firm, was hired to evaluate the deterioration of 220 Washington Street.
       Testing of the molds found within 220 Washington Street was performed by
       PathCon Laboratories.  The results of the testing showed elevated levels of
       toxic mold including, but not limited to Stachybotrys, Aspergillus, bacteria
       that included the presence of Staphylococcus, and fungi that included the
       presence of Stachybotrys chartarum, and Chaetomium.

44.    No remedial measures were taken to address the toxic mold, bacteria, and/or
       fungi within 220 Washington Street despite various positive reports and test
       results.  If any remediation was attempted, it was ultimately unsuccessful.

45.    The refusal, indifference, and reckless conduct of City and State officials has
       created an experiment on the unknowing occupants of 220 Washington Street
       that provides the opportunity to observe the long-term exposure effects on the
       health of more than forty individuals to various toxins.

46.    Due to the failure to remediate 220 Washington Street, the occupants have
       continued to suffer adverse health affects including, but not limited to
       respiratory difficulties, asthma, upper respiratory disease, wheezing,
       headaches, bird-flu disease, and sarcoidosis.

47.    The influx of complaints led to a surprise inspection by the Massachusetts
       Department of Occupational Safety ("DOS") on September 14th and 21st 2004.
       After the inspection, a report dated October 21, 2004 indicates that the DOS
       ordered the City of Somerville to replace the roof, evaluate the deterioration
       of structural steel, rebar, and brick walls, and correct the severe water
       intrusion problems at 220 Washington Street by November 30, 2004 through.

48.    The DOS report dated October 21, 2004 consisted of a 31-page detailed
       accounting and was addressed to the George McLean, Chief of the Somerville
       Police.  The report also included a section entitled "Recommendations and
       Corrective Action Needed" of which several areas were highlighted in bold to
       indicate "Serious concerns" and were given a correction due date of
       November 30, 2004. Those areas labeled as "Serious concerns" include: a.)
       Structural Integrity of the Building; b.) prevent water from entering the
       building through brick walls; c.) replace and/or temporarily repair the roofing
       material unit the roof can be replaced, to prevent water from entering the
       facility through the roof;  d.)  prevent water from entering the building
       through windows and doorways/sliders; e.) once repairs are made and water
       infiltration to the building is eliminated, replace any water damaged materials;
       f.)  insure that ventilation from the basement area (closed area of fire
       department) does not circulate to other areas of the building; g.) remove all
       "filtration media" from supplies and exhausts throughout the building; h.)
       replace carpeting where it has been water damaged and where it presents a trip

8

hazard. Clean carpeting that is highly soiled; i.) clean Detail Office and seal up wall openings to insure that exhaust from basement garage does not enter the office; j.) restore all exhaust ventilation systems to working order in the building. Increase ventilation in areas where insufficient or not working. (Attached Exhibit "A")

49.    On April 19, 2005, in response to the DOS report attached hereto, Somerville Mayor Joseph Curtatone sent a letter to DOS wherein he indicated that the City of Somerville preferred not to spend its limited financial resources on addressing corrective actions. Mayor Curtatone also assured DOS that all personnel would be evacuated as soon as possible. The target date for evacuating all individuals from 220 Washington Street was set for June 30, 2005. That date has come and gone with no action by the City to move people out of the building or enforcement of the Commonwealth of Massachusetts to enforce evacuation.

50.    To date, there has been no formal remediation and the occupants remain inside of 220 Washington Street continuing their exposure(s) and furthering the adverse affects to their health.

51.    No individual, including the Plaintiffs herein, should be subjected to having to endure the unsanitary and unsafe conditions found within 220 Washington Street and should be removed from the premises until they can be assured that no further risk of injury or damage shall occur at 220 Washington Street.

52.    Should the Plaintiffs be required to remain in 220 Washington Street, the Plaintiffs, as well as other unnamed individual occupants, will continue to suffer irreparable harm to their health, safety and welfare.

53.    Plaintiffs were never made aware of their exposure to the cornucopia of toxins in the police headquarters located at 220 Washington Street until the fall of 2004 when several employees discovered that they were not alone in manifesting symptoms or diagnosed with similar ailments. This discovery was made after discussions took place among employees following the inspections by the Department of Safety in September 2004. Police officers, administrative personnel, and 911 dispatchers soon learned that asthma and other respiratory ailments were a common theme among the forty-plus persons working in the building. The diagnosis of sarcoidosis in three individuals to date is an anomaly. Evidence also suggests that former employees working at the location also suffered various illnesses including cancer.

54.    Plaintiffs working at 220 Washington Street must choose between suffering bodily injury or terminating their employment with the City of Somerville.

55.    Plaintiffs have a high probability of success on the merits as the Defendants

9

have documented (through hired consultants' reports, DEP reports, newspaper accounts, and the medical histories provided by Plaintiffs and/or other occupants) that toxic mold, bacteria and fungi are present within 220 Washington Street and that the occupants were to be evacuated by June 30, 2005 due to the unhealthy and unsafe environment inside of 220 Washington Street. All of the Plaintiffs are seeking medical treatment through their respective physicians. Further, Plaintiffs recognize that if they refuse to work at the 220 Washington Street location, the City of Somerville would be without police protection.

56. The Plaintiffs propose a transfer of their offices and department to the Powder Hill School, or in the alternative, trailers as the City of Somerville has provided for the Somerville Fire Department. Individuals who are arrested and detained can be housed at the State Police facility at Wellington Circle. Police officers, 911 dispatchers and administrative personnel will work with all officials in the City of Somerville to continue to preserve the safety of the residents of the City of Somerville and the Commonwealth of Massachusetts during the transition.

Wherefore, with respect to Count I, Plaintiffs requests as follows:

A. Immediate injunctive relief in the form of evacuation of 220 Washington Street by all individuals currently within 220 Washington Street.

B. Plaintiffs propose the immediate relocation of all operations including dispatching, communications, police administration, and operations of the Somerville Police Department to the Powder Hill School, a building owned by the City of Somerville and currently not in use. Further, anyone arrested and detained should be held at the State Police facility at Wellington Circle in Medford.

C. Plaintiffs propose that the City of Somerville and Commonwealth of Massachusetts pay for complete and conclusive testing of the building located at 220 Washington Street, including all floors, rooms (including Room #107-known as the "Battery Room"), storage space, and the surrounding grounds to determine the amount, extent, and types of hazardous chemicals and toxins to which the occupants of 220 Washington Street have been/may have been exposed.

D. Said test and examination results should be distributed to all current occupants of 220 Washington Street, former occupants of 220 Washington Street, and the families/heirs of individuals who once occupied 220 Washington Street, but are now deceased, so as to provide all persons the information required for present or future diagnosis as required.

E. Entry of an injunction prohibiting any named Defendant or other individual/entity from forcing any individual or Plaintiff to enter 220 Washington Street until such time as the entire building is determined to be safe, structurally sound, and

successfully remediated by a professional remediation company following IICRC 520 guidelines and certified for mold remediation by an independent engineering company to verify the absence of toxic mold, bacteria, fungi, and water intrusion.

**COUNT II**

***(Aufiero, et al. v. City of Somerville, et al.- In Violation of 42 U.S.C. §1983-Substantive Due Process Rights)***

57. Plaintiffs repeat and re-allege each statement in paragraphs one (1) through fifty-six (56) above, as fully as if expressly rewritten herein.

58. The Defendants, City of Somerville, Joseph Curtatone, as the mayor of Somerville, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of the Department of Public Works, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Vithal Deshpande, as Environmental Protection Engineer, and Dorothy Kelly Gay as former Somerville Mayor were aware from approximately 1986 through and including the present date of the unsanitary and potentially dangerous conditions found within 220 Washington Street.

59. The Defendants failed to take any action to ensure the health and safety of the occupants of 220 Washington Street despite possessing constructive and actual knowledge as provided through complaints of the occupants of the building, professional environmental testing conducted by PathCon Laboratories, Inc., by and through Simpson Gumpartz & Heger, Inc., and the Division of Occupational Safety.

60. The Defendants as listed in paragraph fifty-eight were informed of the potential harms associated with pro-longed exposure to the indoor air quality in 220 Washington Street, yet deliberately avoided taking any action to evacuate the occupants of 220 Washington Street.

61. The need to take remedial action and remove/relocate the occupants of 220 Washington Street are necessary and obvious steps to assuring the health and safety of the occupants of 220 Washington Street. The Defendants were informed on numerous occasions of the infestation of insects and rodents, the infestation of toxic mold, fungi, and bacteria, and the likelihood of water intrusion within 220 Washington Street, together with the probable adverse health affects caused by pro-longed exposure to said problems, yet the Defendants failed to take any progressive action to alleviate the occupants of said problems over the course of many years in light of financial excuses.

62. The Defendants maintained a position of deliberate indifference with respect to the health and safety of the occupants of 220 Washington Street despite

knowing the potential dangers posed to the occupants of 220 Washington Street.

63. The Defendants, acting under color of state law, violated the Plaintiffs' Substantive Due Process rights granted through the Constitution of the United States by placing the Plaintiffs in danger, thus enhancing their risk of injury through their negligent action (failing to enforce safety regulations) and inaction (failing to take action in removing the Plaintiffs from 220 Washington Street).

64. The Defendants' violation of the Plaintiffs' Substantive Due Process rights is the direct causal link and proximate cause of the ailments which from the Plaintiffs now suffer.

Wherefore, the Plaintiffs pray that judgment be entered against Defendants, City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public Works, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Vithal Deshpande, as Environmental Protection Engineer, and Dorothy Kelly Gay as former Somerville Mayor, in an amount that will fairly and adequately compensate Plaintiffs for damages suffered as a result of the Defendants' violation of 42 U.S.C. §1983-Substantive Due Process rights and all other damages recoverable together with interest, costs, attorney's fees, and such other relief as this Honorable Court may deem appropriate.

## COUNT III

### (Aufiero, et al. v. Mitt Romney, Robert Prezioso, Angelo R. Buonopane- In Violation of 42 U.S.C. §1983-Substantive Due Process Rights)

65. Plaintiffs repeat and re-allege each statement in paragraphs one (1) through sixty-four (64) above, as fully as if expressly rewritten herein.

66. The Mitt Romney, Robert Prezioso, and Angelo R. Buonopane were aware of the unsanitary and potentially dangerous conditions found within 220 Washington Street.

67. During the period in time beginning in or about 1986 through and including the present date, the Defendants as listed in the preceding paragraph had knowledge as to the unsanitary and potentially dangerous conditions found within 220 Washington Street.

68. Despite possessing the constructive and actual knowledge provided through the complaints of the occupants of the building and the professional environmental testing conducted by PathCon Laboratories, Inc. by and through Simpson Gumpartz & Heger, Inc., the Defendants failed to take any

12

action to ensure the health and safety of the occupants of 220 Washington Street.

69. The Defendants as listed in paragraph sixty-six were informed of the potential harms associated with pro-longed exposure to the indoor air quality in 220 Washington Street, yet deliberately avoided taking any action to evacuate the occupants of 220 Washington Street.

70. Through a 31-page report dated October 21, 2004, the Defendants, acting through the Division of Occupational Safety (DOS), instructed the City of Somerville and the Chief of the Somerville Police Department to correct violations of applicable safety codes.

71. The need to take remedial action and remove/relocate the occupants of 220 Washington Street was and has been a necessary and obvious step to assuring the health and safety of the occupants of 220 Washington Street. The Defendants informed the City of Somerville of the infestation of insects and rodents, the infestation of toxic mold, fungi and bacteria, and the likelihood of water intrusion within 220 Washington Street along with the probable adverse health affects caused by pro-longed exposure to said problems and ordered corrections to be made by November 30, 2004.

72. Pursuant to Massachusetts General Laws Chapter 149 §6, the Defendants identified in paragraph sixty-six are charged with enforcing health standards at all county and municipal workplaces. Despite the responsibilities assigned to the DOS through the Massachusetts General Laws, the DOS failed to take any progressive action to enforce its order of October 21, 2004 or to alleviate the occupants of said problems in 220 Washington Street.

73. The Defendants maintained a position of deliberate indifference with respect to the health and safety of the occupants of 220 Washington Street despite their knowledge of the potential dangers posed to the occupants of 220 Washington Street.

74. The Defendants, acting under color of state law, violated the Plaintiffs' Substantive Due Process rights granted through the Constitution of the United States by placing the Plaintiffs in danger, thus enhancing their risk of injury through their negligent action (failing to enforce safety regulations) and inaction (failing to take action in removing the Plaintiffs from 220 Washington Street).

75. The Defendants violation of the Plaintiffs' Substantive Due Process rights is the direct causal link and proximate cause of the ailments the Plaintiffs now suffer from.

Wherefore, the Plaintiffs pray that judgment be entered against Defendants, Mitt Romney, Robert Prezioso, and Angelo R. Buonopane, in an amount that will fairly and adequately compensate Plaintiffs for damages suffered as a result of the Defendants' violation of 42 U.S.C. §1983-Substantive Due Process rights and all other damages recoverable together with interest, costs, attorney's fees, and such other relief as this Honorable Court may deem appropriate.

## COUNT IV

### *(Aufiero, et al. v. City of Somerville, et al.- Reckless Indifference and Wanton Disregard for Safety of Others)*

76.   Plaintiffs repeat and re-allege each statement in paragraphs one (1) through seventy-five (75) above, as fully as if expressly rewritten herein.

77.   Defendants recklessly and wantonly allowed dangerous and toxic molds and fungi, including but not limited to Stachybotrys and Aspergillus, to infest the building identified by address of 220 Washington Street.

78.   Defendants recklessly and wantonly allowed the Plaintiffs to work in an environment that included the presence of dangerous and toxic molds and fungi, including but not limited to, Stachybotrys and Aspergillus. Defendants also recklessly and wantonly placed Plaintiffs in a building, which was visited and inspected by the Department of Environmental Protection in 1999 and 2003 because of the presence of oil and other hazardous materials, without informing the Plaintiffs of the discovered toxins and hazardous materials.

79.   Defendants knew or should have known that causing the Plaintiffs to endure pro-longed exposures to toxic molds and fungi, among other hazardous materials, would cause Plaintiffs to suffer serious harm.

Wherefore, the Plaintiffs pray that judgment be entered against Defendants in an amount that will fairly and adequately compensate Plaintiffs for damages suffered as a result of the Defendants' reckless indifference and wanton disregard for the safety of others and all other damages recoverable together with interest, costs, attorney's fees, and such other relief as this Honorable Court may deem appropriate.

## COUNT V

### *(Aufiero, et al. v. City of Somerville, et al.-Failure to Provide a Safe Work Place)*

80.   Plaintiffs repeat and re-allege each statement in paragraphs one (1) through seventy-nine (79) above, as fully as if expressly rewritten herein.

81.   The Defendants, City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public

14

Works, Mitt Romney, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Dorothy Kelly Gay as former Somerville Mayor, Robert Prezioso, Vithal Deshpande, as Environmental Protection Engineer, and Angelo R. Buonopane, failed to provide a safe work place for the Plaintiffs.

82.    Plaintiffs' occupations revolve around the premise of providing protection and safety to members of the general public by and for the City of Somerville and the Commonwealth of Massachusetts.

83.    Although the Plaintiffs' primary occupational interest is the safety and welfare of others, the Defendants failed to provide a safe work environment for the Plaintiffs by failing to take any remedial action on 220 Washington Street, failing to transfer the Plaintiffs to another location, and subjecting the Plaintiffs to an environment known to be hazardous and potentially dangerous.

Wherefore, the Plaintiffs pray that judgment be entered against Defendants, City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public Works, Mitt Romney, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Dorothy Kelly Gay as former Somerville Mayor, Robert Prezioso, Vithal Deshpande, as Environmental Protection Engineer, and Angelo R. Buonopane, in an amount that will fairly and adequately compensate Plaintiffs for damages suffered as a result of the Defendants' failure to provide a safe work place and all other damages recoverable together with interest, costs, attorney's fees, and such other relief as this Honorable Court may deem appropriate.

## COUNT VI
### (Aufiero, et al. v. City of Somerville, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief,  Robert Bradley, as Somerville Police Chief - Breach of Contract)

84.    Plaintiffs repeat and re-allege each statement in paragraphs one (1) through eighty-three (83) above, as fully as if expressly rewritten herein.

85.    The Defendants, City of Somerville, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, and Robert Bradley, as Somerville Police Chief, did on or about July 1, 2000, effectuate a contractual agreement between said Defendant City of Somerville and the Somerville Police Superior Officer's Association.

86.    Said contract agreement, and all terms included therein, between the City of Somerville and the Somerville Police Superior Officer's Association was to be effective from July 1, 2000 through June 30, 2004.

15

87.    In Article XIX, Section 4-Enforcement of Safety Rules- of the contract
       agreement states:

>    "Both parties to this Agreement shall co-operate in the enforcement of safety rule
>    and regulations.    Complaints with respect to unsafe or unhealthy working
>    conditions shall be brought to the attention of an employee's superior officer or the
>    Chief of Police and shall be subject of grievance or arbitration hereunder.
>
>    The City and the Association, in concert with the Patrolmen's Association, shall
>    establish a joint safety committee consisting of representatives of each party for
>    the promotion of sound safety practices and rules."
>    -Article XIX, Section 4-Enforcement of Safety Rules
>    (Attached Exhibit "B")

88.    Although Article XIX, Section 4 outlines the procedures and applicable
       remedies available to the parties, no such action was undertaken with respect
       to the unsafe and unhealthy working conditions found at 220 Washington
       Street.

       Wherefore, the Plaintiffs pray that judgment be entered against Defendant City of
Somerville, Defendant Donald Caliguri, as former Somerville Police Chief, Defendant
George McLean, as former Somerville Police Chief, and Defendant Robert Bradley, as
Somerville Police Chief in an amount that will fairly and adequately compensate
Plaintiffs for damages suffered as a result of the Defendants' Breach of Contract together
with all other damages recoverable with interest, costs, attorney's fees, and such other
relief as this Honorable Court may deem appropriate.

## COUNT VII

### *(Aufiero, et al. v. Simpson Gumpertz & Heger, Inc.-Negligent Inspection of Premises and Negligence in Failure to Warn of Known Hazards)*

89.    Plaintiffs repeat and re-allege each statement in paragraphs one (1) through
       eighty-eight (88) above, as fully as if expressly rewritten herein.

90.    Defendant Simpson Gumpertz & Heger, Inc. is an engineering firm
       responsible for the investigation and evaluation of 220 Washington Street,
       Somerville, MA in 1998-1999.

91.    In response to the influx of complaints regarding the unsanitary and unsafe
       environment found within 220 Washington Street, the engineering firm of
       Simpson Gumpertz & Heger, Inc. was contacted to investigate and assess the
       breadth of problems that were complained of at 220 Washington Street.

92.    Although engineers working for Simpson Gumpertz & Heger, Inc. were able
       to pull pieces of concrete off of the walls, they observed through sight and
       smell the growth of mold and fungi, saw evidence of flooding, and heard the
       complaints of the occupants of 220 Washington Street, but failed to

16

acknowledge the extent or seriousness of the situation in that it suggested that an evacuation was not necessary.

93.    The negligence of Simpson Gumpertz & Heger, Inc. in conducting an incomplete and/or deficient inspection of 220 Washington Street, and failing to warn the occupants of the known health hazards within 220 Washington Street in 1998/1999 has caused the occupants of 220 Washington Street, including the named Plaintiffs herein, to suffer continued adverse health affects and further damaged their bodies.

Wherefore, the Plaintiffs pray that judgment be entered against Defendant Simpson Gumpertz & Heger, Inc. in an amount that will fairly and adequately compensate Plaintiffs for damages suffered as a result of the Defendant's Negligent Inspection of the Premises and Negligent Failure to Warn of Known Hazards together with all other damages recoverable with interest, costs, attorney's fees, and such other relief as this Honorable Court may deem appropriate.

## COUNT VIII
### *(Aufiero, et al. v. City of Somerville, et al.- In Nuisance)*

94.    Plaintiffs repeat and re-allege each statement in paragraphs one (1) through ninety-three (93) above, as fully as if expressly rewritten herein.

95.    The Defendants, City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public Works, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Dorothy Kelly Gay as former Somerville Mayor, Mitt Romney, Robert Prezioso, Vithal Deshpande, as Environmental Protection Engineer, and Angelo R. Buonopane were at all times the owners of and/or the parties that maintained control of the building located at an address of 220 Washington Street.

96.    The Defendants identified in paragraph number ninety-five, were aware of the unsanitary and potentially dangerous conditions found within 220 Washington Street from a time period beginning no later than 1996 through and including the present date.

97.    By failing to take any action to alleviate the Plaintiffs from being exposed to the toxins found within 220 Washington Street, the Defendants have allowed the Plaintiffs to be exposed to substances and toxins which have caused and continue to cause adverse health affects to the Plaintiffs.

98.    The deliberate indifference of the Defendants has caused the Plaintiffs to suffer through the conditions found within 220 Washington Street and thus

17

compromised the health and safety of the Plaintiffs and other occupants of 220 Washington Street.

Wherefore, the Plaintiffs pray that judgment be entered against Defendants; City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public Works, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Dorothy Kelly Gay as former Somerville Mayor, Mitt Romney, Robert Prezioso, Vithal Deshpande, as Environmental Protection Engineer, and Angelo R. Buonopane in an amount that will fairly and adequately compensate Plaintiffs for damages suffered as a result of the Defendants' nuisance and all other damages recoverable together with interest, costs, and such other relief as this Honorable Court may deem appropriate.

## COUNT IX

### *(Aufiero, et al. v. City of Somerville, et al.-Violation of Title III of Americans with Disabilities Act)*

99. Plaintiffs repeat and re-allege each statement in paragraphs one (1) through ninety-eight (98) above, as fully as if expressly rewritten herein.

100. The Defendants, City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public Works, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Dorothy Kelly Gay as former Somerville Mayor, Mitt Romney, Robert Prezioso, Vithal Deshpande, as Environmental Protection Engineer, and Angelo R. Buonopane, were at all times the owners of and/or the parties that maintained control of the building located at an address of 220 Washington Street, Somerville, MA.

101. The Americans with Disabilities Act (ADA) is a comprehensive federal civil rights law that prohibits discrimination against people with disabilities in employment and in state and local government. Title III Regulation 28 CFR Part/Section 36 addresses Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities.

102. Since the early 1990s, the Defendants have been made aware of the health problems suffered by occupants of 220 Washington Street through formal and informal complaints. Many of the occupants of 220 Washington Street have developed respiratory impairment, multiple chemical sensitivity, environmental illness, and/or hypersensitivity to the allergens and toxins found within the building.

18

103. The more they are exposed, individuals who become hypersensitive to allergens and/or toxins develop symptoms related to their exposure on an increasingly severe level.

104. Although the Defendants were aware of the elevated levels of toxins within the building and the health ailments of the occupants of 220 Washington Street, the Defendants failed to take any remedial action.

105. The Defendants failure to remediate and/or relocate the occupants of 220 Washington Street, including the Plaintiffs herein, has caused the Plaintiffs additional exposure and further exacerbation of their current health status.

106. Pursuant to Sec.36.201 of Title III of the ADA: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation."

107. The Defendants failure to make the appropriate job accommodations or adjustments to the work environment for those individuals who have suffered multiple chemical sensitivity, environmental illness, and hypersensitivity to the allergens and toxins within 220 Washington Street represents a violation of the Americans with Disabilities Act.

108. As a result of the Defendants' violation of the Americans with Disabilities Act, Plaintiffs have suffered damages.

Wherefore, the Plaintiffs pray that judgment be entered against Defendants, City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public Works, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Dorothy Kelly Gay as former Somerville Mayor, Mitt Romney, Robert Prezioso, Vithal Deshpande, as Environmental Protection Engineer, and Angelo R. Buonopane in an amount that will fairly and adequately compensate Plaintiffs for damages suffered as a result of the Defendants' violation of the Americans with Disabilities Act and all other damages recoverable together with interest, costs, and such other relief as this Honorable Court may deem appropriate.

## COUNT X

### *(Aufiero, et al. v. City of Somerville, et al.-Reckless Infliction of Emotional Distress)*

109. Plaintiffs repeat and re-allege each statement in paragraphs one (1) through one hundred-eight (108) above, as fully as if expressly rewritten herein.

19

110. Defendants, City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public Works, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Dorothy Kelly Gay as former Somerville Mayor, Mitt Romney, Robert Prezioso, Vithal Deshpande, as Environmental Protection Engineer, and Angelo R. Buonopane, knew or should have known, that the unsanitary and unhealthy environment within 220 Washington Street posed a serious risk to the safety and welfare of its occupants including the named Plaintiffs herein.

111. Despite receiving numerous complaints, detailed reports of investigations, and environmental tests, the Defendants continually failed to remedy the hazards at 220 Washington Street despite years of cumulative, convincing evidence of contamination in the building.

112. Defendants knew or should have known that subjecting the Plaintiffs to the conditions found within 220 Washington Street would severely compromise the health and welfare of the Plaintiffs.

113. Defendants knew or should have known that the Plaintiffs would suffer from severe emotional distress as a result of the Plaintiffs' acute illnesses, diagnosed diseases and conditions, and resultant need for hospitalizations.

114. Defendants' behavior in failing to remediate the air quality problems within 220 Washington Street, the continuous cover-up, and the denial of the existence of serious problems within the building, despite years of notice and complaints, was and is extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

115. Defendants' actions are the actual and proximate cause of the harm caused to the Plaintiffs, both physically and emotionally. As a result of the Defendants' reckless actions/inactions, the Plaintiffs suffered severe emotional distress.

Wherefore, the Plaintiffs pray that judgment be entered against Defendants; City of Somerville, Joseph Curtatone, as Somerville Mayor, Donald Caliguri, as former Somerville Police Chief, George McLean, as former Somerville Police Chief, Robert Bradley, as Somerville Police Chief, Robert Trahan, Individually and as former Head of Department of Public Works, Joan Langsam, as former City Solicitor, Paul Zirpolo, as DPW Project Manager, Dorothy Kelly Gay as former Somerville Mayor, Mitt Romney, Robert Prezioso, Vithal Deshpande, as Environmental Protection Engineer, and Angelo R. Buonopane, in an amount that will fairly and adequately compensate Plaintiffs for damages suffered as a result of the Defendants' reckless infliction of emotional distress and all other damages recoverable together with interest, costs, and such other relief as this Honorable Court may deem appropriate.

## VII. Verification

We, John Aufiero, Neil F. Collins, Robyn L. DeFranzo, Daniel Hyde, Patrick J. Irving, Thomas A. Leyne, John Mahoney, Joseph E. McCain, William McCarthy, Timothy Mitsakis, Louis M. Remigio, Susan J. DeSousa, Individually and as Next Friend of Cameron A. DeSousa, hereby depose and state individually as follows:

1. I am an employee of the City of Somerville and am employed with the Somerville Police Department.

2. I have been and/or am an occupant of the building located at 220 Washington Street.

3. I have read the Verified Complaint filed herein and, knowing the contents thereof, have found that the allegations of fact set forth therein are based on my own personal knowledge and are true, except as to those allegations based on information and belief which I believe to be true.

Signed under the penalties of perjury on this ___22___ day of July, 2005.

John Aufiero

Neil F. Collins

Robyn L. DeFranzo

Daniel Hyde

Patrick J. Irving

Thomas A. Leyne

John Mahoney

Joseph E. McCain

William McCarthy

Timothy Mitsakis

Louis M. Remigio

Susan J. DeSousa

Date: July 20, 2005

Respectfully submitted,
Plaintiffs as named above,
By their attorney,

17

Stephen L. D'Angelo, Esq.
BBO#: 640900
D'Angelo & Hashem, LLC
6 Beacon Street, Suite 505
Boston, MA 02108
(617) 624-9777

# EXHIBIT A

THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF LABOR AND WORKFORCE DEVELOPMENT

# DIVISION OF OCCUPATIONAL SAFETY

OCCUPATIONAL HYGIENE / INDOOR AIR QUALITY PROGRAM

www.mass.gov/dos/iaq

MITT ROMNEY
Governor
KERRY HEALEY
Lieutenant Governor
JANE C. EDMONDS
Director, DWD
ANGELO R. BUONOPANE
Director, DOL

ROBERT J. PREZIOSO
Commissioner

October 21, 2004

File 05S0068

Chief George McLean
Somerville Police Department
220 Washington St.
Somerville, MA 02143

Dear Chief,

## Introduction

On September 14th and 21st the Somerville Police Department was visited as a result of a call received by our office alleging poor indoor air quality and various adverse health effects as the result of being in the building. A number of individuals accompanied DOS representatives at various points during the visit. These included Vithal Deshpande, Environmental Coordinator, Al Bargoot, Building Inspector, Frank Santangelo, Superintendent of Buildings and Grounds, Joan McKenna, Union Rep, Lt Mike Devereaux, Somerville Police Dept, and a Honeywell Representative. A number of other individuals also joined the tour at different times.

Pursuant to Chapter 149 section 6 of the Massachusetts General Laws the Division of Occupational Safety (DOS) is charged with enforcing health standards at all county and municipal workplaces. It is the policy of our office to reference State and other applicable governmental and industry health and safety regulations and guidelines where appropriate in order to ensure that workers are protected. The purpose of this inspection was to identify factors that potentially contribute to complaints of poor indoor air quality.

The portion of this report entitled "Recommendations and Corrective Action Needed" lists items which you should address as soon as possible in order to ensure that employees are protected. **Items listed in boldface have the greatest potential for**

causing harm to employees. You must take the corrective action recommended in this report in connection with each boldfaced item. Corrective action dates are given only for these boldfaced items. A corrective action date is the date by which you must a take the corrective action recommended in this report.

All reports made by you to DOS with respect to the boldfaced items must be made on the attached **Corrective Action Response Form** by the response dates given. **Failure to (a) take corrective action on the boldfaced items by their respective corrective action dates and file a corrective action response form by the response date stating the same, or (b) file a corrective action response form by the response date explaining why you cannot take such corrective action by such dates, and how and when you will take such action in the future, may result in penalties pursuant to Mass. Gen. L. ch. 149, section 6.**

Although the boldfaced items pose the most immediate threat to your employees' health and safety, DOS strongly recommends that you take the corrective action recommended by DOS with respect to all other items identified in this report as well.

### Background Information/Building Complaints

There have been a number of indoor air quality complaints at the 220 Washington St. building. Our office has visited this building several times, starting as early as 1986, just a year after it was renovated. Several "band-aid" solutions have been tried over the years, however, it is apparent that this building has not been comprehensively managed and has rapidly deteriorated as a result.

The original building was built in 1927 as an MBTA "car barn". In 1985, the entire structure was gutted and the Public Safety complex was designed around the existing external structural elements. As early as 1986, employees were complaining of indoor air quality issues. Then, in 1996 a major flash flood went through the basement of the building causing the Fire Department (located in the basement) to ultimately decide to permanently evacuate the building. To this date, the fire department is located in a trailer in the parking lot of the 220 Washington St. site.

The Police Department, which is primarily located on the first and second floors of this building, remained in the building after the flood. The Police have continued to complain about air quality issues including severe water infiltration since that time.

The building has a number of structural issues that relate to safety of occupants in the building. Ultimately, it is important that a determination is made that the building is structurally safe to occupy. Many structural issues also relate to the health of individuals within the building. For example, the water infiltration into the building that is a result of some of the structural deficiencies is adversely affecting indoor air quality in the building. Details of findings and recommendations follow.

### General Information on Indoor Air Quality Complaints

Air quality problems can exist without the existence of "toxic" levels of pollutants. The most frequent cause of so-called "bad air" complaints involves the buildup of low level contaminants from sources such as furniture, rugs, and office machines. Energy efficient buildings often do not supply enough fresh air to dilute low level contaminants adequately. In addition, ventilation systems are often not maintained and fail to provide the same level of ventilation as they were originally designed to provide. The National Institute of Occupational Safety and Health (NIOSH) estimates that 52% of indoor air quality complaints are due to the lack of adequate ventilation.

Symptoms often associated with poor indoor air quality include headaches, lack of concentration, dizziness, nausea, eye and throat irritation, excessive fatigue, and general malaise. Reactions can vary due to differences in individual susceptibilities.

There are no governmental standards related to indoor air quality with the exception of the building code ventilation standards that were in effect at the time the building was built. There are many guidelines for what are considered to be acceptable levels of contaminants in office environments. These guidelines are used as a comparison to the levels found in this survey. Please note that achieving these target levels does not necessarily guarantee that all occupants will be free of adverse health effects. There are some contaminants that are difficult to measure at low levels. There may be sensitive individuals who are adversely affected at levels lower than those that affect the general public. Sufficient dilution ventilation can minimize the impact of these low-level contaminants.

OSHA is the regulatory agency charged with the protection of workers in private industry. OSHA has established "exposure limits" for many chemicals, however the levels were established with industrial settings in mind, rather than office settings. As is typical with indoor air quality investigations, none of the substances tested revealed levels that were above the OSHA Permissible Exposure Limits (PELs). Due to differences between industrial and office settings, indoor air quality problems may exist at levels that are well below OSHA PELs.

## Indoor Air Quality Findings

The following parameters were assessed in an effort to determine the source of the alleged poor indoor air quality. These parameters are the most common indicators of indoor air quality problems.

1. Carbon Dioxide
2. Carbon Monoxide
3. Temperature and Relative Humidity
4. VOCs
5. Ventilation
6. Housekeeping
7. Ultrafine Particulates
8. Water Damage

A summary of each of the parameters evaluated follows. Recommended corrective action items to address any deficiencies noted are given at the end of the report. All sample results are located in the appendix of this report.

### Carbon Dioxide

People give off Carbon Dioxide when they exhale. If the ventilation system is adequate, then some of this carbon dioxide will be removed and the rest will be diluted with fresh air. In occupied spaces carbon dioxide given off by exhalation can tend to build up over time if there is not enough fresh air to dilute it. If carbon dioxide levels are elevated then one can reason that low levels of other contaminants generated by other sources such as copy machines, smoking, cleaning chemicals and building materials may also accumulate due to inadequate dilution. As mentioned previously, it is the buildup of these other low-level contaminants that frequently cause complaints of poor indoor air quality.

The reason for measuring carbon dioxide in indoor air quality investigations is not to assess the health effects from carbon dioxide but simply to assess the adequacy of the ventilation system. Carbon dioxide gas is not considered to be hazardous at levels below 5000 parts per million. However, levels above 800 parts per million makes the ventilation system suspect in terms of the amount of dilution ventilation supplied to the area.

Somerville Police Department
Page 5 of 32

Assuming normal occupancy in an area, carbon dioxide measurements of

| Less than 800 PPM | 800-1000 PPM | Over 1000 PPM |
|---|---|---|
| Considered to indicate adequate ventilation | Marginal ventilation | ASHRAE * considered to indicate inadequate outside air |

*American Society of Heating Refrigeration and Air Conditioning Engineers-ASHRAE 62-1989

### Findings

Levels of carbon dioxide measured on the day of the visit ranged from 486-700 parts per million. This indicates an adequate supply of fresh air on the day of the visit. Measured levels are given in Appendix A of this report.

### Carbon Monoxide

Carbon Monoxide is a colorless, odorless gas that is given off by incomplete combustion. Cigarette smoke, furnaces and gasoline engine exhaust are common sources of carbon monoxide.

The OSHA Permissible Exposure Limit for carbon monoxide is 50 PPM as an average for an 8-hour day. However, if levels are more than 3 parts per million above ambient outdoor levels this indicate that there is a source of carbon monoxide. The Environmental Protection Agency recommends a limit of 9 parts per million when averaged over an 8 hour day in order to prevent adverse health effects for those at risk of carbon monoxide exposure (such as those with heart disease).

### Findings

Carbon monoxide levels on the day of the testing ranged from 0-1 parts per million. This is essentially background levels of carbon monoxide in city air and indicates no significant source of carbon monoxide on the day of the visit.

### Temperature and Relative Humidity

Temperature and humidity can have a significant impact on perceived air quality. Research has indicated that the perceived air quality is worse when temperatures exceed 76°F. Large variations in the uniformity in temperatures can affect the comfort

of employees. Rarely, however, are temperatures the cause of significant health problems for employees in office settings.

Humidity levels can also have an impact on employee comfort. Low humidity levels such as occur in winter months can lead to dry irritated nose, eyes and respiratory system. In general, relative humidity levels should be maintained between 30-60%. However, low humidity levels minimize the potential for growth of mold and mildew. Our office generally does not recommend introducing humidity into an office environment due to the potential for poor maintenance of humidifiers and the resultant potential for biological growth. Instead, it is best to lower temperatures in the office environment to the lower end of the recommended temperature range, which will result in a higher relative humidity.

The following is taken from the ASHRAE Standard 55-1992 Thermal Environmental Conditions for Human Occupancy. Note that this standard is considered to be a guideline for the comfort of employees who are in typical summer and winter clothing and are performing at light, mainly sedentary activities. These temperature and humidity levels are considered to be comfortable for about 80% of the population.

| Relative Humidity | Winter Temperature | Summer Temperature |
|---|---|---|
| 30% | 68.5°F-75.5°F | 74.0°F-80.0°F |
| 40% | 68.0°F-75.0°F | 73.5°F-80.0°F |
| 50% | 68.0°F-74.5°F | 73.0°F-79.0°F |
| 60% | 67.5°F-74.0°F | 73.0°F-78.5°F |

### Findings

One of the problems occupants report with this building is temperature control. Unfortunately, the temperature is controlled at the DPW and building occupants can not modify temperatures on site. At one time thermostats had been installed in the building. However, they were connected to the ventilation system so that the ventilation would go off completely depending on the temperature. In an effort to insure that fresh air would always circulate, the thermostats were disconnected according to the DPW. At the current time, they remain disconnected.

Temperature and Humidity Levels on the day of the visit ranged between 70-76 degrees and 36-42% humidity. This indicates comfortable temperatures and humidities for most people. Please note that a wide range in temperatures within one workspace is not ideal and may result in occupant perception of being hot or cold. It is best to

keep temperatures as uniform as possible in order to maximize employee comfort. Measured temperature and humidity levels are given in Appendix A of this report.

## Volatile Organic Compounds (VOCs)

Furnishings, carpeting, fabrics, particleboard, paints and adhesives, may give off volatile organic compounds. Levels are usually highest when materials are first installed and tend to diminish over time. Off gassing may.be increased under higher temperatures and humidity. In addition, volatile organic compounds are often found in building cleaning products and may also be given off by the growth of biological materials such as mold.

It is the policy of our office to screen for the presence of gross VOC contamination during most routine indoor air quality investigations. Levels above 1 part per million indicate the presence of a source of VOCs which should be further investigated. Note that OSHA allowable exposure limits for most volatile organic compounds are higher than 1 part per million.

### Findings

No significant levels of common organic compounds were found on the samples collected on the day of the visit. There were detectable levels of fuel oil as would be expected in the boiler room since the boilers had just been cleaned and were open for inspection. Samples were collected by drawing 0.2 liters of air per minute on activated charcoal tubes and were analyzed at the Division of Occupational Safety Laboratory; an AIHA accredited laboratory located in our office. Sample results are given in Appendix B of this report.

### Ventilation

Ventilation can be accomplished by either natural or mechanical means. Natural ventilation is accomplished by opening windows and doors to allow fresh air to circulate within a building. Mechanical ventilation requires the installation of fans and ductwork or plenums to mechanically draw air in and out of a room and evenly distribute air throughout the work area. Mechanical ventilation is usually the preferred method of ventilating workspaces since it is more consistent and can provide a more uniform, predictable amount of fresh air, independent of the weather conditions.

The only requirement related to ventilation in a building is that the ventilation (either natural or mechanical) be in compliance with the building code that was enforced at the

time the building was built or was significantly altered by renovation. Therefore, a building built or renovated in 1976 would have to meet the requirements of the building code for that year, and does not have to meet the code that currently is enforced. There are some exceptions to this requirement. The most recent changes to the Mass. Building Code allows a building official to order changes to ventilation in buildings built prior to 1975 if the official feels there is a health or safety concern for the building occupants.

Existing mechanical ventilation in a building may become substandard for several reasons. The building may have been built under old building codes that do not meet current recommendations. In some buildings, the building design or occupancy has changed from the original design, and the ventilation system was not modified in accordance with the new design or building use. Partitions and walls are often installed without considering how they may affect the airflow from the ventilation system. In many cases, the ventilation system may be inadequate simply because it has not been maintained in accordance with the HVAC manufacturers recommendations.

There are various parameters that can be reviewed in an attempt to determine the adequacy of mechanical ventilation systems. As a result of doing hundreds of indoor air quality investigations, our office provides the following recommendations. In general, our office has found that if a building meets these minimums, then indoor air quality problems are minimized. However, there are many buildings which may not meet these recommendations and where indoor air quality problems do not appear to exist. These recommendations are given for guidance only and are not necessarily required by building codes.

| Parameter | Recommendation | Reference | Findings at your facility |
|---|---|---|---|
| % Outside Air to system | Minimum of 15% 25% Preferred | Occupational Hygiene Program | 25% as a minimum according to Honeywell Rep |
| Total CFM Fresh outside air per occupant | Minimum of 20 Minimum of 35 if smoking allowed | Occupational Hygiene Program | Not known-However, if 25% fresh air, then sufficient fresh air on second floor offices-Insufficient in other areas such as detail office, locker rooms, bathrooms |
| Air changes per hour | Minimum of 6 10 Preferred | Occupational Hygiene Program | See Appendix A-Based on representative measurements, range is from 1.4-4.5 air changes/hour in 2nd floor offices |
| Location of Air Intakes | Minimum of 10 feet away from contaminant sources | 1993 BOCA Code | Side of building-away from contaminant sources |
| Type of Filters Used in Ventilation System | 25-30% efficient 60% preferred | ASHRAE 62-1989R | PM-40 Airex filters-said to be 28% efficient at 10 microns according to Airex |
| # Filter Changes per year | Inspected 2 x year Replaced as needed | Occupational Hygiene Program | Quarterly-no feathers or unusual findings with filters according to Honeywell representative |
| Inspection/ Maintenance of Ventilation system Operation | Twice a year or In accordance with manufacturer recommendations | Occupational Hygiene Program | As Needed |

## Findings

According to the Facilities Department and Honeywell, there are seven air-handling units for this building. To the best of our understanding these serve the following areas:

1. Unit 1-handles foyer area and some areas in fire dept (unsure if also handles trg room and gym.

2. Unit 2-Only unit with AC. Handles center of building except for 911 area. Includes Detectives and Captains offices

3. Unit 3-Handles both cell block and basement areas as well as property room, domestic violence area, civil defense and possibly the auxiliary side of the fire dept area

4. Unit 4-Handles Offices upstairs

5. Unit 5-Currently off. Handled Firing range, which is no longer used.

6. Unit 6-Handles garage area. Note-if door is open this unit does not run.

7. Unit 7-Dedicated to 911 area

Ventilation was measured in areas where there were discrete offices and where the supplies and exhausts were accessible. Air changes per hour in the areas where they could be calculated were marginal. *Most exhausts throughout the facility, whether bathroom or general returns were not functioning or were marginally functioning.* Note that our office noted the absence of functioning exhausts as early as 2001. A response from the city indicated that the exhausts were fixed at that time, however the same condition existed on our return visit in September 2004.

## Housekeeping

Poor housekeeping practices can adversely affect indoor air quality. Carpets and furnishings that are not cleaned on a routine basis can be the source of dusts and other allergens, such as dust mites, which can affect some individuals. In office or school environments, tile or other impervious floor material is preferred due to ease of cleaning. Carpeting which is installed should be vacuumed each day using a high efficiency vacuum. Steam cleaning should be done on the carpets once or twice a year as needed.

05S0069ase 1:05-cv-11575-WGY    Document 1-2    Filed 07/27/2005    Page 12 of 37

In addition, the chemicals used for housekeeping purposes may lead to symptoms in some individuals. Chemical cleaners should be kept to a minimum. The Material Safety Data Sheets (MSDSs) for all cleaning products should be reviewed prior to purchase and use to insure that they will be used properly and do not contain particularly harmful chemicals. Damp mopping and dusting with a light water spray eliminates the source of chemicals and will also minimize airborne dust. Preferably, all housekeeping activities should take place as soon as possible after normal working hours to allow any contaminants or dust generated during cleaning activities to dissipate or settle before re-occupancy. The ventilation system should be fully operational during all cleaning activities.

## Findings

This entire facility is maintained by a single full time employee who everyone agrees is doing his best with his limited resources. Rugs in many of the areas are worn past their normal life and there are areas where rugs are torn and present a trip hazard. In some areas, such as the Traffic Bureau, the rugs are extremely soiled and are in need of a cleaning. In other areas, such as the report writing rooms, carpet has been water damaged and needs to be replaced.

The Detail office, located above the Fire Dept garage, was visibly much dirtier than other offices in the building. It appears that there is a significant amount of particulate matter deposited on all surfaces throughout the office. This is most likely due to the diesel particulate that was entering the office from the garage. A large soot stain was visible at the wall outlet, indicating that this could be a source of the particulate.

The Fire Department recently installed a Plymovent tailpipe exhaust system that should decrease the amount of residual particulate entering the office. When asked if there has been any change in odors since the tailpipe exhaust system was installed, the employees in the Detail office did note that it does seem to have been better lately. This room needs a full cleaning to restore it to a baseline condition of cleanliness.

## Ultra-fine Particle Monitoring

Ultra-fine particles (UFPs) are defined as airborne particles having a diameter of 0.1 micron or smaller and are therefore too small to be seen. Cooking, smoking, diesel engines and many other combustion and chemical reactions produce significant levels of ultra-fine particles.

Until recently, few studies had been done on the potentially adverse health effects of ultra-fines. Preliminary studies indicate that UFPs may have adverse health effects ranging from respiratory to cardiac effects. Ultra-fine particles are not removed from the

Somerville Police Department
Page 12 of 32

lungs at the same rate or degree of efficiency as larger particles. To date however, no definite causal link between UFPs and detrimental health effects has been established.

When there is a significant difference found in the amount of UFP in a complaint area versus an adjacent non-complaint area (i.e. ten or hundred times higher), then a source of ultra-fines is suspected and attempts are made to trace the source using the instrument. The instrument may help identify and verify migration pathways as well. Again, since there are no health or exposure standards for UFPs, the numbers recorded are only used to track potential sources rather than to indicate that there is a hazard. Anecdotal evidence indicates that in some cases the elimination of ultrafine particulate sources has led to the elimination of indoor air quality complaints.

## Findings

A TSI Model Number 8525 P-Trak instrument was used to check ultra-fine particulate (UFP) concentrations in the facility. The results indicate that there does not appear to be any major source of ultrafines within the building and that the ventilation system filtration is reducing levels of ultrafines in the outdoor air by at least 50%. Results are recorded in the table.

### P-Trak Measurements

| Location | Particles per Cubic Centimeter |
|---|---|
| Background (Outside or Ambient) | 42,000-52,000 |
| Lt Devereaux's Office | 35,000 |
| Administration Area | 17,300 |
| Chief's Office | 13,700 |
| 2nd Floor Hallway by Lunchroom | 10,900 |
| 1st Floor Foyer (Doors open) | 21,900 |
| Academy | 12,000 |
| "Bubble" | 6600 |
| Commander's Office | 10,300 |

| Dispatch 911 | 9890 |
| --- | --- |
| Traffic Office | 4860 |
| Detective's Area | 7950 |
| Men's Locker Room | 15,600 |
| Detail Office | 19,000 |
| Ladies Locker Room | 14,900 |
| Basement-Foyer/Hall | 16,000 |

\* Rounded to the nearest hundred-10 second average

## Water Damaged Materials

Any water damage can lead to microbial growth. All sources of water damage and
leaks should be repaired as soon as possible. Health problems associated with
microbial contamination include headaches, eye and skin irritation, asthma and other
respiratory symptoms. Hypersensitivity reactions can occur in some individuals, even
at low levels of exposure. Non- porous water damaged surfaces may be able to be
cleaned, dried and disinfected. However, porous materials such as ceiling tiles, carpets
and wall coverings cannot be easily decontaminated and should be removed and
replaced.

*Note-A recently released Institute of Medicine (IOM) report noted that the presence of
moisture in a building not only promotes mold growth, but also favors dust mite
proliferation, bacterial growth, cockroach and rodent infestation and chemical emissions
from leeching or breakdown of building materials and furnishings. The study found
sufficient evidence of an association between coughs, wheeze, upper respiratory tract
symptoms and asthma in sensitized persons and damp indoor environments. (See
www.nap.edu  Damp Indoor Spaces and Health  May 25, 2004)*

## Findings

Structural issues aside, the most readily apparent concern at the Somerville Public
Safety Building is the severe water infiltration into the building. Water is entering the
building through the walls, windows, sliding doors, and roof. This water damage has
been ongoing for years. During rainstorms, there are areas in the building where water

is said to actually "pour" in to the facility . Along the Merien Street side of the building, the water damage and visible mold is so severe that rooms are often no longer usable (i.e.-room 107). Efflorescence, evidence of continued water damage, is readily visible throughout the facility. Wall materials in many areas are deteriorated. For example, plaster is degraded and delaminated in many areas such as the academy room, gym and patrolman's locker room. Sliders and windows in most areas of the building leak. Water damage is so severe in some areas such as Lt. Devereaux's office that the moisture meter actually penetrated into the wall cavity when the pins were held against the wall for testing. The integrity and presence of flashing and caulking of most windows and sliders is questionable.

As mentioned earlier in the report, the fire department in the basement had been severely flooded. The area has been closed for several years. Visible mold was found in a number of areas, including behind a wall cavity in the Fire office.


### Recommendations/Corrective Action Needed


The following are items that should be addressed as soon as possible in order to insure that employees are protected. **Serious concerns are given a correction due date and are put in bold print.** Other items should also be addressed in order to eliminate indoor air quality concerns. A corrective action form is attached.

**Item No. 1   Insure Structural Integrity of the Building**

**Corrective Action Needed: A report done by BETA Engineering in October 1999 indicated a number of structural deficiencies in the Public Safety Building. These included concerns about the possible deterioration of structural steel, spalling with exposed deteriorated rebar, deterioration of brick facing, map cracking of first floor slab, significant cracking in steel stairway treads on Northeast stairways, and deterioration of walls supporting the parking deck amongst other concerns. It is likely that additional deterioration has now taken place over the last 5 years. A full review of the recommendations made in this report must be conducted. A response on the status of any corrective actions taken or to be taken must be provided to this office. It is recommended that you confer with the Building Inspector about any structural issues.**

Corrective Action Date: November 30, 2004

Item No. 2 Prevent water from entering the building through brick walls.

Corrective Action Needed: Water continues to enter the building, causing severe water damage and mold growth. This infiltration occurs on all sides of the building, but especially on the Marien Street side of the building. Allegedly, after the last DOS report in 2001, there was some waterproofing done to the exterior of the building, however, there are no records existing to show what has been done, nor is there visible evidence of any waterproofing "coating" on the exterior of the building. Observation of the exterior condition of the brick walls revealed that waterproofing alone is unlikely to be able to solve this problem. The mortar from the bricks, and around window casings is in poor condition. A review of the ability to repoint the bricks and seal the window casings must be done.

There is an additional problem that prevents water from entering the building through the brick, even if repointing of the bricks takes place. Based on an observation of an exposed wall opening in the basement, it appears that the building brick facing may be directly in contact with the building insulation and interior walls. According to experts in the building field, drainage planes/airspaces should be part of all building construction. This is to allow proper drainage of rain and condensation. It appears that the building may have been built without consideration of spacing between the exterior and interior wall building materials. Several good reference articles on drainage planes and air spaces in building construction can be found at the following website: http://www.buildingscience.com/resources/resources.htm

In addition, a sheet of plastic was observed in the wall. It was not clear if this material was used throughout the building. In general, vapor permeable wraps, which allow moisture to move through it, are preferred. This plastic sheeting would prevent the building from "breathing" and may create condensation problems regardless of whether or not the bricks are repointed and/or sealed.

In light of these concerns, consult with a specialist in the area of building construction to see if repointing the bricks would solve the problem of water infiltration or if, due to the construction of the building, water infiltration would occur regardless. Develop a plan to prevent water infiltration into the building through the brick walls.

Corrective Action Date: Update this office on findings by November 30, 2004

Item No. 3 Replace and/or temporarily repair the roofing material until the roof can be replaced, to prevent water from entering the facility through the roof.

Corrective Action Needed: According to the BETA engineering report done in 1999, and based on visual observations on the day of the visit, the roof has exceeded its useful service life and needs to be replaced. Water is entering the building at various points through the roof, especially in areas like the main foyer traffic bureau, Superior Officers locker room, gym, women's locker room Commanding Officer's office and Captain's office. The facilities response to this has simply been to replace the water damaged materials, without fixing the SOURCE of the leaks. There are areas where the roof slopes downward (above-above the Gym and Captains office) and water likely pools under rainy conditions. Water should be diverted from these low points to prevent the major water leaks that are said to regularly occur during rainstorms.

Corrective Action Date: Update this office on findings by November 30, 2004

Item No. 4 Prevent water from entering the building through windows and doorways/sliders

Corrective Action Needed: Review the installation and integrity of caulking and flashing at all windows and sliders throughout the facility. Repair and/or replace materials as necessary in order to prevent water infiltration. Note that in some areas, there was moss growing in the windowsills.

Corrective Action Date: Update this office on progress by November 30, 2004

Item No. 5 Once repairs are made and water infiltration to the building is eliminated, replace any water damaged materials

Corrective Action Needed: Replace water damaged ceiling tiles, wall materials, underlying insulation, window casings, carpeting and any other water damaged materials once the sources of water infiltration for each is eliminated.

Standard Referenced: Ma DOS Bulletin 393" Mold and Indoor Air Quality"

Corrective Action Date: Update this office on progress by November 30, 2004

Item No. 6 Insure that ventilation from the basement area (closed area of fire department) does not circulate to other areas of the building.

Corrective Action Needed: According to Honeywell and the facilities department, HVAC units 1 and 3 serve parts of the fire department in the basement that have been closed due to previous flooding, water damage, mold growth. A brief walkthrough of this area was made on the first day of the visit and the ventilation system appeared to be working, however, at that time we had no information about this system and how it may have connected to the rest of the building HVAC. On the return visit, we learned of the connection between the ventilation in the police and fire department, however we could not access this area since the Fire Chief was unavailable and he was the only one with keys. Vithal Deshpande, Environmental Coordinator for the City later called this office and indicated that when he accessed this area, the exhausts in the basement fire department were operational.

Assuming the system does not exhaust 100% of the air and the system in the basement is turned on, then one can assume that the air in the basement is being circulated into other areas of the building. Given the severe flooding and water damage and mold that occurred in the basement, there should not be any circulation of air from this area into other areas of the building.

Corrective Action Date: Update this office on progress by November 30, 2004

Item No. 7 Remove all "filtration media" from supplies and exhausts throughout the building.

Corrective Action Needed: As noted in the DOS report from 2001, and as noted on the day of the visit, filtration media placed on exhausts (and several supplies) throughout the facility should be removed. There is no reason to be filtering air *leaving* the office space and entering the ventilation system and if additional filtration is needed, it should be done at the main HVAC intake NOT at the supply grilles. In addition to essentially serving no purpose, when installed, these filters were shown to slightly lower the air volume entering or leaving the office space. The City of Somerville had a contract with an environmental service to install and replace these filters. No one was sure why these filters had been placed on the supplies or exhausts.

Corrective Action Date-NOTE-According to an email received on September 27, 2004 from Vithal Deshpande, Environmental Coordinator, the services for replacing these filters has been stopped.

Item No. 8  Replace carpeting where it has been water damaged and where it presents a trip hazard. Clean carpeting that is highly soiled.

Corrective Action Needed: Carpeting in the Detective's Bureau is ripped and buckled and presents a trip hazard. Carpeting in the Traffic Bureau and the report writing rooms has been water damaged and is extremely dirty. Since all rooms were not accessed on the day of the visit, a full assessment of the condition of carpeting should be done and appropriate steps taken to either replace or clean the carpets throughout the facility.

Standard Referenced: Ma DOS Bulletin 396 "Allergies, Asthma and Building Housekeeping"

Corrective Action Date: Respond as to action to be taken by November 30, 2004

Item No. 9   Clean Detail Office and seal up wall openings to insure that exhaust from basement garage does not enter the office.

Corrective Action Needed: Fully wet clean and/or HEPA vacuum the office in order to restore it to a baseline "clean" condition. Seal off any openings such as loose wall plug units to prevent exhaust fumes from the fire department engines from entering the space. Monitor the cleanliness of the room now that the Plymovent system has been installed. It is expected that the Detail office will have less exhaust infiltration now that the Plymovent system has been installed in the garage.

Standard Referenced: Standard Referenced: Ma DOS Bulletin 396 "Allergies, Asthma and Building Housekeeping"

Corrective Action Date: November 30, 2004

Item No. 10   Restore all exhaust ventilation systems to working order in the building.   Increase ventilation in areas where insufficient or not working.

Corrective Action Needed: A number of exhausts were not working on the day of the visit. These include: 2nd floor bathroom exhaust, all men's locker room and shower exhausts, women's locker room exhausts (except for one over toilet), Detail office exhaust. In areas such as the traffic area, exhausts are located in the closet where they are blocked by piles of boxes and chairs. Remove all

Somerville Police Department
Page 19 of 32

objects that obstruct these exhausts and post a sign indicating that these areas should not be used for storage.

Insure that cellblocks are maintained under negative pressure to minimize possibility of transmission of airborne illnesses from prisoners to staff.

Exhaust was barely working (less than 20 cfm) in areas such as the Chief's office, and Administration area (2nd floor). There was no ventilation at all in the bubble area on the day of the visit.

Standard Referenced: Ma State Building Code/ Ma DOS Bulleting 392 Mechanical Ventilation

Corrective Action Date: Respond as to action to be taken by November 30, 2004

Item No. 11 Increase ventilation to provide the recommended minimum of 6 air changes per hour

Corrective Action Needed: Contact your HVAC company to see if the airflows to the offices can be increased to provide the recommended minimum of 6 air changes per hour.

Standard Referenced: Ma DOS Bulletin 392 "Mechanical Ventilation Systems and Air Quality: Discussion and Suggestions "

Item No. 12 Temperature Control within the building

Corrective Action Needed: Provide occupants with a way to control temperatures within their workspace. Determine methods to maintain consistent temperatures throughout the facility by installation of thermostats in all occupied areas of the building. Insure that minimum levels of fresh air ventilation will be maintained regardless of temperatures.

Standard Referenced: Ma DOS Bulletin 389 "Thermal Comfort for Indoor Air Quality"

Item No. 13 Keep chemical use to a minimum. Consider using green cleaners,

Corrective Action Needed: The use of harsh cleaning chemicals may contribute to indoor air quality problems. Obtain Material Safety Data Sheets (MSDSs) for all cleaning products and review health effects. Consider using more environmentally friendly cleaners. Information on buying safer products is enclosed with this report. You

may also check the state contract for safer cleaning products at www.comm-pass.com.
(See GR016).

Item No. 14 Develop an Indoor Air Quality Management Plan

It is our agency's experience that once a building has had an air quality concern, it is
not uncommon for the same problems and concerns to continue for years to come.
Once you have addressed the issues raised in this report, it is strongly recommended
that you develop an air quality management plan to prevent future occurrences. An air
quality management plan includes information such as who at the facility will be
responsible for addressing IAQ issues, who is responsible for HVAC maintenance, how
often HVAC systems will be maintained, etc. It also includes a plan to inform building
occupants of any changes that could affect air quality, such as painting or construction
work. There are several sources of information that may help you in establishing such
plans. These include:

- EPA Tools for Schools (617-918-1639)

- OSHA Proposed Indoor Air Quality Standard-
  (Federal Register April 5, 1994)

   Available on the World Wide Web at www.osha.gov

- EPA/NIOSH Building Air Quality: A Guide for building Owners and Facility
  Managers (617-918-1639)

   EPA/NIOSH Building Air Quality Action Plan (to be used in conjunction with
   the above Building Air Quality Guide) (617-918-1639)

   Both of these are available on the World Wide Web at www.epa.gov/iaq/pubs

Thank you for your support and interest in the health and safety of your employees.

Sincerely,                                                Approved:

Nancy A. Comeau CIH                                       Robert Kenrick
Program Supervisor                                        Program Manager

cc:  Joseph Curtatone, Mayor
Lt. Michael Devereaux, Somerville Police
Joan McKenna, President 911 Union
Frank Santangelo, Supt Buildings
Vithal Deshpande, Environmental Coordinator
Al Bargoot, Building Inspector

Enclosures: Form # 378 Water Damaged Materials & IAQ, #381 IAQ , #389 Thermal Comfort
Guidelines for IAQ, #391 HVAC Systems & Building Maintenance Guidelines, #392 Mechanical
Ventilation Systems & Air Quality, #393 Information about Mold and IAQ, #396 Allergies, Asthma, and
Building Housekeeping, Buying Environmentally Safer Products: Environmentally Preferable Cleaners

Appendix A
Air Monitoring Results
Somerville Public Safety Building    File # 05S0068
September 14 and 21, 2004

Carbon dioxide, carbon monoxide, temperature and relative humidity levels were measured using a Q-Track. Ventilation measurements were taken using an Alnor Balometer. Instrument calibration was checked prior to use. Equipment is calibrated periodically in accordance with manufacturer's recommendations and protocols.

| Location | Occu-pants (#) | Window open | Ventilation Supply (CFM)* | Ventilation Exhaust (CFM)* | Carbon Dioxide (PPM)** | Carbon Monoxide (PPM)** | Temp (°F) | Relative Humidity (%) | Comments (% fresh air/neg./pos. pressure, etc. (Other Contaminants) |
|---|---|---|---|---|---|---|---|---|---|
| Lt Devereau's Office | 1 | Slider Open | 180 | 140 (160)* | 486 | 1 | 71 | 39 | Window A/C unit running Air changes/hour=4.5 |
| Admin Office 2nd Floor | 1 | | 180 | 0 (20)* | 650 | 1 | 73 | 39 | Window A/C unit running Air changes/hour=3.9 |
| Chief's Office | 1 | | 110 | 20 | 583 | 1 | 75 | 39 | Window A/C unit running Air changes/hour=1.4 |
| Captains' Office | 2 | | 0 | 0 | 630 | 1 | 71 | 36 | Window A/C unit running |
| Entry Desk ("Bubble") | 1 | | 0 | 0 | 630 | 1 | 71 | 37 | |
| 911 Dispatch | 8 | | | | 700 | 1 | 72 | 40 | High Ceilings, access to ventilation not available |
| Detail Office | 1 | | 50 | 0 | 700 | 1 | 74 | 36 | A/C Unit running |

Somerville Police Department
05S0068
Page 2 of 32

| Location | Occu- pants (#) | Window open | Ventilation Supply (CFM)* | Ventilation Exhaust (CFM)* | Carbon Dioxide (PPM)** | Carbon Monoxide (PPM)** | Temp (°F) | Relative Humidity (%) | Comments (% fresh air/neg./pos. pressure, etc. (Other Contaminants) |
|---|---|---|---|---|---|---|---|---|---|
| Traffic | 1 | 190/200/ 150 | | | 490 | 1 | 70 | 38 | |
| Police Union office | 1 | Not measured | Not measured | | 540 | 1 | 70 | 42 | |
| Basement Common Hallway/ Stairwell (Former Fire Dept) | 0 | Missing Grilles | Missing Grilles | | 490 | 1 | 76 | 40 | ?Ductwork/panels on ventilation removed |
| Mechanic's Office | 1 | | | | 540 | 1 | 70 | 42 | |

*CFM= *Total cubic feet per minute* of air. In order to calculate the *CFM fresh air* per occupant, multiply the % fresh air by the *total CFM*

   Typically it is the *CFM of fresh air* that is needed to compare to ventilation codes. Note that ventilation could not be measured in   all areas due to height of ceiling.

**PPM=parts per million in air

Numbers in bold print indicate levels, which are above recommended limits for acceptable indoor air quality, or, in the case of ventilation, are below recommended ventilation levels. A table of levels of comparison for the various parameters is located on the next page.

A-1

Somerville Police Department
055.0068
Page 3 of 32

Applicable Reference Standards for Indoor Air Quality

| Contaminant or Parameter Measured | Recommending Agency | Acceptable Level |
|---|---|---|
| CFM Fresh Air Per Occupant | Occupational Hygiene Program | 20 CFM/Occupant recommended Note-Building Codes indicate what is required for a particular building |
| Carbon Dioxide | Occupational Hygiene ASHRAE 62-1989 | <800 PPM acceptable 800 PPM-Marginal Ventilation >1000 PPM Inadequate ventilation |
| Carbon Monoxide | EPA (NAAQS) | 9 PPM * hour average or no more than 3PPM above background |
| Temperature | ASHRAE 55-1992 | See Table in text |
| Relative Humidity | ASHRAE 55-1992 | See Table in text |
| Other Contaminants | | |

A-2

Somerville Police Department
05S0068
Page 4 of 32

Appendix B

## VOLATILE ORGANIC COMPOUND MONITORING RESULTS

The following samples were collected on activated charcoal tubes using SKC Aircheck III pumps. The samples were analyzed at the DOS laboratory; an AIHA accredited laboratory, using gas chromatography analysis. Pumps were calibrated at 0.02-0.2 LPM at the DOS laboratory prior to the site visit. Flow rates were checked before and after sampling with calibrated rotometers. Blanks were submitted to the lab along with the samples. All samples that were taken were area samples throughout the Somerville Police Department. Results were as follows:

| DOS. Sample # | Location | Flow Rate (L/min.) | Sample Time (min.) | Results-(PPM) |
|---|---|---|---|---|
| 05L-080 | 1st Floor 911 Dispatch | 0.28 | 112 | <1.0 PPM detected |
| 05L-081 | 1st. Floor 911 Dispatch | 0.28 | 112 | <1.0 PPM detected |
| 05L-082 | 1st Floor Police Union Office | 0.2 | 165 | <1.0 PPM detected |
| 05L-083 | 1st Floor Police Union Office | 0.2 | 165 | <1.0 PPM detected |
| 05L-084 | 2nd Floor IA Office | 0.28 | 168 | <1.0 PPM detected |
| 05L-085 | 2nd Floor IA Office | 0.28 | 168 | <1.0 PPM detected |
| 05L-086 | Basement Storage | 0.2 | 152 | <1.0 PPM detected |
| 05L-087 | Basement Storage | 0.2 | 152 | <1.0 PPM detected |
| 05L-088 | Basement Mechanic's | 0.23 | 72 | 2127 mg/M3* |

Somerville Police Department
05S0068
Page 5 of 32

| | | | |
|---|---|---|---|
| | Office | | |
| 05L-089 | Basement Mechanic's Office | 0.28 | 72 | 739 mg/M3* |
| 05L-090 | Field blank | | | None detected |

Date of Sample Collection: September 14, 2004    Summary of Sample Conditions: Building occupancy was high during visit.

*Note-There is really no standard for fuel oil. The OSHA standard for petroleum distillates could be used as a standard of comparison. This standard allows for 2000 mg/M3 Petroleum Distillates when averaged over and 8 hour workday. Note that no one is in the boiler room and that the boiler had just been cleaned. No detectable levels were found elsewhere in the facility.

Item No. 4
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No.5

Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 6
Response/Corrective Action Taken:

_____

_____

_____

_____

Corrective Action Response Form

Municipality : Somerville Police Department                    File # 05S0068
Engineer Assigned: Nancy Comeau CIH, Program Supervisor

Please complete this form using additional sheets if necessary to document the
action(s) already taken or action(s) to be taken to address the hazard(s) identified or
recommendation(s) made in the report. This form must be completed and sent in to the
Division of Occupational Safety by the response date given in the report. Please
include any supporting documentation such as written policies, photographs and/or
purchase orders. If you *cannot* correct these hazards by the dates given, state:

               a) the reason why you cannot meet the corrective action date

               b) what you will do in the interim

               c) what action you plan to take and by what date.

Item No. 1
Response/Corrective Action Taken:

_____
_____
_____
_____
_____

Item No.2

Response/Corrective Action Taken:

_____
_____
_____
_____

Item No. 3
Response/Corrective Action Taken:

_____
_____
_____
_____

Item No.7

Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 8
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No.9

Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 10
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 11
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 12
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 13
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 14
Response/Corrective Action Taken:

_____

_____

_____

_____

Name: _____    Title: _____
Date: _____    Phone: _____

Return To:
*Nancy Comeau CIH, Program Supervisor*
Division of Occupational Safety
Occupational Hygiene Program
1001 Watertown Street
West Newton, MA 02465

---

Office Use Only
Date Case Closed _____ Engineer Initials _____

---

# EXHIBIT B

AGREEMENT  BETWEEN

THE

CITY OF SOMERVILLE

AND

SOMERVILLE POLICE SUPERIOR OFFICER'S ASSOCIATION

July 1, 2000 – June 30, 2004

(updated 2003 by Lt. Charles J. Femino)

# TABLE OF CONTENTS

**PAGE**

ARTICLE III          EMPLOYEE'S RIGHTS....................................................................4

ARTICLE IV          STABILITY OF AGREEMENT..........................................................5

ARTICLE V           COURT TIME................................................................................5

ARTICLE VI          PAYING POLICE DETAILS.............................................................6

ARTICLE VII         GRIEVANCE AND ARBITRATION PROCEDURE.........................8

ARTICLE VIII        HOURS OF WORK AND OVERTIME.............................................10

                           s.1    Work Week
                           s.2    Work Schedules
                           s.3    O.T. Service
                           s.4    O.T Scheduling
                           s.5    O.T. Method of Compensation
                           s.6    O.T. - Detectives
                           s.7    O.T. - Vacation Periods
                           s.8    Lunch/Dinner Reliefs
                           s.9    Swapping Shifts

ARTICLE IX          HOLIDAYS....................................................................................14

ARTICLE X           VACATIONS..................................................................................15

ARTICLE XI          CLOTHING ALLOWANCE AND EQUIPMENT..............................16

ARTICLE XII         BEREAVEMENT LEAVE................................................................16

ARTICLE XIII        OTHER LEAVES OF ABSENCE......................................................17

ARTICLE XIV        PERSONNEL INTERROGATION PROCEDURE..............................19

ARTICLE XV         SICK LEAVE..................................................................................20

ARTICLE XVI        NO STRIKE CLAUSE.....................................................................23

ARTICLE XVII       SENIORITY....................................................................................23

ARTICLE XVIII      COMPENSATION...........................................................................29

# TABLE OF CONTENTS

**PAGE**

ARTICLE XIX        MISCELLANEOUS..................................................................................32

                   s.1    Seniority List
                   s.2    Association Space for Meetings
                   s.3    Association Bulletin Board
                   s.4    Enforcement of Safety Rules
                   s.5    M.G.L. 150 Rule
                   s.6    Remedy for Invalid Provision
                   s.7    Physical Fitness Standard
                   s.8    General Laws Provided
                   s.9    General Orders Provided
                   s.10   In-Service Training
                   s.11   Personal Files
                   s.12   Promotional Vacancies
                   s.13   Sick Leave Language (deleted as of M.O.A. 2000)
                   s.14   Health Insurance
                   s.15   Police Indemnification for Damage
                   s.16   Unsafe Equipment/M.G.L. 258 Indemnity
                   s.17   Residency
                   s.18   Association Space for Office in Building
                   s.19   Disclosure of Personal Information
                   s.20   Bi-Weekly Wages
                   s.21   5 and 2 Schedule – Buyback
                   s.22   Civil Service Exams
                   s.23   Discuss Training Programs
                   s.24   Line of Duty Death
                   s.25   Drug Testing Program
                   s.26   Discussion of Annual Performance and Appraisal
                   s.27   5 & 2 Day Stipend

ARTICLE XX         DUES AND AGENCY FEE....................................................................42

ARTICLE XXI        INJURY LEAVE AND INDEMNFICATION........................................43

ARTICLE XXII       DURATION OF THE AGREEMENT.....................................................45

                   MEMORANDUM OF AGREEMENT
                   July 2000 through June 30, 2004                                          46

## ARTICLE XIX

## MISCELLANEOUS

**Section 1.** **Seniority List**: The City agrees to post a seniority list, in compliance with the provisions of Article XVII, Sections 1 and 2 in a conspicuous place within the police station showing names and titles of all employees in the Bargaining Unit.

**Section 2.** **Association Space/Office**: The City agrees to provide space in the Police Station for Association meetings.

**Section 3.** **Association Bulletin Board:** The City agrees to provide a bulletin board in a suitable space in the Police Station for Association information purposes.

**Section 4.** **Enforcement of Safety Rules**: Both parties to this Agreement shall co-operate in the enforcement of safety rule and regulations. Complaints with respect to unsafe or unhealthy working conditions shall be brought to the attention of an employee's superior officer or the Chief of Police and shall be subject of grievance or arbitration hereunder.

The City and the Association, in concert with the Patrolmen's Association, shall establish a joint safety committee consisting of representatives of each party for the promotion of sound safety practices and rules.

**Section 5.** **M.G.L. 150E rule:** As is provided by Chapter 150E of the General Laws, the provisions of this Agreement supersede any conflicting or inconsistent rule, regulation or order promulgated by the Chief of Police or the Police Department or the City.

**Section 6.** **Remedy for Invalid Provision:** Should any provision of this agreement or any supplement thereto be held invalid by any court or tribunal of competent jurisdiction, or if compliance with or enforcement of any provisions should be restrained by any court, all other provisions of this Agreement and any supplement thereto shall remain in force, and the parties, on thirty (30) days notice to the other, shall meet to negotiate immediately for a satisfactory replacement for any such provision.

**Section 7.** **Physical Fitness Standards**: The City and the Association, in the concert with the Patrolmen's Association, shall establish a joint committee consisting of representatives of each party, to review and recommend to the parties criteria and standards for annual physical examination of employees.

**Section 8. General Laws.** Criminal statutes shall be made available to employees at Police Headquarters.

**Section 9. Orders.** The Association shall be furnished a copy of each order issued by the Chief of Police.

31

# EXHIBIT B

# AGREEMENT BETWEEN

# THE

# CITY OF SOMERVILLE

# AND

# SOMERVILLE POLICE SUPERIOR OFFICER'S ASSOCIATION

July 1, 2000 – June 30, 2004

(updated 2003 by Lt. Charles J. Femino)

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

ARTICLE III        EMPLOYEE'S RIGHTS.......................................................................4

ARTICLE IV        STABILITY OF AGREEMENT...........................................................5

ARTICLE V         COURT TIME....................................................................................5

ARTICLE VI        PAYING POLICE DETAILS...............................................................6

ARTICLE VII       GRIEVANCE AND ARBITRATION PROCEDURE........................8

ARTICLE VIII      HOURS OF WORK AND OVERTIME..............................................10

        s.1    Work Week
        s.2    Work Schedules
        s.3    O.T. Service
        s.4    O.T. Scheduling
        s.5    O.T. Method of Compensation
        s.6    O.T. - Detectives
        s.7    O.T. - Vacation Periods
        s.8    Lunch/Dinner Reliefs
        s.9    Swapping Shifts

ARTICLE IX        HOLIDAYS.......................................................................................14

ARTICLE X         VACATIONS.....................................................................................15

ARTICLE XI        CLOTHING ALLOWANCE AND EQUIPMENT..............................16

ARTICLE XII       BEREAVEMENT LEAVE.................................................................16

ARTICLE XIII      OTHER LEAVES OF ABSENCE.......................................................17

ARTICLE XIV       PERSONNEL INTERROGATION PROCEDURE..............................19

ARTICLE XV        SICK LEAVE....................................................................................20

ARTICLE XVI       NO STRIKE CLAUSE........................................................................23

ARTICLE XVII      SENIORITY.......................................................................................23

ARTICLE XVIII     COMPENSATION.............................................................................29

# TABLE OF CONTENTS

**PAGE**

ARTICLE XIX          MISCELLANEOUS.................................................................................32

                     s.1     Seniority List
                     s.2     Association Space for Meetings
                     s.3     Association Bulletin Board
                     s.4     Enforcement of Safety Rules
                     s.5     M.G.L. 150 Rule
                     s.6     Remedy for Invalid Provision
                     s.7     Physical Fitness Standard
                     s.8     General Laws Provided
                     s.9     General Orders Provided
                     s.10    In-Service Training
                     s.11    Personal Files
                     s.12    Promotional Vacancies
                     s.13    Sick Leave Language (deleted as of M.O.A. 2000)
                     s.14    Health Insurance
                     s.15    Police Indemnification for Damage
                     s.16    Unsafe Equipment/M.G.L. 258 Indemnity
                     s.17    Residency
                     s.18    Association Space for Office in Building
                     s.19    Disclosure of Personal Information
                     s.20    Bi-Weekly Wages
                     s.21    5 and 2 Schedule – Buyback
                     s.22    Civil Service Exams
                     s.23    Discuss Training Programs
                     s.24    Line of Duty Death
                     s.25    Drug Testing Program
                     s.26    Discussion of Annual Performance and Appraisal
                     s.27    5 & 2 Day Stipend

ARTICLE XX           DUES AND AGENCY FEE....................................................................42

ARTICLE XXI          INJURY LEAVE AND INDEMNFICATION.........................................43

ARTICLE XXII         DURATION OF THE AGREEMENT.....................................................45

                     MEMORANDUM OF AGREEMENT
                     July 2000 through June 30, 2004                                         46

## ARTICLE XIX

### MISCELLANEOUS

**Section 1.    Seniority List**: The City agrees to post a seniority list, in compliance with the provisions of Article XVII, Sections 1 and 2 in a conspicuous place within the police station showing names and titles of all employees in the Bargaining Unit.

**Section 2.    Association Space/Office**: The City agrees to provide space in the Police Station for Association meetings.

**Section 3.    Association Bulletin Board:** The City agrees to provide a bulletin board in a suitable space in the Police Station for Association information purposes.

**Section 4.    Enforcement of Safety Rules**: Both parties to this Agreement shall co-operate in the enforcement of safety rule and regulations. Complaints with respect to unsafe or unhealthy working conditions shall be brought to the attention of an employee's superior officer or the Chief of Police and shall be subject of grievance or arbitration hereunder.

The City and the Association, in concert with the Patrolmen's Association, shall establish a joint safety committee consisting of representatives of each party for the promotion of sound safety practices and rules.

**Section 5.    M.G.L. 150E rule:** As is provided by Chapter 150E of the General Laws, the provisions of this Agreement supersede any conflicting or inconsistent rule, regulation or order promulgated by the Chief of Police or the Police Department or the City.

**Section 6.    Remedy for Invalid Provision:** Should any provision of this agreement or any supplement thereto be held invalid by any court or tribunal of competent jurisdiction, or if compliance with or enforcement of any provisions should be restrained by any court, all other provisions of this Agreement and any supplement thereto shall remain in force, and the parties, on thirty (30) days notice to the other, shall meet to negotiate immediately for a satisfactory replacement for any such provision.

**Section 7.    Physical Fitness Standards**: The City and the Association, in the concert with the Patrolmen's Association, shall establish a joint committee consisting of representatives of each party, to review and recommend to the parties criteria and standards for annual physical examination of employees.

**Section 8.    General Laws.** Criminal statutes shall be made available to employees at Police Headquarters.

**Section 9.    Orders.**  The Association shall be furnished a copy of each order issued by the Chief of Police.

S 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| John Aufiero, et al. | City of Somerville, et al. |

| (b) County of Residence of First Listed Plaintiff **Middlesex** | County of Residence of First Listed Defendant **Middlesex** |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

(c) Attorney's (Firm Name, Address, and Telephone Number)
Beacon St., STE 505  617-624-9777
Boston, MA

Attorneys (If Known)

**05  11575**

## BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                        and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 USC 1983
Brief description of cause: Deliberate & reckless conduct under the color of law resulting in personal injury.

| **VII. REQUESTED IN COMPLAINT:** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** injunctive relief | CHECK YES only if demanded in complaint: |
|---|---|---|---|
| | | | **JURY DEMAND:** ☒ Yes ☐ No |

| **VIII. RELATED CASE(S) IF ANY** | (See instructions): | JUDGE | | DOCKET NUMBER |
|---|---|---|---|---|

DATE **7-26-05**     SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _Avtiero et. al v. City of Somerville et al_

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

    ___  I.  160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

    _X_  II. 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

    ___  III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

    ___  IV. 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

    ___  V.  150, 152, 153.

# 05 11575 REK

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

    YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

    YES ☒    NO ☑

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

    YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

    YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

    YES ☑    NO ☐

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division ☑        Central Division ☐        Western Division ☐

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division ☐        Central Division ☐        Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

    YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Stephen L. D'Angelo_
ADDRESS _6 Beacon Street Suite 505, Boston, MA 02108_
TELEPHONE NO. _617-624-9777_

(CategoryForm.wpd -5/2/05)