UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| JOHN AUFIERO, NEIL F. COLLINS, ROBYN L. DEFRANZO, DANIEL HYDE, PATRICK J. IRVING, THOMAS A. LEYNE, JOHN MAHONEY, JOSEPH E. MCCAIN, WILLIAM MCCARTHY, TIMOTHY MITSAKIS, LOUIS M. REMIGIO, SUSAN J. DESOUSA, Individually & Next Friend of CAMERON A. DESOUSA, JOHN DOE and JANE DOE<br>      Plaintiffs | ) ) ) ) ) ) ) ) ) ) |
| v. | ) C.A. No.: ) |
| CITY OF SOMERVILLE, JOSEPH CURTATONE, as Somerville Mayor, DONALD CALIGURI, as former Somerville Police Chief, GEORGE MCLEAN, as former Somerville Police Chief, ROBERT BRADLEY, Somerville Police Chief, ROBERT TRAHAN, Individually and as Former Head of Department of Public Works, MITT ROMNEY, JOAN LANGSAM, as Former City Solicitor, PAUL ZIRPOLO, as DPW Project Manager, DOROTHY KELLY GAY, as Former Somerville Mayor, ROBERT J. PREZIOSO, SIMPSON GUMPERTZ & HEGER, INC., ENVIROTECH, VITHAL DESHPANDE, as Environmental Protection Engineer for the City of Somerville and ANGELO R. BUONOPANE<br>      Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR MANDATORY INJUNCTION PURSUANT TO F.R.C.P. RULE 65

Now come the Plaintiffs in support of their Motion for Mandatory Injunction to

present this Honorable Court with the memorandum herein. Also attached, please find

sworn-to Affidavits of several Plaintiffs outlining their employment history for the City

of Somerville, a synopsis of their medical history, and their general knowledge of the

environment within 220 Washington Street. (Exhibit "1")

## I. Introduction

The Plaintiffs' claims arise through their employment with the City of Somerville and the Somerville Police Department and/or their association with the building located at 220 Washington Street, Somerville, Massachusetts (hereinafter "220 Washington Street") as identified by context herein. More than 25 individuals of nearly 40 occupants of 220 Washington Street have had their health adversely affected by the toxic environment within the building since their exposure to toxins beginning since or about 1986 when the Somerville Police Department moved into their current location.

The toxic environment within 220 Washington Street includes, but not limited to; chronic dampness, water intrusion, questionable structural integrity, existence of bird feces, elevated levels of carbon dioxide, inadequate or inoperative ventilation systems, and the presence of dangerous molds, bacteria, fungi and hazardous chemicals such as sulfur trioxide. Because of the threat posed by the building's environment to the health of its occupants, the Somerville Fire Department evacuated 220 Washington Street in 1999.

Health problems now attributed to the Plaintiffs' association with 220 Washington Street include the development of pulmonary diseases and asthma, flu-like symptoms, allergy symptoms, Legionnaires Disease, Acquired Leukemia, and the diagnosis of sarcoidosis, a rare disease associated with damp buildings diagnosed in three police officers. The Plaintiffs come from a class of workers commonly known for their physical fitness, yet the outstanding majority of individuals who work in 220 Washington Street suffer from debilitating illnesses. The longer the occupants of 220 Washington Street are

2

exposed to the toxins within the building, the greater the occupants' chances are to suffer further irreparable harm to their health or greater exacerbation of present medical conditions.

Progress appeared to be made in October 2004 when the Massachusetts Department of Occupational Safety ordered corrections of several safety and health code violations within 220 Washington Street. Even though all corrections were to be made by November 30, 2004, no successful remediation occurred. In an April 2005 explanation as to why the building was not fully or adequately remediated, the mayor of Somerville, Joseph Curtatone, reasoned that because of financial considerations no further work was to be performed. Further, Mayor Curtatone stated that the building would be evacuated by the end of the fiscal year, June 30, 2005. No evacuation has taken place and the Plaintiffs continue to be exposed to the toxic environment within 220 Washington Street.

## II. Applicable Law

Federal law governs injunctions sought in both federal question and diversity cases. FRCP 65. The Court must have both subject matter and *in personam* jurisdiction over the party whose actions will be enjoined. F.T.C. v. H.N. Singer, 668 F.2d 1107 (9th Cir. 1982). The party seeking the injunction must establish a reasonable probability that: 1) the court has personal jurisdiction over the party to be enjoined (Zepeda v. United States, 753 F.2d 719 (9th Cir. 1983)); and 2) that the court has subject matter jurisdiction (Visual Sciences, Inc. v. Integrated Communications, Inc., 660 F.2d 56 (2d Cir. 1981)).

Standards generally employed by courts when determining whether to grant an injunction include:

a.  The likelihood of success on the merits;

b.  The threat of irreparable injury;

c.  The balancing of hardships; and

d.  The effect on public interests.

The four standards for granting a preliminary injunction are often weighed together, rather than individually, when evaluating the application. FDIC v. Garner, 125 F.3d 1272 (9th Cir. 1997). If failure to issue the injunction would subject the plaintiff to substantial risk of irreparable harm, the court must then balance this risk against any similar risk of harm that granting the injunction would create for the defendant. Packaging Indus. Group v. Cheney, 380 Mass. At 617, 405 N.E.2d at 112. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue. *Id.*

Courts usually require a strong showing of injury and/or inadequacy of legal remedy before issuing a mandatory injunction. Dahl v. Hem Pharmaceuticals, 7 F.3d 1399 (9th Cir. 1993). There is often a presumption of irreparable injury where the plaintiff establishes that its Constitutional rights will be violated, thus necessitating an injunction in the public interest. Association of General Contractors of CA v. Coalition for Economic Equity, 950 F.2d 1401 (9th Cir. 1991).

### III.    Facts

4

The Plaintiffs were subjected to pro-longed exposures to chronic damp conditions, and the types of molds that produce toxins as well as other hazardous substances present in their workplace environment at 220 Washington Street, Somerville, MA, and have suffered adverse health affects as a result thereof. The Plaintiffs have continued to serve their community, the City of Somerville and the Commonwealth of Massachusetts, even though their own safety and health has been neglected by the City and state they protect on a daily basis.

220 Washington Street, built in 1927, was originally used as an MBTA "car barn" until the Somerville Police and Fire Departments moved their offices to the building in 1986. The structural integrity of the building at 220 Washington Street is compromised from chronic water intrusion and the City of Somerville's failure to maintain and repair the building. Water has permeated through the building's windows, sliding doors, door jams, bricks, roof, and foundation since the Police and Fire Department have occupied the building. Following several increasingly persistent floods, and the occurrence of a major flood in 1999, the Fire Department moved out of 220 Washington Street. The Police Department, 911 dispatching and administrative personnel remain inside of the building despite numerous complaints regarding water intrusion, insect and rodent infestation, indoor bird feces, fumes, inadequate ventilation and the presence of mold/fungi.

In 1999, following complaints of the environment within 220 Washington Street, an engineering firm, Simpson Gumpertz & Heger, Inc. ("SGH") was hired to inspect and evaluate the condition of the building. SGH's inspection included the sampling of

5

several colonies of visible mold. SGH sent the samples to PathCon Laboratories ("PathCon") on January 11, 1999 for further evaluation. On January 27, 1999, PathCon submitted the results of the samples taken from 220 Washington Street. Among the samples collected, the presence of several types of fungi (including Stachybotrys Chartarum, Stachybotrys, Ulocladium, Aspergillus and Chaetomium) and bacteria (Pseucomonas and Bacillus) were detected. (Exhibit "2") Despite possessing knowledge that several toxic molds existed within 220 Washington Street, no successful remediation took place, and the Plaintiffs continued to be exposed to the toxins documented in the building's environment.

In 1999, 2000, 2002, and 2003 the Massachusetts Department of Environmental Protection documented the oil and other hazardous material located at 220 Washington Street. Pending discovery, it is theorized after evaluating the building's prior use as an MBTA 'car barn' and the diagnosed diseases of the occupants, that there are several hazardous substances on-site including; sulfuric acid, sulfuric acid-lead salt, and sulfur trioxide as well as waste oil and diesel fuel. Police officers, firefighters, 911 dispatchers and administrative personnel are continuously exposed to a cornucopia of toxins at 220 Washington Street and are without knowledge as to the clean-up status of the hazardous materials present in and around the building.

Occupants, including the Plaintiffs herein, continue to complain about the air quality inside of 220 Washington Street causing debilitating headaches, bug bites, eye, nose and throat irritation, chest congestion, coughing, wheezing, allergies and asthma. No one has taken affirmative action in response to the complaints of the Plaintiffs. (Exhibit "3")

6

Following the receipt of complaints to their office, the Massachusetts Department of Occupational Safety ("DOS") entered 220 Washington Street in order to conduct inspections of the complained-of conditions. The DOS submitted a 31-page report to George McLean, Chief of the Somerville Police Department, ordering compliance with several violations of both safety and health code violations by November 30, 2004. (Exhibit "4") On April 19, 2005, Somerville mayor Joseph Curtatone explained (as reflected in an April 28, 2005 letter to Mr. Curtatone) that no money was to be expended on renovation or remediation of 220 Washington Street as the occupants were to be relocated by June 30, 2005. (Exhibit "5") No renovation, remediation or relocation has occurred and the Plaintiffs continue to be housed in a building that was basically condemned by the DOS because of the compromised structure of the building, and the toxic mold, fungi and bacteria, and other hazardous substances found within.

#### IV. Health Effects of Pro-longed Exposure to Documented Toxins

The occupants of 220 Washington Street are suffering serious health consequences as a result of their exposure to an environment that contains toxins and hazardous materials. This section provides some basic background on toxic substances that were found to exist inside or around 220 Washington Street and the resultant health consequences related thereto. In fact no recent testing and evaluation has been attempted, however remediation was never accomplished either. The truth is that the mold producing toxins do not go away on their own, they only get worse, especially in a damp environment.

7

A. Toxic Mold, Fungi and Bacteria

Toxic mold and fungi contain mycotoxins which have the potential to cause serious illness through their direct biochemical action on key body functions. (Croft, W.A., Jarvis, B.B., and Yatawara, C.S. *Atmos. Environ.*, 549-552, (1986), and Leino, M., Makela, M., Reijula, K., Haahtela, T., Mussalo-Rauhamaa, H., Tuomi, T., *Stachybotrys chartarum, Clin. Exp. Allergy*, 1603-1610 (2003))  Other toxins can affect various hormonal, neurological, and other body functions to produce serious health effects. (Sorenson, W.G., *Fungal Spores: Hazardous to Health? Environ. Health Perspect.* (Suppl. 3) 469-472 (1999))  Hyperactive immune systems responding to the influx of fungal antigens following chronic exposures are much more likely to be a cause of symptoms in most individuals. (Straus, David C., Advances in Applied Microbiology-*Volume 55: Sick Building Syndrome*, 296-97 (2004))

A moldy environment must be remediated, and in most cases destroyed according to the level of fungal infestation.  All sources of water intrusion must first be discovered and resolved prior to any attempt at remediation.  A remediation must then occur that removes any and all areas showing fungal proliferation including walls, floors, carpets and pads, cabinets, furniture, roofing materials and any other element used for purposes of maintaining the building's structure.  Following a remediation, a previously-exposed individual who has become hypersensitized may not be able to return to the remediated space because his/her sensitivity is too great for the level to which remediation may reduce fungal efflux. (Marinkovich, Vincent A., Advances in Applied Microbiology, Volume 55: *Fungal Hypersensitivity: Pathophysiology, Diagnosis, Therapy*, 300-01 (2004))

8

Indoor dampness may induce asthma through different agents, including molds,
bacteria, house dust mites, or increased emission of chemicals from damp materials (e.g.,
volatile organic compounds [VOC] and degradation products of polyvinyl chloride
[PVC] floors). (Norback, D., Wieslander, G., Nordstrom, K., and Walinder, R., *Int. J.
Tuberc. Lung Dis.*, 1016-1025., (2000))  Several potential mechanisms have been
suggested to link exposures to indoor molds with asthma.  These include IgE-mediated
hypersensitivity reactions to fungal allergens, toxic effects of mycotoxins produced by
fungi, and nonspecific inflammatory reactions caused by microbial volatile organic
compounds (MVOC) or fungal cell wall components. (Husman, T., *Health Effects of
Indoor-Air Microorganisms, Scand. J. Work Environ. Health*, 5-13 (1996), and Jaakkola,
M.S., Nordman, H., Piipari, R., Uitti, J., Laitinen, J., Karjalainen, A., Hahtola, P., and
Jaakkola, J.J.K., *Indoor Dampness and Molds and Development of Adult-Onset Asthma,
Environ. Health Perspect.*, 543-547, (2002))  Based on review of current literature on
indoor molds and asthma in adults it can be concluded that:  a.) there is increasing
evidence that indoor molds increase the severity of an existing asthma; b.) a recent
incident case-control study showed evidence that indoor molds at work increase the risk
of asthma; c.) there is increasing evidence that indoor molds at work increase the risk of
wheezing; and d.) there is evidence that successful remediation of indoor mold problems
may relieve or eliminate symptoms and signs of asthma. (Jaakkola, M.S., Jaakkola,
J.J.K., Advances in Applied Microbiology, Volume 55: *Indoor Molds and Asthma in
Adults*, 332 (2004))

9

Indoor-mold has also been associated with flu-like illnesses with profound fatigue; headache; or blood in the sputum, the urine, or the stool; memory loss, difficulty concentrating, dizziness, loss of balance, and other neurological effects. (Baldo, J., Ahmad, L., and Ruff, R., *Applied Neuropsychology*, 193-202 (2002), and Johanning, E., Morey, P., Jarvis, B., Biagini, R., Hull, D., and Landsbergis, P., *Stachybotrys Chartarum in a Water Damaged Office Environment. Int. Arch. Occup. Environ. Health*, 207-218, (1996)) Exposure to fungi and mycotoxins can, depending on dose and duration of exposure cause ill health or aggravate conditions including: a.) infections; b.) mycosis; c.) endemic mycosis; d.) opportunistic mycosis; e.) allergies; f.) asthma; g.) rhinitis; h.) sinusitis; i.) conjunctivitis; j.) eczema; k.) hay fever; l.) wheezing; m.) pneumonitis; n.) contact dermatitis; o.) organic dust toxic syndrome; p.) hypersensitivity; q.) pneumonitis systemic; r.) skin and mucous membrane flare-up; and s.) respiratory tract infections.

## B. Health Effects Linked to Exposures to Sulfuric Acid, Sulfuric Acid-Lead Salt, Sulfur Trioxide, Waste Oil and Diesel Fuel

In order to junk old batteries, the MBTA would split the batteries in order to drain them because the battery could not be disposed of until the fluid, sulfuric acid, was drained. Sulfuric acid, Sulfuric acid-lead salt, Sulfur Trioxide, waste oil and diesel fuel are all substances suspected to be present in and around the building located at 220 Washington Street. Sulfuric acid, Sulfuric acid-lead salt, and Sulfur Trioxide are all chemicals and substances considered to be highly hazardous which are common to battery acids used in batteries of vehicles. These hazardous substances, as well as waste oil and diesel fuel, are suspected in this local due to the previous use of the building (MBTA 'car barn' wherein the Transit Authority housed and maintained vehicles of

transportation), the record of the Massachusetts Department of Environmental Protection-Bureau of Waste Site Cleanup's visits regarding oil and other hazardous materials, and the symptoms and diagnosed diseases of the occupants of 220 Washington Street, Somerville, MA.

Within the respiratory tract, sulfur trioxide reacts rapidly with water to form sulfuric acid. Therefore the adverse effects of sulfur trioxide are similar to those of exposure and inhalation of sulfuric acid. There have been many studies, conducted through the use of lab rats, mice, rabbits, and guinea pigs, that indicate pro-longed exposures to sulfuric acid can cause mortality through gross lung hemorrhaging.

Although complete records of the investigations are not available at this juncture, there is proof that the Department of Environmental Protection-Bureau of Waste Site Cleanup had inspected 220 Washington Street on May 20, 1999, May 30, 2000, May 30, 2002, and May 30, 2003 and found oil and hazardous material on-site during their inspections. The type or amount of hazardous material located at 220 Washington Street has yet to be determined through discovery in this matter. It is only known at this point in time that oil and hazardous material had been found at 220 Washington Street and no Plaintiff was ever made aware of this fact prior to the initiation of this suit. The hazardous materials suspected on-site may in-fact be considered carcinogenic depending on the dose and length of exposure.

Several cases of cancer are reported among policemen, firemen and administrative personnel who have worked in the building, including Acquired Leukemia. The diagnosis of the disease known as sarcoidosis in three occupants of the

11

building located at 220 Washington Street is another signal indicating the presence of air borne toxins. Sarcoidosis is a granulomatous disease similar to tuberculosis, leprosy, and fungal infections. (American Thoracic Society: *Statement on Sarcoidosis, Am. J. Respir. Crit. Care Med.*, Volume 160, Number 2, 736-755 (August 1999)) Sarcoidosis represents itself as a scarring of organ tissue, most commonly found in the lungs (90% of all cases), but also able to be found in other organs including the heart, liver, skin and brain. Id. at 748, 49. Past research suggests that environmental factors may be associated with sarcoidosis risk, including positive associations between sarcoidosis "and work environments with mold/mildew exposures [environments with possible exposures to microbial bioaerosols]". (*A Case Control Etiologic Study of Sarcoidosis, Am. J. Respir. Crit. Care Med.*, Volume 170, 1324-1330 (2004))

Sarcoidosis has also been associated with "occupational exposure to insecticides, agricultural employment, and moldy, musty environments typically associated with bioaerosol exposure." Id. "Interestingly, another study of 31 patients with sarcoidosis found that patients with sarcoidosis were more likely than control subjects to report having been exposed to workplace inorganic dusts, molds, and solvent or oils." Id.

## IV.    Argument

Plaintiffs turn to this Honorable Court seeking the opportunity to find protection from having to endure further exposure to the environmental toxins found within 220 Washington Street. Employees' numerous complaints to State and City officials have fallen on deaf ears for years. Environmental reports and tests detailing known hazards are ignored by government officials. Complete indifference to comply with ordered

12

corrections of safety and health code violations has been had by all. Although the Somerville Fire Department evacuated the building nearly ten years ago because of environmental concerns, the Police Department, 911 dispatchers, administrative personnel and some firefighters remain subject to further inhalation and exposure to the documented toxins inside of the building with no apparent hope for relocation.

In deciding whether to grant an injunction as sought herein, this Court has to evaluate the four factors determinative to the granting of an injunction. In this matter, the Plaintiffs likelihood of success on the merits is overwhelming. There has been a long documented history of occupant complaints, news paper accounts, reports of the Massachusetts Department of Environmental Protection and Department of Occupational Safety, and environmental test results and reports indicating severe problems with both the safety of the building's in-door environment as well as the building's structural integrity. The Plaintiffs herein, as well as many other individuals who experienced the environment inside of 220 Washington Street, have suffered adverse health effects as a result of their exposure. Further, the list of eye-witness accounts of the unsafe and unhealthy environment inside of 220 Washington Street is endless. As to accountability, the Plaintiffs have remained loyal servants to the City of Somerville and the Commonwealth of Massachusetts; protecting and serving the community even though their own health and safety was being compromised every time they walked through the doors of 220 Washington Street.

13

Due to the supposed complexity[1] of a proposed transfer of a police station, it appears the linchpin decision to be made is the Plaintiffs' risk of irreparable harm balanced against any potential risk that may be suffered by the Defendants if the injunction is granted. "Irreparable harm" in the context of a preliminary injunction is harm that cannot be vindicated by a final judgment. Packaging Indus. Group v. Cheney, 380 Mass. At 617 n.11, 405 N.E.2d at 112 n.11. It is Plaintiffs' contention that no matter the supposed complexity of the proposed transfer, the health and safety of the occupants of 220 Washington Street remains compromised every minute spent inside of the building. Every day, week, month, and year of continuous exposure further compromises the health and safety of police officers, firefighters, 911 dispatchers and administrative personnel who occupy 220 Washington Street.

No argument concerning financial resources should even be considered herein given the gravity of Plaintiffs' health and safety. The City of Somerville has a history of passing the problem on, in essence passing the buck. The Plaintiffs propose relocation to Powder Hill School, or in the alternative to trailers located behind 220 Washington Street just as the City had previously provided the fire department with no interruption of protection provided to the community. Failure to relocate these people will have devastating health consequences that would compromise not only the health of the Plaintiffs but also the safety of the City of Somerville as more individuals get sick.

## V. Conclusion

---

[1] In 1996, the Somerville Fire Department transferred their offices out of 220 Washington Street and continues to operate to this day in trailers behind 220 Washington Street. Plaintiffs contend that a transfer is not only possible, but has been already completed by a similar institution (similar communications, technology, and equipment).

the building and surrounding lands in order to determine and assess the amount, types

and degrees of hazardous toxins that are found in order to better analyze their own

personal health more accurately.

Date: July 27, 2005

Respectfully submitted,
The Plaintiffs,
By their attorney,

Stephen L. D'Angelo, Esq.
BBO#: 640900
D'Angelo & Hashem, LLC
6 Beacon Street, Suite 505
Boston, MA 02108
(617) 624-9777

# EXHIBIT 1

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| JOHN AUFIERO, NEIL F. COLLINS,<br>ROBYN L. DEFRANZO, DANIEL HYDE,<br>PATRICK J. IRVING, THOMAS A. LEYNE,<br>JOHN MAHONEY, JOSEPH E. MCCAIN,<br>WILLIAM MCCARTHY, TIMOTHY MITSAKIS,<br>LOUIS M. REMIGIO, SUSAN J. DESOUSA,<br>Individually & Next Friend of<br>CAMERON A. DESOUSA, JOHN DOE and<br>JANE DOE<br>          Plaintiffs | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| v. | ) C.A. No.:<br>) |
| CITY OF SOMERVILLE, JOSEPH CURTATONE, as<br>Somerville Mayor, DONALD CALIGURI, as former<br>Somerville Police Chief, GEORGE MCLEAN, as<br>former Somerville Police Chief, ROBERT BRADLEY,<br>as Somerville Police Chief, ROBERT TRAHAN,<br>Individually and as Former Head of Department<br>of Public Works, MITT ROMNEY,<br>JOAN LANGSAM, as Former City Solicitor,<br>PAUL ZIRPOLO, as DPW Project Manager,<br>DOROTHY KELLY GAY, as Former Somerville<br>Mayor, ROBERT J. PREZIOSO, SIMPSON<br>GUMPERTZ & HEGER, INC., ENVIROTECH,<br>VITHAL DESHPANDE, as Environmental Protection<br>Engineer, and ANGELO R. BUONOPANE<br>          Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF JOHN AUFIERO

All of the following statements are sworn to as true to the extent of my knowledge under the pains and penalties of perjury.

1.  My name is John Aufiero.

2.  I am the Sergeant of the Patrolman Division with the Somerville Police Department.

3.  I have been a member of the Somerville Police Department since 1988.

4.  I began working in the building located at 220 Washington Street, Somerville, MA in 1988.

5.    Since 1996 I began to experience headaches and fatigue whenever I worked in the building located at 220 Washington Street, Somerville, MA.

6.    Prior to working within 220 Washington Street, Somerville, MA, I did not experience any of the symptoms I now suffer from.

7.    On July 20, 2005 I took a thermometer into the booking/cell block area of 220 Washington Street to measure the temperatures within. The booking/cell block area was measured to have a temperature of 101 degrees.

8.    There is no ventilation in the cell block area, and detainees are held behind plexi-glass so that they can not be cooled down through the use of fans.

9.    I have previously ordered the detainees taken out of their cell and showered in order to cool down their body temperatures.

10.   On a number of occasions over the last several years I have had Cataldo Ambulance called in order to provide medical assistance to individuals suffering asthmatic attacks while in 220 Washington Street.

11.   I am aware of numerous other individuals who work inside of 220 Washington Street, Somerville, MA who have experienced similar adverse health affects as myself.

12.   I believe my adverse health affects are directly caused by the environment within 220 Washington Street.

Signed under the pains and penalties of perjury that the statements above are true and accurate according to the best of my knowledge:

John Aufiero

2

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| JOHN AUFIERO, NEIL F. COLLINS,<br>ROBYN L. DEFRANZO, DANIEL HYDE,<br>PATRICK J. IRVING, THOMAS A. LEYNE,<br>JOHN MAHONEY, JOSEPH E. MCCAIN,<br>WILLIAM MCCARTHY, TIMOTHY MITSAKIS,<br>LOUIS M. REMIGIO, SUSAN J. DESOUSA,<br>Individually & Next Friend of<br>CAMERON A. DESOUSA, JOHN DOE and<br>JANE DOE<br>     Plaintiffs | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| v. | ) **C.A. No.:** |
| | ) |
| CITY OF SOMERVILLE, JOSEPH CURTATONE, as<br>Somerville Mayor, DONALD CALIGURI, as former<br>Somerville Police Chief, GEORGE MCLEAN, as<br>former Somerville Police Chief, ROBERT BRADLEY,<br>as Somerville Police Chief, ROBERT TRAHAN,<br>Individually and as Former Head of Department<br>of Public Works, MITT ROMNEY,<br>JOAN LANGSAM, as Former City Solicitor,<br>PAUL ZIRPOLO, as DPW Project Manager,<br>DOROTHY KELLY GAY, as Former Somerville<br>Mayor, ROBERT J. PREZIOSO, SIMPSON<br>GUMPERTZ & HEGER, INC., ENVIROTECH,<br>VITHAL DESHPANDE, as Environmental Protection<br>Engineer, and ANGELO R. BUONOPANE<br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF THOMAS A. LEYNE

All of the following statements are sworn to as true to the extent of my knowledge under the pains and penalties of perjury.

1.  My name is Thomas A. Leyne.

2.  I am a patrolman with the Somerville Police Department.

3.  I have been a patrolman with the Somerville Police Department for twenty-nine years.

4.  I began working in the building located at 220 Washington Street, Somerville, MA in 1986.

5.    Beginning in the early 1990s I began suffering adverse health affects including: bronchitis, pneumonia, shortness of breath, constant congestion, increased sinus pressure, hay fever, asthma, and general difficulty breathing. I have since been diagnosed with emphysema.

6.    Prior to working within 220 Washington Street, Somerville, MA, I did not experience any of the symptoms I now suffer from.

7.    I am now medicated by my doctors for all of my respiratory difficulties.

8.    I am aware of numerous other individuals who work inside of 220 Washington Street, Somerville, MA who have experienced similar adverse health affects as myself.

9.    I believe my adverse health affects are directly caused by the environment within 220 Washington Street.

Signed under the pains and penalties of perjury that the statements above are true and accurate according to the best of my knowledge:

Thomas A. Leyne

Thomas A. Leyne

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| JOHN AUFIERO, NEIL F. COLLINS,<br>ROBYN L. DEFRANZO, DANIEL HYDE,<br>PATRICK J. IRVING, THOMAS A. LEYNE,<br>JOHN MAHONEY, JOSEPH E. MCCAIN,<br>WILLIAM MCCARTHY, TIMOTHY MITSAKIS,<br>LOUIS M. REMIGIO, SUSAN J. DESOUSA,<br>Individually & Next Friend of<br>CAMERON A. DESOUSA, JOHN DOE and<br>JANE DOE<br>     Plaintiffs<br><br>v.<br><br>CITY OF SOMERVILLE, JOSEPH CURTATONE, as<br>Somerville Mayor, DONALD CALIGURI, as former<br>Somerville Police Chief, GEORGE MCLEAN, as<br>former Somerville Police Chief, ROBERT BRADLEY,<br>as Somerville Police Chief, ROBERT TRAHAN,<br>Individually and as Former Head of Department<br>of Public Works, MITT ROMNEY,<br>JOAN LANGSAM, as Former City Solicitor,<br>PAUL ZIRPOLO, as DPW Project Manager,<br>DOROTHY KELLY GAY, as Former Somerville<br>Mayor, ROBERT J. PREZIOSO, SIMPSON<br>GUMPERTZ & HEGER, INC., ENVIROTECH,<br>VITHAL DESHPANDE, as Environmental Protection<br>Engineer, and ANGELO R. BUONOPANE<br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No.:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF SUSAN J. DESOUSA

All of the following statements are sworn to as true to the extent of my knowledge under the pains and penalties of perjury.

1.  My name is Susan J. DeSousa

2.  I am a dispatcher with the Somerville Police Department.

3.  I began working in the building located at 220 Washington Street, Somerville, MA on October 31, 2000.

4.  In June of 2001 I began to experience debilitating headaches, increased sinus pressure, eye and throat irritation and shortness of breath.

5.  I have personally observed and witnessed the same or similar symptoms in other individuals who work and/or worked in the building located at 220 Washington Street, Somerville, MA.

6.  Other individuals who work and/or worked at 220 Washington Street have complained to me regarding their health problems including those suffered by me and also including skin rashes, bug bites, asthma and other ailments.

7.  Because I have suffered a shortness of breath, I have been given medications by my doctors to assist my breathing.

8.  I have never suffered any of the symptoms listed above prior to working at 220 Washington Street, Somerville, MA.

9.  My symptoms subsided while I left my job during maternity leave.

10. I believe my adverse health affects are directly caused by the environment within 220 Washington Street.

Signed under the pains and penalties of perjury that the statements above are true and accurate according to the best of my knowledge:

Susan J. DeSousa

2

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| JOHN AUFIERO, NEIL F. COLLINS,<br>ROBYN L. DEFRANZO, DANIEL HYDE,<br>PATRICK J. IRVING, THOMAS A. LEYNE,<br>JOHN MAHONEY, JOSEPH E. MCCAIN,<br>WILLIAM MCCARTHY, TIMOTHY MITSAKIS,<br>LOUIS M. REMIGIO, SUSAN J. DESOUSA,<br>Individually & Next Friend of<br>CAMERON A. DESOUSA, JOHN DOE and<br>JANE DOE<br>       Plaintiffs | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| v. | ) C.A. No.: |
| CITY OF SOMERVILLE, JOSEPH CURTATONE, as<br>Somerville Mayor, GEORGE MCLEAN, as former<br>Somerville Police Chief, ROBERT BRADLEY,<br>as Somerville Police Chief, ROBERT TRAHAN,<br>Individually and as Former Head of Department<br>of Public Works, MITT ROMNEY,<br>JOAN LANGSAM, as Former City Solicitor,<br>PAUL ZIRPOLO, as DPW Project Manager,<br>DOROTHY KELLY GAY, as Former Somerville<br>Mayor, ROBERT J. PREZIOSO, SIMPSON<br>GUMPERTZ & HEGER, INC., ENVIROTECH,<br>VITHAL DESHPANDE, as Environmental Protection<br>Engineer, and ANGELO R. BUONOPANE<br>       Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF ROBYN DEFRANZO

All of the following statements are sworn to as true to the extent of my knowledge under the pains and penalties of perjury.

1.    My name is Robyn DeFranzo.

2.    I am a 911 dispatcher with the Somerville Police Department.

3.    I have been a dispatcher with the Somerville Police Department for ten years.

4.    I began working in the building located at 220 Washington Street, Somerville, MA in 1996.

5.  Beginning in early 1997 I began suffering adverse health affects including: bronchitis, pneumonia, shortness of breath, constant congestion, hay fever, asthma, and general difficulty breathing. I had such severe symptoms during my pregnancy in June of 1999, I was put on paid leave to protect the health and safety of my unborn child.

6.  Prior to working within 220 Washington Street, Somerville, MA, I did not experience any of the symptoms I now suffer from.

7.  I am now medicated by my doctors for all of my respiratory difficulties.

8.  I am aware of numerous other individuals who work inside of 220 Washington Street, Somerville, MA who have experienced similar adverse health affects as myself.

9.  I believe my adverse health affects are directly caused by the environment within 220 Washington Street.

Signed under the pains and penalties of perjury that the statements above are true and accurate according to the best of my knowledge:

Robyn DeFranzo

2

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| JOHN AUFIERO, NEIL F. COLLINS, ROBYN L. DEFRANZO, DANIEL HYDE, PATRICK J. IRVING, THOMAS A. LEYNE, JOHN MAHONEY, JOSEPH E. MCCAIN, WILLIAM MCCARTHY, TIMOTHY MITSAKIS, LOUIS M. REMIGIO, SUSAN J. DESOUSA, Individually & Next Friend of CAMERON A. DESOUSA, JOHN DOE and JANE DOE **Plaintiffs** | ) ) ) ) ) ) ) ) ) ) ) |
| v. | ) **C.A. No.:** ) |
| CITY OF SOMERVILLE, JOSEPH CURTATONE, as Somerville Mayor, DONALD CALIGURI, as former Somerville Police Chief, GEORGE MCLEAN, as former Somerville Police Chief, ROBERT BRADLEY, as Somerville Police Chief, ROBERT TRAHAN, Individually and as Former Head of Department of Public Works, MITT ROMNEY, JOAN LANGSAM, as Former City Solicitor, PAUL ZIRPOLO, as DPW Project Manager, DOROTHY KELLY GAY, as Former Somerville Mayor, ROBERT J. PREZIOSO, SIMPSON GUMPERTZ & HEGER, INC., ENVIROTECH, VITHAL DESHPANDE, as Environmental Protection Engineer, and ANGELO R. BUONOPANE **Defendants** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## AFFIDAVIT OF TIMOTHY MITSAKIS

All of the following statements are sworn to as true to the extent of my knowledge under the pains and penalties of perjury.

1.   My name is Timothy Mitsakis.

2.   I am a patrolman with the Somerville Police Department.

3.   I began my career as a patrolman with the Somerville Police Department on October 10, 2001 when I entered the academy.

4.   I began working in the building located at 220 Washington Street, Somerville, MA in February 2002.

5.  Beginning approximately six months after I began working in the building located at 220 Washington Street, Somerville, MA I began suffering shortness of breath, constant congestion, and asthmatic difficulties while breathing.

6.  I have never smoked cigarettes, and I have not consumed alcohol in over fifteen years. I had never experienced any difficulty breathing prior to working within 220 Washington Street, Somerville, MA.

7.  I have been diagnosed with sarcoidosis of my lungs. My doctors have told me that the sarcoidosis is attributed to inhaling airborne toxins.

8.  I am now medicated by my doctors for all of my respiratory difficulties, including Albuterol to help alleviate my shortness of breath.

9.  I am aware of numerous other individuals who work inside of 220 Washington Street, Somerville, MA who have experienced similar adverse health affects as myself.

10. I am aware of 20-25 other individuals who work inside of 220 Washington Street, Somerville, MA who are also medicated with Albuterol to alleviate their difficulties with breathing.

11. I believe my adverse health affects are directly caused by the environment within 220 Washington Street.

Signed under the pains and penalties of perjury that the statements above are true and accurate according to the best of my knowledge:

Timothy Mitsakis

2

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN AUFIERO, NEIL F. COLLINS,<br>ROBYN L. DEFRANZO, DANIEL HYDE,<br>PATRICK J. IRVING, THOMAS A. LEYNE,<br>JOHN MAHONEY, JOSEPH E. MCCAIN,<br>WILLIAM MCCARTHY, TIMOTHY MITSAKIS,<br>LOUIS M. REMIGIO, SUSAN J. DESOUSA,<br>Individually & Next Friend of<br>CAMERON A. DESOUSA, JOHN DOE and<br>JANE DOE<br>     Plaintiffs | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| v. | ) C.A. No.: |
| CITY OF SOMERVILLE, JOSEPH CURTATONE, as<br>Somerville Mayor, GEORGE MCLEAN, as former<br>Somerville Police Chief, ROBERT BRADLEY,<br>as Somerville Police Chief, ROBERT TRAHAN,<br>Individually and as Former Head of Department<br>of Public Works, MITT ROMNEY,<br>JOAN LANGSAM, as Former City Solicitor,<br>PAUL ZIRPOLO, as DPW Project Manager,<br>DOROTHY KELLY GAY, as Former Somerville<br>Mayor, ROBERT J. PREZIOSO, SIMPSON<br>GUMPERTZ & HEGER, INC., ENVIROTECH,<br>VITHAL DESHPANDE, as Environmental Protection<br>Engineer, and ANGELO R. BUONOPANE<br>     Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF WILLIAM HURLEY

All of the following statements are sworn to as true to the extent of my knowledge under the pains and penalties of perjury.

1.  My name is William Hurley.

2.  I am a District Chief with the Somerville Fire Department.

3.  I have been a firefighter with the Somerville Fire Department for thirty two years.

4.  I worked in the building located at 220 Washington Street, Somerville, MA in approximately 1988.

5.  Beginning in late 2001 I began suffering adverse health affects inability to sleep excessive fatigue and run down. The following March I was diagnosed with Acquired Chronic Myloginal Leukemia.

6.  Prior to working within 220 Washington Street, Somerville, MA, I did not experience any of the symptoms I now suffer from.

7.  I am now medicated by my doctors for cancer. I will need to take this medication for the rest of my life if I survive. .

8.  I am aware of other individuals who work inside of 220 Washington Street, Somerville, MA who have experienced similar adverse health affects.

9.  I believe my adverse health affects are directly caused by the environment within 220 Washington Street.

Signed under the pains and penalties of perjury that the statements above are true and accurate according to the best of my knowledge:

William Hurley

2

# **SUPPORTING AFFIDAVITS**

1. Affidavit of John Aufiero - Plaintiff

2. Affidavit of Thomas A. Leyne – Plaintiff

3. Affidavit of Susan J. DeSousa – Plaintiff

4. Affidavit of Robyn DeFranzo – Plaintiff

5. Affidavit of Timothy Mitsakis – Plaintiff

6. Affidavit of William Hurley

# EXHIBIT 2

PathConLaboratories

January 27, 1999
Final Report 90015

Vince Cammalleri
Simpson Gumpertz and Heger
297 Broadway
Arlington, MA 02474-5310

Re: 99452.00

Dear Mr. Cammalleri,

The microbiological analyses of the samples that were submitted to
PathCon January 11, 1999 (see Table 1), have been completed. Results are
presented in Table 2.

The submitted samples 1 and 2 were analyzed by direct microscopic visual
examination and the culture method. The microscopic examinations showed
evidence of fungal spores and hyphae on samples 1 and 2. Laboratory results
of the culture analysis are presented in Table 2.

The purpose of this report is to identify and quantify microorganisms
from collected samples at the time they are submitted. It is not the intent
of this report to make any suggestions or associations concerning potential
health effects of building occupants, nor to suggest any remediation
procedures. There are no governmental regulations concerning permissible
numbers of fungi and bacteria in environmental samples.

Thank you for your business.

Sincerely,

PATHOGEN CONTROL ASSOCIATES, INC.
By:

Kimberly H. Kirkland, B.S.
Laboratory Supervisor

George K. Morris, Ph.D.
President/CEO

Pathogen Control Associates, Inc.

270 Scientific Drive  Suite 3  Norcross, Georgia 30092
Phone: 770-446-0540  Fax: 770-446-0610

PathCon Final Report GC015

Table 2. Results of Microbiological Analysis
of Environmental Sample(s)

| Sample | Concentration[1] | Taxa[2,3] |
|---|---|---|
| 01 | $4.6 \times 10^{05}$ (High) | Fungi |
| | | Cladosporium (23/23) |
| | | Penicillium (1/23) |
| | | Rhizopus (<1/23) |
| 01 | $>6.0 \times 10^{06}$ (High) | Bacteria |
| | | Gram positive rod (124/>300) |
| | | Gram positive rod (116/>300) |
| | | Pseudomonas, not aeruginosa (103/>300) |
| 02 | $3.5 \times 10^{05}$ (High) | Fungi |
| | | Penicillium (27/35) |
| | | Cladosporium (5/35) |
| | | Chaetomium (2/35) |
| | | Aspergillus sydowi (1/35) |
| | | Aspergillus ustus group (<1/35) |
| 02 | $1.0 \times 10^{06}$ (High) | Bacteria |
| | | Bacillus (93/102) |
| | | Bacillus (6/102) |
| | | Sphingomonas (3/102) |
| 03 | $4.6 \times 10^{04}$ (Moderate) | Fungi |
| | | Cladosporium (140/230) |
| | | Penicillium (75/230) |
| | | Rhodotorula (yeast) (5/230) |
| | | Mucor group (4/230) |
| | | Aspergillus sydowi (3/230) |
| | | Yeast (3/230) |
| 03 | $6.0 \times 10^{04}$ (Moderate) | Bacteria |
| | | Pseudomonas, not aeruginosa (104/300) |
| | | Gram positive rod (58/300) |
| | | Bacillus (94/300) |

[1] Colony forming units of fungi on Malt Extract Agar (MEA)
and bacteria on R2Ac Agar per gram of sample (for samples 1, 2, 3, and 4) or
per swab (for samples 5 and 6).

[2] Genera listed in descending order of occurrence.

[3] ( ) = Taxon Count/Total Count.

what

3

PathCon Final Report G0015

Table 2. Results of Microbiological Analysis
of Environmental Sample(s).

| Sample | Concentration | Taxa[2] |
|---|---|---|
| 04 | $2.2 \times 10^{03}$ (Moderate) | Fungi<br>Penicillium 1 (5/11)<br>Penicillium 2 (2/11)<br>Stachybotrys chartarum (2/11)<br>Aspergillus clavus group (1/11)<br>Aspergillus sydowi (1/11) |
| 04 | $2.0 \times 10^{02}$ (Low) | Bacteria<br>Staphylococcus, not aureus (1/1) |
| 05 | $3.8 \times 10^{06}$ | Fungi<br>Stachybotrys chartarum (39/39) |
| 05 | $7.9 \times 10^{04}$ | Bacteria<br>Pseudomonas, not aeruginosa (48/79)<br>Pseudomonas, not aeruginosa (31/79) |
| 06 | $4.0 \times 10^{01}$ | Fungi<br>Stachybotrys chartarum (2/4)<br>Chaetomium (1/4)<br>Penicillium (1/4) |
| 06 | $< 10^{n}$ | Bacteria |

[1] Colony forming units of fungi on Malt Extract Agar (MEA) and bacteria on R2Ac Agar per gram of sample (for samples 1, 2, 3, and 4) or per swab (for samples 5 and 6).

[2] Genera listed in descending order of occurrence.

[3] ( ) = Taxon Count/Total Count.

4

# EXHIBIT 3

v Hit:   Modify   First   Last   Next   Prev   Hit-list   Report   Quit          PRNT

hit 'm' from page 7

                    Police Administrative Event

in #: 52071
e:    05/06/2005   Time:    2101              Operator: B63

in Code: 415 HAZARD          (Attention:                 )

icer: 63    MAHONEY J        Unit: DIV2    How Recv'd: TEL    Show on log? Y

--- Narrative ----------------------------------        page 1 of 1
ES LEAKING IN CONSOLE AREA & STATION  AREA CAUSING
'ERE NOSE BURN & HEAD ACHE FOR INSIDE WORKERS.
!ING FROM AUX FIRE DEPT LIGHTING UNIT.

w Hit:   Modify   First   Last   Next   Prev   Hit-list   Report   Quit          PRNT

hit 'k' from page 7

                    Police Administrative Event

ain #: 51064
.e:    02/25/2005    Time:    935                Operator: E262

ain Code: 415 HAZARD          (Attention:                    )

:icer:                          Unit:       How Recv'd: TEL    Show on log? Y

---- Narrative ------------------------------------    page 1 of 1
 THE DISPATCH AREA A STRONG ODOR OF GASOLINE EMINATING FROM GARAGE
)M APPROX 0730 TO PRESENT. GARAGE CONTACTED AND FUEL FILTER WAS BEING
PLACED.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'i' from page 7

                    Police Administrative Event

nin #: 50824
:e:    02/11/2005   Time:    1120              Operator: E397

nin Code: 415 HAZARD        (Attention:                  )

ficer: 397  CORNELIO C      Unit: 911    How Recv'd: TEL   Show on log? Y

---- Narrative -----------------------------------    page 1 of 1
RY STRONG SMELL OF FUMES COMING INTO DISPATCH AREA

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'h' from page 7

                         Police Administrative Event

nin #: 50686
te:    02/04/2005   Time:    829            Operator: SILV

nin Code: 415 HAZARD         (Attention:                 )

ficer: 245   WHALEN           Unit:       How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------     page 1 of 1
C WHALEN REPORTS THERE ARE SEVERAL NEW LEAKS AND WATER DAMAGE TO THE
ILING TILES AND RUGS IN THE DETECTIVE BUREAU.  THE NEW LEAKS ARE
OVE SEVERAL DETECTIVES CUBES AND THE DETECTIVE CLERK AREA.  THESE
AKS ARE ABOVE COMPUTER EQUIPMENT AND SENSITIVE FILES.  ALSO THERE IS
STRONG MOLD/MILDEW SMELL IN THE DETECTIVE BUREAU.  THE LEAKING HAS
USED DAMAGE TO SEVERAL COMPUTERS AS WELL AS FILES IN THE DETECTIVE
REAU.

W NOTIFIED 2/7/05  SGT SILVA

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'g' from page 7

                          Police Administrative Event

min #: 50633
te:     01/31/2005   Time:    2205              Operator: B241

min Code: 415 HAZARD          (Attention:                )

ficer: 241   OLIVEIRA M       Unit:       How Recv'd: TEL   Show on log? Y

----- Narrative -------------------------------------    page 1 of 1
IPLOYEES DETECTED A VERY STRONG SMELL OF SMOKE OR 'BURNING RUBBER'.
I CONTACTED FIRE DEPARTMENT.  FIRE DEPARTMENT CONCLUDED THAT THE
IXILARY FIRE TRUCKS WERE LEFT RUNNING DOWNSTAIRS AND THE CARBON
)NOXIDE FUMES TRAVELED THRU THE VENTS AND CAME UPSTAIRS AT THE
ISPATCH AREA.  ACCORDING TO DISTRICT FIRE CHIEF ON SCENE, THE VENTS
LE LOCATED DIRECTLY BEHIND DISPATCH NEAR THE BOOKING ROOM.  SGT
)ZELLA, D. GROSSE, C. CORNIELO, OFC. MELO AND I WERE ALL FEELING LITE
EADED DUE TO THE ODOR.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'c' from page 7

                    Police Administrative Event

min #: 50098
te:    01/07/2005   Time:    1207              Operator: B245

min Code: 415 HAZARD          (Attention:                 )

ficer: 245   WHALEN           Unit:         How Recv'd: TEL   Show on log? Y

---- Narrative ----------------------------------        page 1 of 1
T WHALEN REPORTS THAT IT IS RAINING IN THE DETECTIVE BUREAU FOR THE
COND TIME THIS WEEK.  WATER IS RUNNING THROUGH THE LIGHT FIXTURES OF
E DETECTIVE BUREAU.  DPW HAS BEEN NOTIFIED!!!!

ew Hit:   Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'j' from page 6

                    Police Administrative Event

nin #: 44464
te:    09/13/2004   Time:    1656              Operator: E397

min Code: 415 HAZARD          (Attention:                    )

ficer: 397   CORNELIO C        Unit: 911    How Recv'd: TEL    Show on log? Y

---- Narrative -----------------------------------          page 1 of 1
CORNELIO REPORTS ON THIS DATE AT APPROX 4:45PM A MOUSE RAN OUT FROM
E COMMANDER'S OFFICE AND INTO THE 911 AREA.

w Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

. hit 'i' from page 6

                    Police Administrative Event

iin #: 44387
:e:   09/09/2004   Time:   1451              Operator: E397

nin Code: 415 HAZARD        (Attention:            )

ficer: 397  CORNELIO C      Unit:       How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------      page 1 of 1
 APPROXIMATELY 1PM AFTER PEST CONTROL CAME IN TO PLACE TRAPS IN 911
EA, A MOUSE CAME OUT FROM BEHIND FILE CABINET AND THEN RETURNED BACK
HIND 911 CABINETS. THE MOUSE IS STILL IN 911 AREA.

ᴇw Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'h' from page 6

                          Police Administrative Event

nin #: 44381
te:   09/09/2004   Time:     740                 Operator: E418

min Code: 415 HAZARD           (Attention:                    )

ficer: 418   VALLERY K          Unit:       How Recv'd: DSK   Show on log? Y

---- Narrative ------------------------------------      page 1 of 1
VALLERY RPTS TWICE DURING THE LAST HALF SHIFT, NOTICED A MOUSE
NNING BEHIND THE COMPUTER AND ON THE DESK AREA.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'g' from page 6

                         Police Administrative Event

min #: 44259
te:    09/03/2004   Time:    2007              Operator: E419

min Code: 415 HAZARD          (Attention:                  )

ficer: 419   DESOUSA S        Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative ----------------------------------        page 1 of 1


RATS IN 911 AREA, HEALTH HAZARD

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'f' from page 6

                      Police Administrative Event

min #: 44194
te:    08/30/2004   Time:    1827            Operator: B48

min Code: 415 HAZARD        (Attention:                )

ficer: 48    GAUGHAN M       Unit: DIV1    How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------    page 1 of 2
;T. GAUGHAN REPORTS THAT THE COMMANDERS OFFICE WAS EXPERIENCING SEVERE
)LD SMELL DUE TO CEILING TILES BROKEN AND WATER SOAKED FROM A WATER
:AK IN THE AIR CONDITIONING SYSTEM. LT. DEVEREAUX REPORTED THAT
JNNEWELL WAS CONTACTED AND RESPONDED TO SPD TO ALLEDGEDLY FIX THE
:OBLEM.
;T. GAUGHAN CONTACTED STAN KOTY AT D.P.W. AT 1545 HRS. AND D.P.W.
:SPONDED TO REPLACE THE CEILING TILES AND ELIMINATE THE DOWN DRAFT
?FECT THE MISSING TILES WERE CAUSING, WHICH WAS MAKING IT SMELL.
;T. GAUGHAN IS EXPERIENCING BREATHING DIFFICULTIES FROM THE SMELL.
:LL SEEK MEDICAL ATTENTION IF NEEDED. ALSO SGT. NARGI HAD TO USE THE

ǝw Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

ᴄ hit 'd' from page 6

                        Police Administrative Event

ɴin #: 43969
te:     08/17/2004   Time:    1822              Operator: E419

min Code: 415 HAZARD          (Attention:                )

ficer: 419   DESOUSA S        Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative -----------------------------------      page 1 of 1

˙ THE PAST FEW DAYS, NUMEROUS FLEAS HAVE BEEN FLYING AROUND DISPATCH
.EA.  HEALTH HAZARD

tput:   Choose a printer [Current=booking]   -or-  <CANCEL> 5_                PRNT
. records      3. journal      5. booking     7. admin      9. -- OTHER --
. traffic      4. station      6. detect      8. adminpa

                          Police Administrative Event

min #: 43829
te:     08/11/2004   Time:    1001                Operator: E262

min Code: 415 HAZARD          (Attention:                    )

ficer: 203   POLITO J         Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------------     page 1 of 1
' POLITO REPORTS THERE ARE GNATS FLYING AROUND COMMANDERS OFFICE.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'a' from page 6

                        Police Administrative Event

nin #: 43829
:e:    08/11/2004   Time:    1001              Operator: E262

nin Code: 415 HAZARD          (Attention:                    )

ficer: 203   POLITO J         Unit:         How Recv'd: TEL   Show on log? Y

---- Narrative -----------------------------------        page 1 of 1
POLITO REPORTS THERE ARE GNATS FLYING AROUND COMMANDERS OFFICE.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

t hit 's' from page 5

                    Police Administrative Event

min #: 43692
te:    08/04/2004    Time:    2011            Operator: E416

min Code: 415 HAZARD        (Attention:                )

ficer: 416   GROSSE D        Unit:      How Recv'd: TEL   Show on log? Y

---- Narrative ----------------------------------       page 1 of 1
ILE SITTING AT THE CO DISPATCH POSITION IN THE 9-11 ROOM I WAS
VERLY BITTEN ON MY RIGHT ARM IN 4 DIFFERENT SPOTS
BIG WELTS HAVE APPEARED.
SO TWO BIG BITES ON RIGHT LEG APPEARED
TES ARE EXTREMLY ITCHY AND SWOLLEN
SO A BITE ON SMALL FINGER ON LEFT HAND

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'q' from page 5

                        Police Administrative Event

nin #: 43439
te:     07/19/2004    Time:     831              Operator: E458

min Code: 415 HAZARD          (Attention:                    )

ficer: 249   KIELY J          Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------         page 1 of 1
AIN THERE ARE FLIES AND BUGS IN THE DISPATCH AREA.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'p' from page 5

                         Police Administrative Event

min #: 43417
.te:    07/18/2004   Time:   1458              Operator: E262

lmin Code: 415 HAZARD        (Attention:                )

ficer:                       Unit:      How Recv'd: TEL   Show on log? Y

----- Narrative ------------------------------------          page 1 of 1

IERE ARE MULTIPLE LARGE FLIES BUZZING OCCUPANTS OF DISPATCH AREA.

ew Hit:   Modify   First   Last   Next   Prev   Hit-list   Report   Quit          PRNT

t hit 'o' from page 5

## Police Administrative Event

min #: 43290
te:    07/10/2004    Time:    2242                Operator: B82

min Code: 415 HAZARD        (Attention:                    )

ficer: 82    LYONS D            Unit: DAYS    How Recv'd: WAL    Show on log? Y

---- Narrative -----------------------------------    page 1 of 1
E 911, STATION & CONSOLE AREA ARE INFESTED   WITH
UIT FLIES PLEASE DO SOMETHING.

w Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

. hit 'n' from page 5

                        Police Administrative Event

ain #: 43274
:e:    07/10/2004    Time:    1102            Operator: E249

nin Code: 415 HAZARD          (Attention:                )

ficer: 249   KIELY J            Unit:      How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------      page 1 of 1
ERE ARE BUGS FLYING AROUND IN THE DISPATCH AREA.

w Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

. hit 'm' from page 5

                          Police Administrative Event

nin #: 43269
:e:   07/10/2004   Time:   452              Operator: E419

nin Code: 415 HAZARD        (Attention:                )

ficer: 419   DESOUSA S       Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative ----------------------------------        page 1 of 1

GE BEETLE FLYING AROUND DISPATCH AREA, POSSIBLY HAS FANGS

:w Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'l' from page 5

                        Police Administrative Event

nin #: 43196
te:    07/05/2004   Time:    1339              Operator: E274

min Code: 415 HAZARD        (Attention:              )

ficer: 274   MEDEIROS T        Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative -----------------------------------     page 1 of 1
C M COSTA REPORTS THAT TILES IN FEMALE LOCKER ROOM ARE LEAKING

:w Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'i' from page 5

                         Police Administrative Event

nin #: 42978
:e:   06/23/2004   Time:   2046              Operator: E416

nin Code: 415 HAZARD          (Attention:                  )

ficer: 419   DESOUSA S        Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative ----------------------------------------    page 1 of 1
 20.10 ON THIS DATE THE SOMERVILLE FIRE DEPT WAS DISPATCHED TO THE
ATION DUE TO A STRONG ODOR OF GAS. FIRE DEPT STATES AUX FIRE TRUCKS
RE LEFT RUNNING AGAIN. 911 PERSONNEL WERE AFFECTED
 DESOUSA EXCUSED
 MILLIGAN HEADACHE
 GROSSE UPSET STOMACH

w Hit:   Modify   First   Last   Next   Prev   Hit-list   Report   Quit          PRNT

. hit 'h' from page 5

                          Police Administrative Event

nin #: 42838
:e:    06/14/2004   Time:    2352              Operator: E261

nin Code: 415 HAZARD         (Attention:                    )

ficer: 199   VOZELLA J        Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative -----------------------------------   page 1 of 1
T VOZELLA REPORTS THAT HE SAW 2 RATS IN THE GYM AREA

ew Hit:   Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

: hit 'g' from page 5

                          Police Administrative Event

nin #: 42761
te:    06/11/2004   Time:    1033              Operator: E262

min Code: 415 HAZARD          (Attention:                  )

ficer:                         Unit:      How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------       page 1 of 1
' THIS TIME IN STATION AREA AND 911 AREA OCCUPANTS ARE BEING DIVE
'MBED BY A FLY THAT IS EXTRAORDINARILY LARGE IN COMPARISON TO OTHER
,IES.

:w Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'c' from page 5

                        Police Administrative Event

nin #: 41696
te:    04/13/2004   Time:    1244              Operator: B72

nin Code: 415 HAZARD        (Attention:              )

ficer: 397   CORNELIO C        Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------       page 1 of 1
TER IS LEAKING FROM CEILING ONTO FLOOR IN LADIES LOCKER ROOM
W NOTIFIED AT 1400 HRS   LT D

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 'a' from page 5

                    Police Administrative Event

min #: 41577
te:   04/06/2004   Time:    2127              Operator: B72

min Code: 415 HAZARD        (Attention:                  )

ficer: 105   FEMINO C        Unit:       How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------    page 1 of 1
:R LT FEMINO:
' LEAST 4 STATION PERSONNEL HAVE COMPLAINED ABOUT SNEEZING, COUGHING,
)RE THROATS, EYE IRRITATION. COMPLAINTS SEEM TO EVOLVE AROUND THE AIR
JALITY WITHIN DISPATCH/CONSOLE AREA.

:TY ENVIRONMENTAL OFFICER HAS TOURED BUILDING AND WILL BE FILING REPORT
[ D

w Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

. hit 'r' from page 4

                        Police Administrative Event

nin #: 41527
:e:     04/04/2004   Time:    1416              Operator: B72

nin Code: 415 HAZARD          (Attention:                )

ficer: 397   CORNELIO C       Unit:       How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------     page 1 of 1
TER IS LEAKING FROM CEILING IN LADIES LOCKER ROOM AND FLOODING THE
OOR
W NOTIFIED AND CAN ONLY CLEAN UP THE WATER.

w Hit:   Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

. hit 'q' from page 4

                    Police Administrative Event

nin #: 41279
:e:    03/19/2004   Time:    1718           Operator: B72

nin Code: 415 HAZARD        (Attention:              )

ficer: 420   MILLIGAN A      Unit: 911    How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------   page 1 of 1
E CEILING IN THE LADIES LOCKER IS LEAKING
D REPORTS DPW HAS TAKEN DOWN THE TILES.

w Hit:   Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

  hit 'p' from page 4

                    Police Administrative Event

nin #: 40789
:e:    02/19/2004   Time:    811              Operator: E262

nin Code: 415 HAZARD        (Attention:                  )

ficer: 262   WARD K          Unit:       How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------    page 1 of 1
 THIS TIME THERE ARE FUMES FROM GARAGE LEAKING INTO 911 AREA.

:w Hit:   Modify   First   Last   Next   Prev   Hit-list   Report   Quit          PRNT

: hit 'o' from page 4

                        Police Administrative Event

nin #: 40780
:e:    02/18/2004   Time:    830                Operator: E262

nin Code: 415 HAZARD         (Attention:                    )

ficer: 262   WARD K            Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------     page 1 of 1
 THIS TIME DIRT FROM ABOVE GRATE FALLING ON TO COUNTER IN 911 AREA.

w Hit:   Modify   First   Last   Next   Prev   Hit-list   Report   Quit          PRNT

   hit 'l' from page 4

                          Police Administrative Event

iin #: 40392
.e:    01/27/2004   Time:    1203               Operator: E262

iin Code: 415 HAZARD           (Attention:                  )

Ticer: 262   WARD K             Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative -----------------------------------------          page 1 of 1
 THIS TIME STRONG GAS FUMES ARE ENTERING DISPATCH AREA.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

t hit 'j' from page 4

                          Police Administrative Event

min #: 40251
te:     01/19/2004   Time:    1256              Operator: E262

min Code: 415 HAZARD         (Attention:                    )

ficer: 262   WARD K          Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative -----------------------------------        page 1 of 1
: STATIONMAN/911 AREA THE VENTS IN CIELING ARE PRODUCING A BLACK
ISTANCE ONTO WALLS, FANS AND FILTER ON VENT.

ew Hit:   Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

t hit 'i' from page 4

                    Police Administrative Event

min #: 36013
te:    12/15/2003   Time:    122              Operator: B63

min Code: 415 HAZARD         (Attention:                )

ficer: 63    MAHONEY J       Unit: DIV2    How Recv'd: WAL    Show on log? Y

----- Narrative -----------------------------------        page 1 of 1
'F MAHONEY REPORTS THAT THE ROOF IS LEAKING IN THE
)BBY OVER THE TRAFFIC DOOR AT THIS TIME. ALSO
ROSS THE LOBBY BY TGHE OTHER OFFICE.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'f' from page 4

                     Police Administrative Event

min #: 34226
te:     09/06/2003   Time:    1136              Operator: E262

min Code: 415 HAZARD          (Attention:                    )

ficer: 68    NARGI A          Unit:          How Recv'd: TEL   Show on log? Y

---- Narrative -----------------------------------       page 1 of 1
;T NARGI REPORTS WATER LEAKING FROM CEILING IN COMMANDERS OFFICE

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'd' from page 4

                         Police Administrative Event

min #: 33939
te:   08/17/2003   Time:   1507              Operator: E261

min Code: 415 HAZARD          (Attention:                    )

ficer: 203   POLITO J          Unit:        How Recv'd: TEL   Show on log? Y

---- Narrative ------------------------------------      page 1 of 2
E STATION IS IN AN UNSANITARY CONDITION. I PERSONALLY OBSERVED THREE
EAS   IN THE COMMANDERS OFFICE. THE BATHROOM IS UNSANITARY AND DOES
T HAVE ENOUGH PAPER TOWELS TO LAST THROUGH THE WEEK-END.  A NEW
LL DISPENSER NEEDS TO BE ADDED BECAUSE THE PAPERTOWELS DO NOT FIT THE
SPENSER THAT IS THERE. OPERATOR K.WARD REPORTS HE OBSERVED FLEAS  IN
E DISPATCH AREA. THE CARPET IN THE COMMANDERS AND SERGEANTS OFFICE IS
PPED, HAS SUSTAINED WATER DAMAGE FROM NUMEROUS WATER SPILLS THROUGH
E CEILING AND NEEDS TO BE REPLACED. THE TRASH PILES UP FROM SATURDAY A
12 NOON THRU MONDAY  BEFORE IT IS EMPTIED. THIS IS CAUSING THE
FFICES TO SMELL AND IS ATTRACTING FLIES DUE TO A LACK OF JANITORIAL SER

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'c' from page 4

                    Police Administrative Event

min #: 32471
te:    05/18/2003   Time:    2315            Operator: E420

min Code: 415 HAZARD        (Attention:                )

ficer: 420   MILLIGAN A      Unit: E 911   How Recv'd: TEL   Show on log? Y

----- Narrative ------------------------------------   page 1 of 1
)CKROACHES WERE SEEN ON THE WINDOW SILL IN THE BREAK ROOM.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit           PRNT

: hit 's' from page 3

                          Police Administrative Event

nin #: 31097
te:    03/02/2003   Time:    1506              Operator: E262

min Code: 415 HAZARD           (Attention:                 )

ficer:                         Unit:       How Recv'd: TEL   Show on log? L

---- Narrative ------------------------------------      page 1 of 1
' POLITO REPORTS THAT CONSOLE OPERATOR HAS REPORTED TO HIM THAT CEILING
  LEAKING INTO FRONT LOBBY NEAR FRONT DOORS.

ew Hit:   Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

t hit 'r' from page 3

                        Police Administrative Event

min #: 30710
te:    02/09/2003   Time:    710              Operator: E397

lmin Code: 415 HAZARD        (Attention:                )

ficer: 397   CORNELIO C      Unit:       How Recv'd: TEL   Show on log? Y

----- Narrative ----------------------------------- page 1 of 1
ISIDE PERSONNEL COMPLAINING OF HEADACHE, BURNING EYES, NOSE AND THROAT
JE TO STRONG SMELL OF PETROLEUM FUMES. REFER TO JP#03005385.
{ONT DOORS AND LUNCH ROOM WINDOWS HAD TO BE OPENED IN AN ATTEMPT TO
ENTILATE BUILDING.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'q' from page 3

                    Police Administrative Event

min #: 26841
.te:    09/09/2002   Time:    744              Operator: E262

imin Code: 415 HAZARD         (Attention:                )

fficer: 262   WARD K          Unit:      How Recv'd: TEL   Show on log? Y

----- Narrative ------------------------------------      page 1 of 1

J COMMUNICATION AREA AND STATIONMAN AREA SMALL FLYING INSECTS ARE IN
REA AND SEVERAL PEOPLE HAVE BEEN BITTEN.

ew Hit:   Modify  First   Last   Next   Prev   Hit-list   Report   Quit        PRNT

t hit 'a' from page 3

                         Police Administrative Event

min #: 10408
te:    01/22/2001   Time:    1950              Operator: B86

lmin Code: 415 HAZARD         (Attention:                    )

ificer: 72    DEVEREAUX M      Unit: CO     How Recv'd: TEL   Show on log? Y

----- Narrative ------------------------------------        page 1 of 1
: DEVEREAUX REPORTS THAT STATION PERSONNELL ARE COMPLAINING OF
.EVATED CARBON MONOXIDE LEVELS, CAUSING NAUSEAU AND HEADACHE.
JXILIARY FIRE DEPT IS RUNNING THE LIGHTING TRUCKS JUST OUTSIDE THE
\RAGE DOORS AND THE EXHAUST IS BEING SUCKED INTO THE BUILDING'S AIR
(STEM.    FIRE DPT ORDERED TO CEASE RUNNING TRUCKS

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

t hit 'p' from page 2

                    Police Administrative Event

min #: 4012
.te:    09/07/2000    Time:    648              Operator: B63

min Code: 415 HAZARD         (Attention:                )

ficer: 63    MAHONEY J #2      Unit: DIV2    How Recv'd: AKL    Show on log? Y

----- Narrative -------------------------------------      page 1 of 1
?F MAHONEY REPORTS THAT IN STATION AREA #2 IT APPEARS
) BE SOME TYPE OF CONDESATION UNDER THE DESK OR MOLD...

ew Hit:   Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

ıt hit 'o' from page 2

                          Police Administrative Event

imin #: 2847
ıte:    06/23/2000   Time:    1137               Operator: E246

imin Code: 415 HAZARD          (Attention:                    )

Fficer: 143  BENKOVIC M         Unit:       How Recv'd: TEL   Show on log? Y

----- Narrative ------------------------------------          page 1 of 1
FFICER M BENKOVIC REPORTS A STRONG SMELL OF GAS IN LOBBY AREA OF THE
ƆLICE STATION AND THE PUBLIC LADIES ROOM.  FIRE DEPT RESPONDED

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit 'j' from page 2

                         Police Administrative Event

imin #: 1658
.te:    04/18/2000   Time:    145              Operator: E397

imin Code: 415 HAZARD        (Attention:               )

:ficer: 86   HYDE D          Unit: DIV 2   How Recv'd: TEL   Show on log? Y

----- Narrative ------------------------------------        page 1 of 1
[ HYDE REPORTS THAT SEVERAL INSIDE PERSONNEL ARE COMPLAINING OF EYE
JD THROAT IRRITATION AND CHEST CONGESTION. ENVIRO TECH HAS BEEN
)RKING IN THE BUILDING.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit        PRNT

ot hit 'h' from page 2

Police Administrative Event

imin #: 1525
ate:    04/12/2000   Time:    118              Operator: E398

imin Code: 415 HAZARD        (Attention:                )

Fficer: 86    HYDE D          Unit:      How Recv'd: TEL   Show on log? Y

----- Narrative ------------------------------------        page 1 of 1
I D HYDE REPORTS THAT HE AND THE STATION PERSONNEL ARE EXPERIENCING
REATHING DISCOMFORT DUE TO A CHEMICAL LIKE IRRITATION IN THEIR
HROATS, AS WELL AS COMPLAINTS OF HEADACHES.
NVIROTEK IS CURRENTLY WORKING ON THE VENTS.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit       PRNT

t hit 'g' from page 2

                    Police Administrative Event

min #: 1510
te:    04/11/2000    Time:    156              Operator: B175

min Code: 415 HAZARD         (Attention:              )

ficer: 72    DEVEREAUX M      Unit: CO    How Recv'd: TEL    Show on log? Y

---- Narrative ------------------------------------    page 1 of 1
? DEVEREAUX REPORTS THAT HE AND STATION PERSONNEL ARE EXPERIENCING
REATHING DISCOMFORT DUE TO A CHEMICAL LIKE IRRITATION IN THEIR
IROATS, AS WELL AS COMPLAINTS OF HEADACHES. IT IS SIMILAR TO
(PERIENCING MACE.
WIROTEK IS CURRENTLY WORKING ON THE VENTS.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit            PRNT

t hit 'c' from page 2

                          Police Administrative Event

min #: 992057
te:    06/03/1999   Time:    315              Operator: B223

min Code: 415 HAZARD          (Attention:                    )

ficer: 63    MAHONEY J #2      Unit: DIV2    How Recv'd: TEL   Show on log? Y

----- Narrative ----------------------------------        page 1 of 1
F J. MAHONEY REPORTS THAT THERE IS A HEALTH HAZARD IN THE
TATION/PERSON AREA. COCKROACHES HAVE BEEN SEEN IN THE & ON
SK TOPS AS WELL AS THE FLOOR. BARRELS IN THIS AREA HAVE BEEN
PTY BY POLICE PERSONEL.   SO NOTED........

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

: hit 's' from page 1

                          Police Administrative Event

min #: 983774
te:    10/31/1998   Time:    1801              Operator: B217

min Code: 415 HAZARD          (Attention:              )

ficer: 100   NADILE E         Unit: D/O    How Recv'd: TEL    Show on log? Y

---- Narrative ------------------------------------     page 1 of 1
'F NADILE RPS THAT HE HAS OBSERVED WATER LEAKING FROM THE CEILING
I THE COMMON HALLWAY NEAR THE LOUNGE AREA.  LT DAMRON NOTIFIED JOHN
LLIVAN AND HE TOLD LT DAMRON THAT HE WILL RECTIFY THE PROBLEM IN THE
i.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

t hit '1' from page 1

                        Police Administrative Event

imin #: 943074
te:   09/01/1994   Time:    521                 Operator: B48

imin Code: 415 HAZARD           (Attention:                )

:ficer: 86   HYDE D           Unit: DIV 2   How Recv'd: DSK   Show on log? Y

----- Narrative ------------------------------------       page 1 of 1
:TENTION CAPT. TATOSKY & JANITOR ALAN KOSLOFSKY

)NSOLE OPERATOR ANN O'CONNOR REPORTED A COCKROACH WAS RUNNING ALONG
3SK AREA IN CONSOLE ROOM LAST EVENING. OFF. GAUGHAN CONFIRMED AND
PRAYING SHOULD START ASAP, ALONG WITH TUESDAY EVENING COCKROACHES WERE
3SERVED IN ADMIN. OFFICE BY SUSAN BESSON.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit          PRNT

ב hit 'i' from page 1

                    Police Administrative Event

min #: 940620
te:    02/16/1994   Time:    2255            Operator: B151

min Code: 415 HAZARD        (Attention:                )

ficer:                       Unit:      How Recv'd: DSK   Show on log? Y

---- Narrative ------------------------------------    page 1 of 1
'T STANFORD REPORTS THAT THERE IS A WATER LEAK IN THE MAIN LOBBY AND
 ALIANO FROM THE CITY HAS BEEN NOTIFIED.

ew Hit:  Modify  First  Last  Next  Prev  Hit-list  Report  Quit           PRNT

t hit 'h' from page 1

                        Police Administrative Event

min #: 954281
te:    12/02/1995   Time:    1642              Operator: B57

lmin Code: 415 HAZARD        (Attention:                )

ficer: 57   LEYNE T          Unit:       How Recv'd: TEL   Show on log? Y

----- Narrative ------------------------------------      page 1 of 1
? O'CONNOR REPORTS ON THE RECOMMENDATION OF THE BOSTON GAS COMPANY AND
IE SOMERVILLE FIRE DEPARTMENT.  IN THE GARAGE AREA, THE OIL DRUM IS TO
? REMOVED, IT IS SITUATED UNDER A RADIANT HEATER WHICH COULD RESULT IN
EXPLOSION.

TTN:  ADMINISTRATION

# EXHIBIT 4

THE COMMONWEALTH OF MASSACHUSETTS

**DIVISION OF OCCUPATIONAL SAFETY**

OCCUPATIONAL HYGIENE / INDOOR AIR QUALITY PROGRAM

www.mass.gov/dos/iaq

MITT ROMNEY
Governor
KERRY HEALEY
Lieutenant Governor
JANE C. EDMONDS
Director, DWD
ANGELO R. BUONOPANE
Director, DOL

ROBERT J. PREZIOSO
Commissioner

October 21, 2004

File 05S0068

Chief George McLean
Somerville Police Department
220 Washington St.
Somerville, MA 02143

Dear Chief,

Introduction

On September 14th and 21st the Somerville Police Department was visited as a result of a call received by our office alleging poor indoor air quality and various adverse health effects as the result of being in the building. A number of individuals accompanied DOS representatives at various points during the visit. These included Vithal Deshpande, Environmental Coordinator, Al Bargoot, Building Inspector, Frank Santangelo, Superintendent of Buildings and Grounds, Joan McKenna, Union Rep, Lt Mike Devereaux, Somerville Police Dept, and a Honeywell Representative. A number of other individuals also joined the tour at different times.

Pursuant to Chapter 149 section 6 of the Massachusetts General Laws the Division of Occupational Safety (DOS) is charged with enforcing health standards at all county and municipal workplaces. It is the policy of our office to reference State and other applicable governmental and industry health and safety regulations and guidelines where appropriate in order to ensure that workers are protected. The purpose of this inspection was to identify factors that potentially contribute to complaints of poor indoor air quality.

The portion of this report entitled "Recommendations and Corrective Action Needed" lists items which you should address as soon as possible in order to ensure that employees are protected. Items listed in boldface have the greatest potential for

causing harm to employees. You must take the corrective action recommended in this report in connection with each boldfaced item. Corrective action dates are given only for these boldfaced items. A corrective action date is the date by which you must a take the corrective action recommended in this report.

All reports made by you to DOS with respect to the boldfaced items must be made on the attached Corrective Action Response Form by the response dates given. **Failure to (a) take corrective action on the boldfaced items by their respective corrective action dates and file a corrective action response form by the response date stating the same, or (b) file a corrective action response form by the response date explaining why you cannot take such corrective action by such dates, and how and when you will take such action in the future, may result in penalties pursuant to Mass. Gen. L. ch. 149, section 6.**

Although the boldfaced items pose the most immediate threat to your employees' health and safety, DOS strongly recommends that you take the corrective action recommended by DOS with respect to all other items identified in this report as well.

## Background Information/Building Complaints

There have been a number of indoor air quality complaints at the 220 Washington St. building. Our office has visited this building several times, starting as early as 1986, just a year after it was renovated. Several "band-aid" solutions have been tried over the years, however, it is apparent that this building has not been comprehensively managed and has rapidly deteriorated as a result.

The original building was built in 1927 as an MBTA "car barn". In 1985, the entire structure was gutted and the Public Safety complex was designed around the existing external structural elements. As early as 1986, employees were complaining of indoor air quality issues. Then, in 1996 a major flash flood went through the basement of the building causing the Fire Department (located in the basement) to ultimately decide to permanently evacuate the building. To this date, the fire department is located in a trailer in the parking lot of the 220 Washington St. site.

The Police Department, which is primarily located on the first and second floors of this building, remained in the building after the flood. The Police have continued to complain about air quality issues including severe water infiltration since that time.

The building has a number of structural issues that relate to safety of occupants in the building. Ultimately, it is important that a determination is made that the building is structurally safe to occupy. Many structural issues also relate to the health of individuals within the building. For example, the water infiltration into the building that is a result of some of the structural deficiencies is adversely affecting indoor air quality in the building. Details of findings and recommendations follow.

## General Information on Indoor Air Quality Complaints

Air quality problems can exist without the existence of "toxic" levels of pollutants. The most frequent cause of so-called "bad air" complaints involves the buildup of low level contaminants from sources such as furniture, rugs, and office machines. Energy efficient buildings often do not supply enough fresh air to dilute low level contaminants adequately. In addition, ventilation systems are often not maintained and fail to provide the same level of ventilation as they were originally designed to provide. The National Institute of Occupational Safety and Health (NIOSH) estimates that 52% of indoor air quality complaints are due to the lack of adequate ventilation.

Symptoms often associated with poor indoor air quality include headaches, lack of concentration, dizziness, nausea, eye and throat irritation, excessive fatigue, and general malaise. Reactions can vary due to differences in individual susceptibilities.

There are no governmental standards related to indoor air quality with the exception of the building code ventilation standards that were in effect at the time the building was built. There are many guidelines for what are considered to be acceptable levels of contaminants in office environments. These guidelines are used as a comparison to the levels found in this survey. Please note that achieving these target levels does not necessarily guarantee that all occupants will be free of adverse health effects. There are some contaminants that are difficult to measure at low levels. There may be sensitive individuals who are adversely affected at levels lower than those that affect the general public. Sufficient dilution ventilation can minimize the impact of these low-level contaminants.

OSHA is the regulatory agency charged with the protection of workers in private industry. OSHA has established "exposure limits" for many chemicals, however the levels were established with industrial settings in mind, rather than office settings. As is typical with indoor air quality investigations, none of the substances tested revealed levels that were above the OSHA Permissible Exposure Limits (PELs). Due to differences between industrial and office settings, indoor air quality problems may exist at levels that are well below OSHA PELs.

## Indoor Air Quality Findings

The following parameters were assessed in an effort to determine the source of the alleged poor indoor air quality. These parameters are the most common indicators of indoor air quality problems.

1. Carbon Dioxide
2. Carbon Monoxide
3. Temperature and Relative Humidity
4. VOCs
5. Ventilation
6. Housekeeping
7. Ultrafine Particulates
8. Water Damage

A summary of each of the parameters evaluated follows. Recommended corrective action items to address any deficiencies noted are given at the end of the report. All sample results are located in the appendix of this report.

### Carbon Dioxide

People give off Carbon Dioxide when they exhale. If the ventilation system is adequate, then some of this carbon dioxide will be removed and the rest will be diluted with fresh air. In occupied spaces carbon dioxide given off by exhalation can tend to build up over time if there is not enough fresh air to dilute it. If carbon dioxide levels are elevated then one can reason that low levels of other contaminants generated by other sources such as copy machines, smoking, cleaning chemicals and building materials may also accumulate due to inadequate dilution. As mentioned previously, it is the buildup of these other low-level contaminants that frequently cause complaints of poor indoor air quality.

The reason for measuring carbon dioxide in indoor air quality investigations is not to assess the health effects from carbon dioxide but simply to assess the adequacy of the ventilation system. Carbon dioxide gas is not considered to be hazardous at levels below 5000 parts per million. However, levels above 800 parts per million makes the ventilation system suspect in terms of the amount of dilution ventilation supplied to the area.

Assuming normal occupancy in an area, carbon dioxide measurements of

| Less than 800 PPM | 800-1000 PPM | Over 1000 PPM |
|---|---|---|
| Considered to indicate adequate ventilation | Marginal ventilation | ASHRAE * considered to indicate inadequate outside air |

*American Society of Heating Refrigeration and Air Conditioning Engineers-ASHRAE 62-1989

### Findings

Levels of carbon dioxide measured on the day of the visit ranged from 486-700 parts per million. This indicates an adequate supply of fresh air on the day of the visit. Measured levels are given in Appendix A of this report.

### Carbon Monoxide

Carbon Monoxide is a colorless, odorless gas that is given off by incomplete combustion. Cigarette smoke, furnaces and gasoline engine exhaust are common sources of carbon monoxide.

The OSHA Permissible Exposure Limit for carbon monoxide is 50 PPM as an average for an 8-hour day. However, if levels are more than 3 parts per million above ambient outdoor levels this indicate that there is a source of carbon monoxide. The Environmental Protection Agency recommends a limit of 9 parts per million when averaged over an 8 hour day in order to prevent adverse health effects for those at risk of carbon monoxide exposure (such as those with heart disease).

### Findings

Carbon monoxide levels on the day of the testing ranged from 0-1 parts per million. This is essentially background levels of carbon monoxide in city air and indicates no significant source of carbon monoxide on the day of the visit.

### Temperature and Relative Humidity

Temperature and humidity can have a significant impact on perceived air quality. Research has indicated that the perceived air quality is worse when temperatures exceed 76°F. Large variations in the uniformity in temperatures can affect the comfort

of employees. Rarely, however, are temperatures the cause of significant health problems for employees in office settings.

Humidity levels can also have an impact on employee comfort. Low humidity levels such as occur in winter months can lead to dry irritated nose, eyes and respiratory system. In general, relative humidity levels should be maintained between 30-60%. However, low humidity levels minimize the potential for growth of mold and mildew. Our office generally does not recommend introducing humidity into an office environment due to the potential for poor maintenance of humidifiers and the resultant potential for biological growth. Instead, it is best to lower temperatures in the office environment to the lower end of the recommended temperature range, which will result in a higher relative humidity.

The following is taken from the ASHRAE Standard 55-1992 Thermal Environmental Conditions for Human Occupancy. Note that this standard is considered to be a guideline for the comfort of employees who are in typical summer and winter clothing and are performing at light, mainly sedentary activities. These temperature and humidity levels are considered to be comfortable for about 80% of the population.

| Relative Humidity | Winter Temperature | Summer Temperature |
|---|---|---|
| 30% | 68.5°F-75.5°F | 74.0°F-80.0°F |
| 40% | 68.0°F-75.0°F | 73.5°F-80.0°F |
| 50% | 68.0°F-74.5°F | 73.0°F-79.0°F |
| 60% | 67.5°F-74.0°F | 73.0°F-78.5°F |

### Findings

One of the problems occupants report with this building is temperature control. Unfortunately, the temperature is controlled at the DPW and building occupants can not modify temperatures on site. At one time thermostats had been installed in the building. However, they were connected to the ventilation system so that the ventilation would go off completely depending on the temperature. In an effort to insure that fresh air would always circulate, the thermostats were disconnected according to the DPW. At the current time, they remain disconnected.

Temperature and Humidity Levels on the day of the visit ranged between 70-76 degrees and 36-42% humidity. This indicates comfortable temperatures and humidities for most people. Please note that a wide range in temperatures within one workspace is not ideal and may result in occupant perception of being hot or cold. It is best to

keep temperatures as uniform as possible in order to maximize employee comfort.
Measured temperature and humidity levels are given in Appendix A of this report.

## Volatile Organic Compounds (VOCs)

Furnishings, carpeting, fabrics, particleboard, paints and adhesives, may give off
volatile organic compounds. Levels are usually highest when materials are first
· installed and tend to diminish over time. Off gassing may be increased under higher
temperatures and humidity. In addition, volatile organic compounds are often found in
building cleaning products and may also be given off by the growth of biological
materials such as mold.

It is the policy of our office to screen for the presence of gross VOC contamination
during most routine indoor air quality investigations. Levels above 1 part per million
indicate the presence of a source of VOCs which should be further investigated. Note
that OSHA allowable exposure limits for most volatile organic compounds are higher
than 1 part per million.

### Findings

No significant levels of common organic compounds were found on the samples
collected on the day of the visit. There were detectable levels of fuel oil as would be
expected in the boiler room since the boilers had just been cleaned and were open for
inspection. Samples were collected by drawing 0.2 liters of air per minute on activated
charcoal tubes and were analyzed at the Division of Occupational Safety Laboratory; an
AIHA accredited laboratory located in our office. Sample results are given in Appendix
B of this report.

### Ventilation

Ventilation can be accomplished by either natural or mechanical means. Natural
ventilation is accomplished by opening windows and doors to allow fresh air to circulate
within a building. Mechanical ventilation requires the installation of fans and ductwork
or plenums to mechanically draw air in and out of a room and evenly distribute air
throughout the work area. Mechanical ventilation is usually the preferred method of
ventilating workspaces since it is more consistent and can provide a more uniform,
predictable amount of fresh air, independent of the weather conditions.

The only requirement related to ventilation in a building is that the ventilation (either
natural or mechanical) be in compliance with the building code that was enforced at the

time the building was built or was significantly altered by renovation. Therefore, a building built or renovated in 1976 would have to meet the requirements of the building code for that year, and does not have to meet the code that currently is enforced. There are some exceptions to this requirement. The most recent changes to the Mass. Building Code allows a building official to order changes to ventilation in buildings built prior to 1975 if the official feels there is a health or safety concern for the building occupants.

Existing mechanical ventilation in a building may become substandard for several reasons. The building may have been built under old building codes that do not meet current recommendations. In some buildings, the building design or occupancy has changed from the original design, and the ventilation system was not modified in accordance with the new design or building use. Partitions and walls are often installed without considering how they may affect the airflow from the ventilation system. In many cases, the ventilation system may be inadequate simply because it has not been maintained in accordance with the HVAC manufacturers recommendations.

There are various parameters that can be reviewed in an attempt to determine the adequacy of mechanical ventilation systems. As a result of doing hundreds of indoor air quality investigations, our office provides the following recommendations. In general, our office has found that if a building meets these minimums, then indoor air quality problems are minimized. However, there are many buildings which may not meet these recommendations and where indoor air quality problems do not appear to exist. These recommendations are given for guidance only and are not necessarily required by building codes.

| Parameter | Recommendation | Reference | Findings at your facility |
|---|---|---|---|
| % Outside Air to system | Minimum of 15% 25% Preferred | Occupational Hygiene Program | 25% as a minimum according to Honeywell Rep |
| Total CFM Fresh outside air per occupant | Minimum of 20 Minimum of 35 if smoking allowed | Occupational Hygiene Program | Not known-However, if 25% fresh air, then sufficient fresh air on second floor offices-Insufficient in other areas such as detail office, locker rooms, bathrooms |
| Air changes per hour | Minimum of 6 10 Preferred | Occupational Hygiene Program | See Appendix A-Based on representative measurements, range is from 1.4-4.5 air changes/hour in 2nd floor offices |
| Location of Air Intakes | Minimum of 10 feet away from contaminant sources | 1993 BOCA Code | Side of building-away from contaminant sources |
| Type of Filters Used in Ventilation System | 25-30% efficient 60% preferred | ASHRAE 62-1989R | PM-40 Airex filters-said to be 28% efficient at 10 microns according to Airex |
| # Filter Changes per year | Inspected 2 x year Replaced as needed | Occupational Hygiene Program | Quarterly-no feathers or unusual findings with filters according to Honeywell representative |
| Inspection/ Maintenance of Ventilation system Operation | Twice a year or In accordance with manufacturer recommendations | Occupational Hygiene Program | As Needed |

## Findings

According to the Facilities Department and Honeywell, there are seven air-handling units for this building. To the best of our understanding these serve the following areas:

1. Unit 1-handles foyer area and some areas in fire dept (unsure if also handles trg room and gym.

2. Unit 2-Only unit with AC. Handles center of building except for 911 area. Includes Detectives and Captains offices

3. Unit 3-Handles both cell block and basement areas as well as property room, domestic violence area, civil defense and possibly the auxiliary side of the fire dept area

4. Unit 4-Handles Offices upstairs

5. Unit 5-Currently off. Handled Firing range, which is no longer used.

6. Unit 6-Handles garage area. Note-if door is open this unit does not run.

7. Unit 7-Dedicated to 911 area

Ventilation was measured in areas where there were discrete offices and where the supplies and exhausts were accessible. Air changes per hour in the areas where they could be calculated were marginal. *Most exhausts throughout the facility, whether bathroom or general returns were not functioning or were marginally functioning.* Note that our office noted the absence of functioning exhausts as early as 2001. A response from the city indicated that the exhausts were fixed at that time, however the same condition existed on our return visit in September 2004.

## Housekeeping

Poor housekeeping practices can adversely affect indoor air quality. Carpets and furnishings that are not cleaned on a routine basis can be the source of dusts and other allergens, such as dust mites, which can affect some individuals. In office or school environments, tile or other impervious floor material is preferred due to ease of cleaning. Carpeting which is installed should be vacuumed each day using a high efficiency vacuum. Steam cleaning should be done on the carpets once or twice a year as needed.

In addition, the chemicals used for housekeeping purposes may lead to symptoms in some individuals. Chemical cleaners should be kept to a minimum. The Material Safety Data Sheets (MSDSs) for all cleaning products should be reviewed prior to purchase and use to insure that they will be used properly and do not contain particularly harmful chemicals. Damp mopping and dusting with a light water spray eliminates the source of chemicals and will also minimize airborne dust. Preferably, all housekeeping activities should take place as soon as possible after normal working hours to allow any contaminants or dust generated during cleaning activities to dissipate or settle before re-occupancy. The ventilation system should be fully operational during all cleaning activities.

### Findings

This entire facility is maintained by a single full time employee who everyone agrees is doing his best with his limited resources. Rugs in many of the areas are worn past their normal life and there are areas where rugs are torn and present a trip hazard. In some areas, such as the Traffic Bureau, the rugs are extremely soiled and are in need of a cleaning. In other areas, such as the report writing rooms, carpet has been water damaged and needs to be replaced.

The Detail office, located above the Fire Dept garage, was visibly much dirtier than other offices in the building. It appears that there is a significant amount of particulate matter deposited on all surfaces throughout the office. This is most likely due to the diesel particulate that was entering the office from the garage. A large soot stain was visible at the wall outlet, indicating that this could be a source of the particulate.

The Fire Department recently installed a Plymovent tailpipe exhaust system that should decrease the amount of residual particulate entering the office. When asked if there has been any change in odors since the tailpipe exhaust system was installed, the employees in the Detail office did note that it does seem to have been better lately. This room needs a full cleaning to restore it to a baseline condition of cleanliness.

### Ultra-fine Particle Monitoring

Ultra-fine particles (UFPs) are defined as airborne particles having a diameter of 0.1 micron or smaller and are therefore too small to be seen. Cooking, smoking, diesel engines and many other combustion and chemical reactions produce significant levels of ultra-fine particles.

Until recently, few studies had been done on the potentially adverse health effects of ultra-fines. Preliminary studies indicate that UFPs may have adverse health effects ranging from respiratory to cardiac effects. Ultra-fine particles are not removed from the

lungs at the same rate or degree of efficiency as larger particles. To date however, no definite causal link between UFPs and detrimental health effects has been established.

When there is a significant difference found in the amount of UFP in a complaint area versus an adjacent non-complaint area (i.e. ten or hundred times higher), then a source of ultra-fines is suspected and attempts are made to trace the source using the instrument. The instrument may help identify and verify migration pathways as well. Again, since there are no health or exposure standards for UFPs, the numbers recorded are only used to track potential sources rather than to indicate that there is a hazard. Anecdotal evidence indicates that in some cases the elimination of ultrafine particulate sources has led to the elimination of indoor air quality complaints.

## Findings

A TSI Model Number 8525 P-Trak instrument was used to check ultra-fine particulate (UFP) concentrations in the facility. The results indicate that there does not appear to be any major source of ultrafines within the building and that the ventilation system filtration is reducing levels of ultrafines in the outdoor air by at least 50%. Results are recorded in the table.

### P-Trak Measurements

| Location | Particles per Cubic Centimeter |
|---|---|
| Background (Outside or Ambient) | 42,000-52,000 |
| Lt Devereaux's Office | 35,000 |
| Administration Area | 17,300 |
| Chief's Office | 13,700 |
| 2nd Floor Hallway by Lunchroom | 10,900 |
| 1st Floor Foyer (Doors open) | 21,900 |
| Academy | 12,000 |
| "Bubble" | 6600 |
| Commander's Office | 10,300 |

| Dispatch 911 | 9890 |
|---|---|
| Traffic Office | 4860 |
| Detective's Area | 7950 |
| Men's Locker Room | 15,600 |
| Detail Office | 19,000 |
| Ladies Locker Room | 14,900 |
| Basement-Foyer/Hall | 16,000 |

\* Rounded to the nearest hundred-10 second average

## Water Damaged Materials

Any water damage can lead to microbial growth. All sources of water damage and leaks should be repaired as soon as possible. Health problems associated with microbial contamination include headaches, eye and skin irritation, asthma and other respiratory symptoms. Hypersensitivity reactions can occur in some individuals, even at low levels of exposure. Non- porous water damaged surfaces may be able to be cleaned, dried and disinfected. However, porous materials such as ceiling tiles, carpets and wall coverings cannot be easily decontaminated and should be removed and replaced.

*Note-A recently released Institute of Medicine (IOM) report noted that the presence of moisture in a building not only promotes mold growth, but also favors dust mite proliferation, bacterial growth, cockroach and rodent infestation and chemical emissions from leeching or breakdown of building materials and furnishings. The study found sufficient evidence of an association between coughs, wheeze, upper respiratory tract symptoms and asthma in· sensitized persons and damp indoor environments. (See www.nap.edu  Damp Indoor Spaces and Health  May 25, 2004)*

## Findings

Structural issues aside, the most readily apparent concern at the Somerville Public Safety Building is the severe water infiltration into the building. Water is entering the building through the walls, windows, sliding doors, and roof. This water damage has been ongoing for years. During rainstorms, there are areas in the building where water

is said to actually "pour" in to the facility . Along the Merien Street side of the building, the water damage and visible mold is so severe that rooms are often no longer usable (i.e.-room 107). Efflorescence, evidence of continued water damage, is readily visible throughout the facility. Wall materials in many areas are deteriorated. For example, plaster is degraded and delaminated in many areas such as the academy room, gym and patrolman's locker room. Sliders and windows in most areas of the building leak. Water damage is so severe in some areas such as Lt. Devereaux's office that the moisture meter actually penetrated into the wall cavity when the pins were held against the wall for testing. The integrity and presence of flashing and caulking of most windows and sliders is questionable.

As mentioned earlier in the report, the fire department in the basement had been severely flooded. The area has been closed for several years. Visible mold was found in a number of areas, including behind a wall cavity in the Fire office.


Recommendations/Corrective Action Needed


The following are items that should be addressed as soon as possible in order to insure that employees are protected. Serious concerns are given a correction due date and are put in bold print. Other items should also be addressed in order to eliminate indoor air quality concerns. A corrective action form is attached.

Item No. 1   Insure Structural Integrity of the Building

Corrective Action Needed: A report done by BETA Engineering in October 1999 indicated a number of structural deficiencies in the Public Safety Building. These included concerns about the possible deterioration of structural steel, spalling with exposed deteriorated rebar, deterioration of brick facing, map cracking of first floor slab, significant cracking in steel stairway treads on Northeast stairways, and deterioration of walls supporting the parking deck amongst other concerns. It is likely that additional deterioration has now taken place over the last 5 years. A full review of the recommendations made in this report must be conducted. A response on the status of any corrective actions taken or to be taken must be provided to this office. It is recommended that you confer with the Building Inspector about any structural issues.

Corrective Action Date: November 30, 2004

Item No. 2  Prevent water from entering the building through brick walls.

Corrective Action Needed:  Water continues to enter the building, causing severe
water damage and mold growth.  This infiltration occurs on all sides of the
building, but especially on the Marien Street side of the building.  Allegedly, after
the last DOS report in 2001, there was some waterproofing done to the exterior of
the building, however, there are no records existing to show what has been done,
nor is there visible evidence of any waterproofing "coating" on the exterior of the
.building.  Observation of the exterior condition of the brick walls revealed that
waterproofing alone is unlikely to be able to solve this problem.  The mortar from
the bricks, and around window casings is in poor condition.  A review of the
ability to repoint the bricks and seal the window casings must be done.

There is an additional problem that prevents water from entering the building
through the brick, even if repointing of the bricks takes place.  Based on an
observation of an exposed wall opening in the basement, it appears that the
building brick facing may be directly in contact with the building insulation and
interior walls.  According to experts in the building field, drainage
planes/airspaces should be part of all building construction.  This is to allow
proper drainage of rain and condensation.  It appears that the building may have
been built without consideration of spacing between the exterior and interior wall
building materials.  Several good reference articles on drainage planes and air
spaces in building construction can be found at the following website:
http://www.buildingscience.com/resources/resources.htm

In addition, a sheet of plastic was observed in the wall.  It was not clear if this
material was used throughout the building.  In general, vapor permeable wraps,
which allow moisture to move through it, are preferred.  This plastic sheeting
would prevent the building from "breathing" and may create condensation
problems regardless of whether or not the bricks are repointed and/or sealed.

In light of these concerns, consult with a specialist in the area of building
construction to see if repointing the bricks would solve the problem of water
infiltration or if, due to the construction of the building, water infiltration would
occur regardless.  Develop a plan to prevent water infiltration into the building
through the brick walls.

Corrective Action Date:  Update this office on findings by November 30, 2004

Item No. 3 Replace and/or temporarily repair the roofing material until the roof can be replaced, to prevent water from entering the facility through the roof.

Corrective Action Needed: According to the BETA engineering report done in 1999, and based on visual observations on the day of the visit, the roof has exceeded its useful service life and needs to be replaced. Water is entering the building at various points through the roof, especially in areas like the main foyer traffic bureau, Superior Officers locker room, gym, women's locker room Commanding Officer's office and Captain's office. The facilities response to this has simply been to replace the water damaged materials, without fixing the SOURCE of the leaks. There are areas where the roof slopes downward (above-above the Gym and Captains office) and water likely pools under rainy conditions. Water should be diverted from these low points to prevent the major water leaks that are said to regularly occur during rainstorms.

Corrective Action Date: Update this office on findings by November 30, 2004

Item No. 4 Prevent water from entering the building through windows and doorways/sliders

Corrective Action Needed: Review the installation and integrity of caulking and flashing at all windows and sliders throughout the facility. Repair and/or replace materials as necessary in order to prevent water infiltration. Note that in some areas, there was moss growing in the windowsills.

Corrective Action Date: Update this office on progress by November 30, 2004

Item No. 5 Once repairs are made and water infiltration to the building is eliminated, replace any water damaged materials

Corrective Action Needed: Replace water damaged ceiling tiles, wall materials, underlying insulation, window casings, carpeting and any other water damaged materials once the sources of water infiltration for each is eliminated.

Standard Referenced: Ma DOS Bulletin 393" Mold and Indoor Air Quality"

Corrective Action Date: Update this office on progress by November 30, 2004

Item No. 6 Insure that ventilation from the basement area (closed area of fire department) does not circulate to other areas of the building.

Corrective Action Needed: According to Honeywell and the facilities department, HVAC units 1 and 3 serve parts of the fire department in the basement that have been closed due to previous flooding, water damage, mold growth. A brief walkthrough of this area was made on the first day of the visit and the ventilation system appeared to be working, however, at that time we had no information about this system and how it may have connected to the rest of the building HVAC. On the return visit, we learned of the connection between the ventilation in the police and fire department, however we could not access this area since the Fire Chief was unavailable and he was the only one with keys. Vithal Deshpande, Environmental Coordinator for the City later called this office and indicated that when he accessed this area, the exhausts in the basement fire department were operational.

Assuming the system does not exhaust 100% of the air and the system in the basement is turned on, then one can assume that the air in the basement is being circulated into other areas of the building. Given the severe flooding and water damage and mold that occurred in the basement, there should not be any circulation of air from this area into other areas of the building.

Corrective Action Date: Update this office on progress by November 30, 2004

Item No. 7 Remove all "filtration media" from supplies and exhausts throughout the building.

Corrective Action Needed: As noted in the DOS report from 2001, and as noted on the day of the visit, filtration media placed on exhausts (and several supplies) throughout the facility should be removed. There is no reason to be filtering air *leaving* the office space and entering the ventilation system and if additional filtration is needed, it should be done at the main HVAC intake NOT at the supply grilles. In addition to essentially serving no purpose, when installed, these filters were shown to slightly lower the air volume entering or leaving the office space. The City of Somerville had a contract with an environmental service to install and replace these filters. No one was sure why these filters had been placed on the supplies or exhausts.

Corrective Action Date-NOTE-According to an email received on September 27, 2004 from Vithal Deshpande, Environmental Coordinator, the services for replacing these filters has been stopped.

Item No. 8 Replace carpeting where it has been water damaged and where it presents a trip hazard. Clean carpeting that is highly soiled.

Corrective Action Needed: Carpeting in the Detective's Bureau is ripped and buckled and presents a trip hazard. Carpeting in the Traffic Bureau and the report writing rooms has been water damaged and is extremely dirty. Since all rooms were not accessed on the day of the visit, a full assessment of the condition of carpeting should be done and appropriate steps taken to either replace or clean the carpets throughout the facility.

Standard Referenced: Ma DOS Bulletin 396 "Allergies, Asthma and Building Housekeeping"

Corrective Action Date: Respond as to action to be taken by November 30, 2004

Item No. 9   Clean Detail Office and seal up wall openings to insure that exhaust from basement garage does not enter the office.

Corrective Action Needed: Fully wet clean and/or HEPA vacuum the office in order to restore it to a baseline "clean" condition. Seal off any openings such as loose wall plug units to prevent exhaust fumes from the fire department engines from entering the space. Monitor the cleanliness of the room now that the Plymovent system has been installed. It is expected that the Detail office will have less exhaust infiltration now that the Plymovent system has been installed in the garage.

Standard Referenced: Standard Referenced: Ma DOS Bulletin 396 "Allergies, Asthma and Building Housekeeping"

Corrective Action Date: November 30, 2004

Item No. 10   Restore all exhaust ventilation systems to working order in the building.   Increase ventilation in areas where insufficient or not working.

Corrective Action Needed: A number of exhausts were not working on the day of the visit. These include: 2nd floor bathroom exhaust, all men's locker room and shower exhausts, women's locker room exhausts (except for one over toilet), Detail office exhaust. In areas such as the traffic area, exhausts are located in the closet where they are blocked by piles of boxes and chairs. Remove all

objects that obstruct these exhausts and post a sign indicating that these areas should not be used for storage.

Insure that cellblocks are maintained under negative pressure to minimize possibility of transmission of airborne illnesses from prisoners to staff.

Exhaust was barely working (less than 20 cfm) in areas such as the Chief's office, and Administration area (2nd floor). There was no ventilation at all in the bubble area on the day of the visit.

Standard Referenced: Ma State Building Code/ Ma DOS Bulleting 392 Mechanical Ventilation

Corrective Action Date: Respond as to action to be taken by November 30, 2004

Item No. 11 Increase ventilation to provide the recommended minimum of 6 air changes per hour

Corrective Action Needed: Contact your HVAC company to see if the airflows to the offices can be increased to provide the recommended minimum of 6 air changes per hour.

Standard Referenced: Ma DOS Bulletin 392 "Mechanical Ventilation Systems and Air Quality: Discussion and Suggestions "

Item No. 12 Temperature Control within the building

Corrective Action Needed: Provide occupants with a way to control temperatures within their workspace. Determine methods to maintain consistent temperatures throughout the facility by installation of thermostats in all occupied areas of the building. Insure that minimum levels of fresh air ventilation will be maintained regardless of temperatures.

Standard Referenced: Ma DOS Bulletin 389 "Thermal Comfort for Indoor Air Quality"

Item No. 13 Keep chemical use to a minimum. Consider using green cleaners,

Corrective Action Needed: The use of harsh cleaning chemicals may contribute to indoor air quality problems. Obtain Material Safety Data Sheets (MSDSs) for all cleaning products and review health effects. Consider using more environmentally friendly cleaners. Information on buying safer products is enclosed with this report. You

may also check the state contract for safer cleaning products at www.comm-pass.com.
(See GR016).

Item No. 14 Develop an Indoor Air Quality Management Plan

It is our agency's experience that once a building has had an air quality concern, it is
not uncommon for the same problems and concerns to continue for years to come.
Once you have addressed the issues raised in this report, it is strongly recommended
that you develop an air quality management plan to prevent future occurrences. An air
quality management plan includes information such as who at the facility will be
responsible for addressing IAQ issues, who is responsible for HVAC maintenance, how
often HVAC systems will be maintained, etc. It also includes a plan to inform building
occupants of any changes that could affect air quality, such as painting or construction
work. There are several sources of information that may help you in establishing such
plans. These include:

- EPA Tools for Schools (617-918-1639)

- OSHA Proposed Indoor Air Quality Standard-
  (Federal Register April 5, 1994)

  Available on the World Wide Web at www.osha.gov

- EPA/NIOSH Building Air Quality: A Guide for building Owners and Facility
  Managers (617-918-1639)

  EPA/NIOSH Building Air Quality Action Plan (to be used in conjunction with
  the above Building Air Quality Guide) (617-918-1639)

  Both of these are available on the World Wide Web at www.epa.gov/iaq/pubs

Thank you for your support and interest in the health and safety of your employees.

Sincerely,                                          Approved:

Nancy A. Comeau CIH                                 Robert Kenrick
Program Supervisor                                  Program Manager

cc: Joseph Curtatone, Mayor
Lt. Michael Devereaux, Somerville Police
Joan McKenna, President 911 Union
Frank Santangelo, Supt Buildings
Vithal Deshpande, Environmental Coordinator
Al Bargoot, Building Inspector

Enclosures: Form # 378 Water Damaged Materials & IAQ, #381 IAQ , #389 Thermal Comfort
Guidelines for IAQ, #391 HVAC Systems & Building Maintenance Guidelines, #392 Mechanical
Ventilation Systems & Air Quality, #393 Information about Mold and IAQ, #396 Allergies, Asthma, and
Building Housekeeping, Buying Environmentally Safer Products: Environmentally Preferable Cleaners

Appendix A
Air Monitoring Results
Somerville Public Safety Building    File # 05S0068
September 14 and 21, 2004

Carbon dioxide, carbon monoxide, temperature and relative humidity levels were measured using a Q-Track. Ventilation measurements were taken using an Alnor Balometer. Instrument calibration was checked prior to use. Equipment is calibrated periodically in accordance with manufacturer's recommendations and protocols.

| Location | Occu-pants (#) | Window open | Ventilation Supply (CFM)* | Ventilation Exhaust (CFM)* | Carbon Dioxide (PPM)** | Carbon Monoxide (PPM)** | Temp (°F) | Relative Humidity (%) | Comments (% fresh air/neg./neg pressure, etc. (Other Contaminants) |
|---|---|---|---|---|---|---|---|---|---|
| Lt Devereau's Office | 1 | Slider Open | 180 | 140 (160)* | 486 | 1 | 71 | 39 | Window A/C unit running Air changes/hour=4.5 |
| Admin Office 2nd Floor | 1 | | 180 | 0 (20)* | 650 | 1 | 73 | 39 | Window A/C unit running Air changes/hour=3.9 |
| Chief's Office | 1 | | 110 | 20 | 583 | 1 | 75 | 39 | Window A/C unit running Air changes/hour=1.4 |
| Captains' Office | 2 | | | | 630 | 1 | 71 | 36 | Window A/C unit running |
| Entry Desk ("Bubble") | 1 | | 0 | 0 | 630 | 1 | 71 | 37 | |
| 911 Dispatch | 8 | | | | 700 | 1 | 72 | 40 | High Ceilings, access to ventilation not available |
| Detail Office | 1 | | 50 | 0 | 700 | 1 | 74 | 36 | A/C Unit running |

Somerville Police Department
05S0068
Page 2 of 32

| Location | Occu-pants (#) | Window open | Ventilation Supply (CFM)* | Ventilation Exhaust (CFM)* | Carbon Dioxide (PPM)** | Carbon Monoxide (PPM)** | Temp (°F) | Relative Humidity (%) | Comments (% fresh air/neg./po pressure, etc. (Other Contaminants)) |
|---|---|---|---|---|---|---|---|---|---|
| Traffic | 1 | 190/200/150 | | | 490 | 1 | 70 | 38 | |
| Police Union office | 1 | Not measured | Not measured | | 540 | 1 | 70 | 42 | |
| Basement Common Hallway/ Stairwell (Former Fire Dept) | 0 | Missing Grilles | Missing Grilles | | 490 | 1 | 76 | 40 | ?Ductwork/panels on ventilation removed |
| Mechanic's Office | 1 | | | | 540 | 1 | 70 | 42 | |

*CFM= *Total cubic feet per minute* of air. In order to calculate the *CFM fresh air* per occupant, multiply the % fresh air by the *total* CFM

Typically it is the *CFM of fresh air* that is needed to compare to ventilation codes. Note that ventilation could not be measured in   all areas due to height of ceiling.

**PPM=parts per million in air

Numbers in bold print indicate levels, which are above recommended limits for acceptable indoor air quality, or, in the case of ventilation, are below recommended ventilation levels. A table of levels of comparison for the various parameters is located on the next page.

A-1

Somerville Police Department
05S0068
Page 3 of 32

## Applicable Reference Standards for Indoor Air Quality

| Contaminant or Parameter Measured | Recommending Agency | Acceptable Level |
|---|---|---|
| CFM Fresh Air Per Occupant | Occupational Hygiene Program | 20 CFM/Occupant recommended Note-Building Codes indicate what is required for a particular building |
| Carbon Dioxide | Occupational Hygiene ASHRAE 62-1989 | <800 PPM acceptable 800 PPM-Marginal Ventilation >1000 PPM Inadequate ventilation |
| Carbon Monoxide | EPA (NAAQS) | 9 PPM * hour average or no more than 3PPM above background |
| Temperature | ASHRAE 55-1992 | See Table in text |
| Relative Humidity | ASHRAE 55-1992 | See Table in text |
| Other Contaminants | | |

A-2

Somerville Police Department
05S0068
Page 4 of 32

Appendix B

## VOLATILE ORGANIC COMPOUND MONITORING RESULTS

The following samples were collected on activated charcoal tubes using SKC Aircheck III pumps. The samples were analyzed at the DOS laboratory; an AIHA accredited laboratory, using gas chromatography analysis. Pumps were calibrated at 0.02-0.2 LPM at the DOS laboratory prior to the site visit. Flow rates were checked before and after sampling with calibrated rotometers. Blanks were submitted to the lab along with the samples. All samples that were taken were area samples throughout the Somerville Police Department. Results were as follows:

| DOS. Sample # | Location | Flow Rate (L/min.) | Sample Time (min.) | Results-(PPM) |
|---|---|---|---|---|
| 05L-080 | 1st Floor 911 Dispatch | 0.28 | 112 | <1.0 PPM detected |
| 05L-081 | 1st. Floor 911 Dispatch | 0.28 | 112 | <1.0 PPM detected |
| 05L-082 | 1st. Floor Police Union Office | 0.2 | 165 | <1.0 PPM detected |
| 05L-083 | 1st Floor Police Union Office | 0.2 | 165 | <1.0 PPM detected |
| 05L-084 | 2nd Floor IA Office | 0.28 | 168 | <1.0 PPM detected |
| 05L-085 | 2nd Floor IA Office | 0.28 | 168 | <1.0 PPM detected |
| 05L-086 | Basement Storage | 0.2 | 152 | <1.0 PPM detected |
| 05L-087 | Basement Storage | 0.2 | 152 | <1.0 PPM detected |
| 05L-088 | Basement Mechanic's | 0.23 | 72 | 2127 mg/M3* |

Somerville Police Department
05S0068
Page 5 of 32

| | | | |
|---|---|---|---|
| 05L-089 | Office<br>Basement<br>Mechanic's<br>Office | 0.28 | 72 | 739 mg/M3* |
| 05L-090 | Field blank | . | | None detected |

Date of Sample Collection:  September 14, 2004    Summary of Sample Conditions: Building occupancy was high during visit.

*Note-There is really no standard for fuel oil. The OSHA standard for petroleum distillates could be used as a standard of comparison. This standard allows for 2000 mg/M3 Petroleum Distillates when averaged over and 8 hour workday. Note that no one is in the boiler room and that the boiler had just been cleaned.  No detectable levels were found elsewhere in the facility.

Item No. 4
Response/Corrective Action Taken:

_____
_____
_____
_____
_____

Item No.5

Response/Corrective Action Taken:

_____
_____
_____
_____
_____

Item No. 6
Response/Corrective Action Taken:

_____
_____
_____
_____
_____

Municipality : Somerville Police Department                                    File # 05S0068
Engineer Assigned: Nancy Comeau CIH, Program Supervisor

Please complete this form using additional sheets if necessary to document the
action(s) already taken or action(s) to be taken to address the hazard(s) identified or
recommendation(s) made in the report. This form must be completed and sent in to the
Division of Occupational Safety by the response date given in the report. Please
include any supporting documentation such as written policies, photographs and/or
purchase orders. If you *cannot* correct these hazards by the dates given, state:

>               a) the reason why you cannot meet the corrective action date
>
>               b) what you will do in the interim
>
>               c) what action you plan to take and by what date.

Item No. 1
Response/Corrective Action Taken:

_____
_____
_____
_____
_____

Item No.2

Response/Corrective Action Taken:

_____
_____
_____
_____
_____

Item No. 3
Response/Corrective Action Taken:

_____
_____
_____
_____

Item No.7

Response/Corrective Action Taken:

_____
_____
_____
_____

Item No. 8
Response/Corrective Action Taken:

_____
_____
_____
_____

Item No.9

Response/Corrective Action Taken:

_____
_____
_____
_____

Item No. 10
Response/Corrective Action Taken:

_____
_____
_____
_____

Item No. 11
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 12
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 13
Response/Corrective Action Taken:

_____

_____

_____

_____

Item No. 14
Response/Corrective Action Taken:

_____
_____
_____
_____
_____

Name: _____ Title: _____
Date: _____ Phone: _____

Return To:
*Nancy Comeau CIH, Program Supervisor*
Division of Occupational Safety
Occupational Hygiene Program
1001 Watertown Street
West Newton, MA 02465

-------------------------------------------------------------------
Office Use Only
Date Case Closed _____ Engineer Initials _____
-------------------------------------------------------------------

# EXHIBIT 5



THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENTS OF LABOR AND WORKFORCE DEVELOPMENT
**DIVISION OF OCCUPATIONAL SAFETY**
OCCUPATIONAL HYGIENE / INDOOR AIR QUALITY PROGRAM
www.mass.gov/dos/iaq

MITT ROMNEY
Governor
KERRY HEALEY
Lieutenant Governor
JANE C. EDMONDS
Director, DWD

ROBERT J. PREZIOSO
Commissioner

April 28, 2005

Mr. Joseph Curtatone
Mayor
City of Somerville
93 Highland Avenue
Somerville, Ma 02145

Re-File # 05S0068b

Dear Mayor Curtatone,

The Division of Occupational Safety (DOS) is in receipt of your letter dated April 19, 2005 in which you provided information about the action the City has taken or will be taking to address the working conditions at the Somerville Police Department. In your letter, you indicated that the City prefers not to spend its limited financial resources on addressing corrective actions, and reassured our agency that the plan is to vacate all personnel from the facility as soon as possible. The letter also stated that an RFP was expected to be completed by the end of April. In our meeting on Wednesday, March 30, 2005, you indicated that your plan was to relocate personnel to a temporary facility by the end of this fiscal year.

While DOS accepts the City's assertion that it does not wish to spend money on a building that is ultimately going to be vacated, in order to ensure the safety of the employees in the building, we need to be assured that the building is considered to be structurally sound in the meantime. We discussed the need for this assurance in our meeting and you indicated that you would have an engineer or the building inspector put this assurance in writing. Your letter did not indicate that any such structural inspection had taken place. We are asking that you respond to this issue immediately (as listed as #1 in our original report dated October 21, 2004).

In addition, the DOS would like a projected timeline for relocation of staff into a temporary facility. In the interim please take every measure possible to ensure the safety and health of the employees of the Somerville Police Department. This may include, but not limited to, relocating individuals to other areas within the existing building, until a more permanent solution can be found.

As we stated during our meeting, we are available to assist in the evaluation of temporary office space and in providing recommendations for assuring good indoor air quality in any space in which the police department may ultimately relocate.

If you have any further questions, please feel free to contact me at 617-969-7177 x329.

Sincerely,

Robert Kenrick

Robert Kenrick
Program Manager

cc: Kathryn Palmer
    General Counsel

cc: Chief George McLean
    Vithal Deshpande

# EXHIBIT 6



Statement for the Record
Before the Subcommittees on Oversight and
Investigations and Housing and Community
Opportunity
Committee on Financial Services
United States House of Representatives

# State of the Science on Molds and Human Health

*Statement of*

# Stephen C. Redd, M.D.

*Chief, Air Pollution and Respiratory Health Branch*
*National Center for Environmental Health*
**Centers for Disease Control and Prevention,
U.S. Department of Health and Human
Services**



**For Release on Delivery**
**Expected at 2:00 PM**
**on Thursday, July 18, 2002**

Good afternoon. I am Dr. Stephen Redd, the lead CDC scientist on air pollution and respiratory health at the Centers for Disease Control and Prevention (CDC). Accompanying me today is Dr. Thomas Sinks, Associate Director for Science of environmental issues at CDC.

We are pleased to appear before you today on behalf of the CDC, an agency whose mission is to protect the health and safety of the American people. I want to thank you for taking the time to hear about the mold exposures in poorly maintained housing and other indoor environments and their effect on people's health. While there remain many unresolved scientific questions, we do know that exposure to high levels of molds causes some illnesses in susceptible people. Because molds can be harmful, it is important to maintain buildings, prevent water damage and mold growth, and clean up moldy materials.

Today I will briefly summarize for the committee

- CDC's perspective on the state of the science relating to mold and health effects in people;
- CDC's efforts to evaluate health problems associated with molds,
- CDC's collaborations with other Federal agencies related to mold and people's health;
- CDC's collaboration with the Institute of Medicine on mold and health; and
- CDC's next steps regarding mold and health.

## The State of the Science

Fungi are a kingdom of organisms that include mushrooms, mildews, molds, and yeasts. It is

estimated that there are between 50,000 and 250,000 species of fungi, and fewer than 200 have been described as human pathogens that can cause infections. Molds are ubiquitous in nature and grow almost anywhere indoors and outdoors. More than 1,000 different kinds of indoor molds have been found in U.S. homes. Molds spread and reproduce by making spores, which are very small and lightweight, able to travel through air, capable of resisting dry, adverse environmental conditions, and hence capable of surviving a long time. Molds need moisture and food to grow, and their growth is stimulated by warm, damp, and humid conditions.

Molds can cause illnesses in situations other than humid indoor environments. We have documented that molds can cause infections in susceptible people, particularly in hospital settings where 9% of hospital-acquired (nosocomial) infections are caused by fungi. Respiratory infections due to inhalation of the fungus *Aspergillus* have been documented mostly in immunocompromised individuals. Molds also have been associated with some cancers. Two mold-produced toxins (aflatoxins and ochratoxin A) have been classified by the National Toxicology Program as human carcinogens (http://ntp-server.niehs.nih.gov/). Chronic ingestion of these toxins from eating contaminated foods has been associated with liver and kidney tumors in animals and people.

We also know that respiratory illnesses among workers may be attributed to mold exposures. In industrial and agricultural settings, various forms of hypersensitivity pneumonitis (e.g., farmer's lung, woodworker's lung, malt worker's lung), and other allergic responses and infectious respiratory diseases (e.g., aspergillosis) have been reported. Farmer's lung is caused by

*Thermoactinomycetes species* or fungi found in moldy hay, straw, or grain dust. Farmer's lung has been extensively reported in many countries including the United States, Canada, The Scandinavian countries, France, and other European countries. Reported prevalence of farmer's lung ranges from 0.5% to 9.6% in farming populations.

Outbreaks of hypersensitivity pneumonitis also have been reported in office buildings in relation to exposures to mold-contaminated humidifiers and ventilation systems (Arnow et al. 1987. *Early detection of hypersensitivity pneumonitis in office workers, American Journal of Medicine* 64:236-242 and Hodgson et al. 1987. *An outbreak of recurrent acute and chronic hypersensitivity pneumonitis in office workers.* American Journal of Epidemiology 125:631-638)).

We also know that molds can cause illness when people are exposed to extensive mold growth indoors. In its 1993 report "Indoor Allergens," the Institute of Medicine (IOM) concluded that airborne fungal allergens were most often associated with allergic diseases, such as allergic rhinitis/conjunctivitis, allergic asthma, and hypersensitivity pneumonitis. In its 2000 report "Clearing the Air: Asthma and Indoor Air Exposures," IOM concluded that there is sufficient evidence of an association between exposure to mold and exacerbations of asthma. The IOM also stated that there was inadequate evidence that molds caused people to become asthmatic.

We do not know whether molds cause other adverse health effects, such as pulmonary hemorrhage, memory loss, or lethargy. We also do not know if the occurrence of mold-related

illnesses is increasing. Other than surveillance for hospital-acquired infections, there is no system to track the public's exposure to and the possible health effects of mold.

Exposure to mold does not always result in a health problem. However, routine measures should be taken to prevent mold growth indoors because some people are, or may become, allergic to it.

For people who are allergic to mold, common effects include hay-fever-like allergic symptoms. Certain individuals with chronic respiratory disease (chronic obstructive pulmonary disease or asthma) may experience difficulty breathing when exposed to mold. Also, people with immune suppression or underlying lung disease are more susceptible to fungal infections.

### CDC efforts to evaluate the health problems associated with molds

CDC has conducted several activities related to mold in wet indoor environments and its effect on people's health.

·In 1994, CDC conducted two epidemiologic investigations of reported clusters of the acute onset of bleeding from the lungs of very young children (pulmonary hemorrhage or idiopathic pulmonary hemosiderosis). In one investigation a possible association was reported between exposure to the mold *Stachybotrys atra* (*S. atra*) and disease. This association was not reported in the second investigation. In a further review of our first investigation, CDC reviewers and an external panel of experts determined that there was insufficient evidence of any association between exposure to *S. atra* or other toxic fungi and idiopathic pulmonary hemosiderosis in infants. CDC has plans to further evaluate the relationship between pulmonary hemorrhage and

*S. atra* through state-based surveillance, further investigations of identified disease clusters, and focused research studies.

·In July 2001, following flooding in North Dakota, CDC investigated Turtle Mountain Reservation residents' concerns that mold contaminating their homes might be contributing to an increase in illness among tribal members. CDC assessed both the physical and environmental condition of the homes to identify any environmental hazards, including the presence of mold, and collected information on health conditions of the individuals living in the homes. An interim report identified several existing hazards unrelated to mold and made recommendations to address these hazards. The final report is expected in October 2002.  In addition to working with the Indian Health Service and the Federal Emergency Management Agency (FEMA) on this project, CDC also worked with the U.S. Department of Housing and Urban Development (HUD) to identify procedures that might be implemented to assess conditions of HUD homes that would help to prevent mold.

· CDC responded to a request from the State of Texas and the City of Houston in the summer of 2001, after the city experienced significant flooding, to assess the conditions of the buildings and provide advice on cleanup and repair of affected buildings. The emphasis of this technical assistance was cleanup and prevention of further mold growth and prevention of unnecessary exposure.

· In 1999, CDC's occupational health experts began a 5-year initiative on work-related asthma in

offices and schools, with an emphasis on moisture and mold exposures. We have a targeted research program regarding work-related asthma that includes evaluations of workplaces, intervention studies, and recommendations for reducing the risk of respiratory disease, and provision of information to management, employees and environmental health and safety professionals. The research aims are to be achieved utilizing problem buildings identified through the CDC's occupational Health Hazard Evaluation program. Specific objectives include methods development and testing, specifically with regard to state-of-the-art techniques for assessing indoor air quality-related exposures; quantification of objective medical indices related to asthma and other lung diseases; and planned case-control, cross-sectional, and intervention studies directed towards risk factor identification and assessment.

So far, the results include the following:

- there were significant relationships between reports of work-related respiratory disease and visual assessment of water and mold-damage in two studies;

- there were significant relationships between endotoxin and ultra-fine particles in air and work-related respiratory symptoms; and

- there were significant relationships between indicators of mold in chair and floor dust and work-related respiratory symptoms.

· CDC is planning an occupational and environmental research project regarding bioaerosols in schools to address children's and teacher's health issues.

· CDC is working to address indoor air quality issues, including mold, in partnership with stakeholders through the National Occupational Research Agenda (NORA). NORA efforts have resulted in development of the research priorities paper, "Improving the Health of Workers in Indoor Environments: Priority Research Needs for a National Occupational Research Agenda," which identifies important areas for future research. The paper has been accepted for publication in the American Journal of Public Health (AJPH).

### CDC's collaborations with other Federal agencies

CDC is working with federal, state, local, and tribal governments to investigate and respond to mold-related problems. I have already mentioned that we work with HUD, FEMA, and the Indian Health Service on mold issues. We have also assisted the U.S. Environmental Protection Agency (EPA) Indoor Environments Division in the development of a guide for mold remediation in schools and large buildings and in the development of a brief guide to mold for homeowners. CDC is participating in the development of a World Health Organization guidance document on exposures to biological agents in the indoor environment; this document should be finalized in the year 2003. CDC also has worked with the Council of State and Territorial Epidemiologists in the development of case definitions and classifications for pulmonary hemorrhage in infants.

### CDC's collaboration with the Institute of Medicine

CDC is funding the IOM to evaluate the relationship between damp or moldy indoor environments and the manifestation of adverse health effects. Under this project, the IOM will


- determine the extent to which these programs are coordinated to respond to issues related to indoor mold exposures;

- identify resources that states need in order to develop and implement appropriate responses; and

- develop a coordinated public health response strategy to mold exposure.

CDC will continue to investigate and evaluate the health effects of and quantify the risks associated with, exposure to mold and poor indoor air. The expectation is that such studies will help to identify the environmental factors and antecedents associated with mold contamination and factors that determine poor health outcomes. For example, CDC is developing a protocol for investigating the possible health effects of exposure to mold in indoor school environments. CDC will use the knowledge, experience and skill gained from these investigations and evaluations to translate science-based findings into appropriate public health interventions to reduce any health risk found to be associated with mold exposure.

There are a number of barriers that need to be overcome in investigating the possible effects of molds on health. There are no accepted standards for mold sampling in indoor environments or for analyzing and interpreting the data in terms of human health. Molds are ubiquitous in the environment, and can be found almost anywhere samples are taken. It is not known, however, what quantity of mold is acceptable in indoor environments with respect to health. Because of difficulties related to sampling for mold, most studies have tended to be based primarily on baseline environmental data rather than human dose-response data. For these reasons, and because individuals have different sensitivities to molds, setting standards and guidelines for

indoor mold exposure levels is difficult and may not be practical. Despite the lack of standards, CDC concurs with EPA's recommendation to remedy mold contamination in indoor environments to prevent negative health effects.

## Summary

We do know that people who are exposed to molds may experience a variety of illnesses. Fungi account for 9% of nosocomial infections, that is, infections originating or taking place in a hospital. Ingestion of foods contaminated with certain toxins produced by molds is associated with development of human cancer. Many respiratory illnesses among workers may be attributed to mold exposures. Uncommon illnesses that collectively can be called hypersensitivity pneumonitis are caused by chronic exposures to high concentrations of mold and are almost exclusively limited to certain agricultural workers in particularly moldy environments. Common illnesses caused by molds include allergic conditions such as hay fever and asthma.

Because molds can be harmful, CDC concurs with the general recommendations of agencies such as EPA and FEMA, which offer information on preventing and cleaning up mold growth in indoor environments. Linkages between indoor airborne exposures to molds and other health effects, such as bleeding from the lung, or memory loss, have not yet been scientifically substantiated. CDC and other organizations are taking steps to fill the gaps in our knowledge about linkages between exposure to mold and human health.

Thank you again for the opportunity to testify. I would be happy to answer any questions that you have.

State of the Science on Molds and Human Health                         July 18, 2002
House Financial Services Subcommittees                                   ? ? ??710

# EXHIBIT 7

# *Stachybotrys chartarum*: cause of human disease or media darling?

J. DAVID MILLER*, THOMAS G. RAND† & BRUCE B. JARVIS‡

*Department of Chemistry, NSERC Industrial Research, Carleton University, Ottawa, ON K1S 0M3, †Department of Biology, St Mary's University, Halifax, NS B3H 3C3, Canada; and ‡Department of Chemistry, University of Maryland, College Park, MD, USA*

This is a review of the literature of associations of the saprotrophic fungus *Stachybotrys chartarum sensu lato* with human and animal illnesses. This fungus grows on very wet cellulose-based building materials. *S. chartarum* has been the subject of considerable media attention because of temporal associations of exposure with unexpected and dramatic outcomes such as infant pulmonary hemosiderosis and neurocognitive damage. It is generally accepted that living or working in mouldy environments is associated with building related asthma, exacerbating asthma in mould-sensitive asthmatics and increased rates of upper respiratory disease. However, such relationships are with building-associated moulds, comprising many species that colonize wet or damp building materials, and are not specific to *S. chartarum*. There is limited evidence that severe lung damage can occur from building exposure to *S. chartarum* but possibly only under conditions of exposure that approach those associated with handling contaminated straw. There is no positive evidence in the literature to account for putative neurological damage resulting from exposure to this mould.

**Keywords** *Stachybotrys chartarum*, toxins, allergens, disease, public health

## Introduction

At the beginning of the 21st century, there is a certain irony that one of the few anamorphic Ascomycetes known to the general public in North America is *Stachybotrys chartarum*. The fungus found today on water-saturated wallboard was described as *S. atra* in 1837 from wallpaper collected in a home in Prague. In 2001, *Stachybotrys* figured in the plot of the syndicated US cartoon, 'Rex Morgan MD', which is surely unprecedented attention given to a mould in popular culture. There can be no doubt that several other moulds have a vastly greater impact on human health

Received 14 June 2002; Accepted 11 January 2003

Correspondence: J. David Miller, Department of Chemistry, 228 Stacie Building, Carleton University, Ottawa, ON K1S 5B6, Canada. Tel: 613 520 2600 (ext. 1053); Fax: 613 520 3749; E-mail: david_miller@carleton.ca

© 2003 ISHAM

and welfare. The mycotoxin-producing fungi, *Fusarium graminearum* (deoxynivalenol, zearalenone), *Aspergillus flavus* (aflatoxin) and *F. verticillioides* (fumonisin) together result in massive economic losses and increased mortality and morbidity [1,2].

In situations where hay or straw has become saturated with water under aerobic conditions, *S. chartarum* thrives. This is no longer common in agriculture and essentially has never been an issue in North America because of an exceptionally favourable climate for farming. In eastern Europe, inhalation exposure to *S. chartarum*-contaminated material in agricultural environments has been demonstrated to harm the health of adult humans and animals. The resulting disease in farm animals and farm workers is mainly due to the potent mycotoxins produced by this fungus. *S. chartarum* and the related species *Memnoniella echinata* out-compete other fungi on water-saturated paper, including the paper covering of wall-

DOI: 10.1080/1369378031000137350

▄▄▄ | Intel et al.

board. Water leaks that dampen such substrates, and the presence of surfaces on which condensation occurs, have become fairly common occurrences in housing in the USA and Canada. Interior surfaces that are primarily wood and plaster are resistant to mould growth; those where surfaces include paper are correspondingly susceptible. Damage from floods and storms also can result in large amounts of water-saturated paper in homes and buildings.

This change in building technology, perhaps along with other changes making housing less resistant to water incursions, and with lower rates of natural ventilation, have made mould damage in housing, the non-industrial workplace and schools more common than 40 years ago. Since the mid-1980s, this has given rise to new questions on the population health impact of mould growth on building materials, particularly in housing.

Damp housing contains a fairly narrow spectrum of fungi that are capable of colonizing building materials and surfaces. These comprise xerophiles such as *Wallemia sebi*, hydrophilic species including *S. chartarum* and *Chaetomium globosum*, as well as species that thrive at intermediate water activities (e.g. *Aspergillus versicolor*). If paper is dried to a water activity ($a_w$) below 0.97 at 25°C within 24 h, *S. chartarum* cannot compete with other saprotrophic species; it grows best on substrates close to water saturation. Conditions where *S. chartarum* dominates indicate serious and usually catastrophic water infiltrations, such as from storms, pipe leaks and envelope and roof failures. In general, these are uncommon when the entire housing stock of around 110 million homes in North America is considered.

Varying by genotype, isolates of this species produce metabolites that are the most potent low-molecular-weight inhibitors of protein synthesis known. Other metabolites are produced, including a number of other immunomodulatory metabolites and compounds of unknown toxicity. The trichothecenes produced are in a chemical class that is subject to international regulation in food, mainly because of neurotoxicity.

Short-term studies of *S. chartarum* spores instilled into the lungs of rodents disclose various effects on lung biology. The no-adverse-effect level for installation exposures is not known. Neonate animals are more sensitive. The effects observed are related to several components of the spores, including toxins, beta-glucan and proteases, as well as to the physical damage resulting from inhalation of organic materials. Studies of chronic exposure or nasal-only exposure to spores and mycelial fragments have not been reported. Although it is known that particulate exposure results

in the release from lung tissues of mediators such as endothelins or macrophage-derived neurotransmitters, nothing is known about these secondary effects.

Agricultural exposure and exposure from handling *Stachybotrys*-contaminated building materials or contents are known to result in severe effects on human and animal health. A series of case reports of severe lung damage in sick infants and children has appeared in the literature. In some cases, *S. chartarum* spores or DNA were isolated from lung washings but the role of the toxins in disease has not been unambiguously shown. This is primarily because biomarkers of exposure to the chemicals responsible for the damage in animal models do not yet exist. Antibodies to *Stachybotrys* proteins have been detected in human sera but have not been associated with allergic disease.

From a public health perspective, *S. chartarum* spores in settled dusts or as visible mould on surfaces is an indicator of serious water damage. This translates to unusual indoor exposure to spores and mycelial fragments of this and other building-associated fungi. Mould exposure in buildings is associated with exacerbation of asthma in mould-asthmatic patients, with increasing upper respiratory disease and with building-associated allergic disease [3,4]. The purpose of this review is to summarize the literature on *S. chartarum* and to describe the limits of the disease associations that have been made from building exposure.

## Biology of *S. chartarum*

### Taxonomy

The taxonomy of the species of *Stachybotrys* and the allied genus *Memnoniella* has been the subject of literature reviews by Jong and Davis [5] and more recently by Koster *et al.* [6].

*S. chartarum* grows well on common mycological media such as malt extract, potato sucrose agar or V-8 agars. Two studies suggested that cornmeal agar results in the highest recovery from environmental samples [7,8]. Most taxonomic studies employed cornmeal agar as the identification medium (cornmeal agar is commonly used for the culture of lignicolous fungi). In culture or on natural substrates, the fungus sporulates profusely, forming dark masses of conidia from characteristic phialides. The phialides are 9–14 μm in length, in whorls, olivaceous and often with conspicuous collarettes. The phialides produce conidia successively into a slime droplet. Conidia are ellipsoidal, unicellular, $7-12 \times 4-6$ μm, and dark brown to black with a ridged topography when mature. *S. atra* was described as having smooth spores by Corda [9]. *S.*

*chartarum* (Ehrenb. ex. Link) Hughes was described as having both smooth and rough conidia [10]. Various mycologists who have examined a large number of strains have noted variation in colony morphology, as well as differences in growth rate, suggesting the presence of two species.

As in *Fusarium graminearum*, chemotypes are known. There are two types of strains: those that produce macrocyclic trichothecenes (satratoxins, roridin) and those that produce atranones plus trichodermols. Both groups produce spirodrimanes. Unlike *F. graminearum*, in which the chemotypes are geographically separated [11], in North America the chemotypes of *S. chartarum* occur in the same econiche [12,13; Miller, unpublished data]. Similarly, it has been reported that different genotypes of *S. chartarum* occur on the same sample [14]. Koster *et al.* have shown that there are two lines within *S. chartarum sensu lato*, but also that there are important problems in naming these according to the rules of mycological nomenclature [6]. Confusion exists as to exactly what was meant by *S. chartarum* or *S. atra*.

The genus *Memnoniella* is similar to *Stachybotrys*, and *S. chartarum sensu lato* may be found together with *M. echinata* (Riv.) Galloway, although the latter is more common in warmer areas. *M. echinata* phialides are similar to those of *S. chartarum*, and bear rough conidia 3–6 µm in diameter. Zuck observed that *M. echinata* developed both *Memnoniella-* and *Stachybotrys*-type conidia [15]. Separation of the two genera has been a matter of controversy for the past 40 years. Smith considered that possession of dry conidia in chains, as in *Memnoniella*, or slimy aggregated conidia, as in *Stachybotrys*, was not sufficient to separate strains into two genera, and reduced *Memnoniella* to synonymy with *Stachybotrys* [16], a position endorsed by Kendrick and Carmichael [17], Barron [18] and Carmichael *et al.* [19]. Zuck observed that *M. echinata* developed conidia in both dry chains and slimy aggregates [15], something also observed by Li *et al.*, who additionally reported that closely related species can also form both types of conidia [20]. Comparative sequence analysis of species of *Stachybotrys* and *Memnoniella* convinced Haugland *et al.* that *M. echinata* should revert to *S. echinata* (Rivolta) Smith [21]. Based on morphological characteristics and comparative sequence analysis of the nuclear ribosomal RNA operon, they also concluded that *Memnoniella* should be relegated to synonymy with *Stachybotrys*. This view was supported by data from Peltola *et al.* [22]. Limited studies of North American strains showed that *M. echinata* produces trichodermol and the

*Penicillium* metabolite griseofulvin [23]. Whether there are chemotypes in this taxon remains unknown.

When *S. chartarum sensu lato* is actively growing on natural substrates or in culture, the characteristic phialides and conidia are easy to recognize [24]. Polymerase chain reaction (PCR) primers specific for *S. chartarum* are sometimes used in commercial laboratories to identify this fungus. A PCR product analysis using a fluorogenic probe has also been developed to quantify conidia of *S. chartarum* and can be used in the analysis of samples from mould-contaminated indoor environments [25,26]. The half-life of the conidia of *S. chartarum* and *M. echinata* is short compared with that of other moulds (i.e. months versus years). Microscopic examination [27] or even molecular analysis of environmental samples is sometimes required to find this organism [28,29].

## Ecology

*Stachybotrys chartarum* is not pathogenic [30]. The preferred natural substrates of *S. chartarum* are stems of woody plants, including balsa and pine, with soil as a reservoir [5,24,31]. It is strongly hydrophilic, with a minimum $a_w$ for growth of 0.94 and an optimal temperature of 23°C both for UK and for North American strains [32,33]. The growth rate of a North American strain at this temperature was 1.5 mm/day at $a_w$ 0.99, 1.0 mm/day at $a_w$ 0.97 and 0.5 mm/day at $a_w$ 0.95. Conidial germination followed the same pattern. Depending on $a_w$, good growth rates from 15 to 30°C are possible [32; data reproduced in 34]. It is not competitive in nature outside these ranges.

From the time of the original isolation of *S. chartarum* from wallpaper, it was the fact that it is strongly cellulolytic and will grow under conditions of low nitrogen that attracted attention. The US Army Quartermaster Corps became interested in cellulolytic fungi during WWII because in Southeast Asia and the Pacific the useful life of untreated tarpaulins, tents, ropes and sandbags was very short in areas of high temperature and rainfall. Army tents had to be replaced after 6–8 months. The US Army Quartermaster Laboratories created a massive culture collection of fungi from deteriorated materials from military bases in the South Pacific, as well as others collected in Panama, Florida and elsewhere, as documented by Siu [35]. Among 4500 isolates of fungi from exposed cotton textiles, the most abundant unambiguously cellulolytic species were *Trichoderma viride*, *Chaetomium globosum* and *M. echinata* [34]. Studies of mouldy wallboard in North America reveal that *M. echinata*, as might be expected from the military studies, is more common in

Pacific coastal areas and is replaced by *S. chartarum* in cooler mid-Atlantic areas and in eastern Canada [13,34]. Both *S. chartarum* and *M. echinata* cause soft rot of wood, so that the growth of either results in the degradation of cellulose and hence of the material itself.

*Chaetomium globosum* and *C. sphaerospermum* are also common on wet wallboard collected across North America. Compared with the latter, the former less commonly occurs with *S. chartarum* [34]. This may mean that one or the other species produces antifungal compounds. As noted by Grant *et al.*, where there are hydrophilic fungi, a prevalence of species with lower optimal $a_w$ can be anticipated in samples because some areas of the substrate are inevitably of lower $a_w$ [33].

## Allergens and toxins from *S. chartarum*

The average aerodynamic size of spores in a series of North American strains of *S. chartarum* was noted by Sorenson *et al.* to be 5.6 μm (Table 1) [36]. This average conceals a considerable variation in size. Approximately one-third of the spores were within the respirable range [36]. Furthermore, the degree of hydration of spores, a consequence of the prevailing relative humidity, affects those ranges [37]. Particles at the lower end of that size range can reach the alveoli; others may be swallowed. There is some variation with age: lower airway deposition of 5-μm particles is sixfold higher in newborns than in adults [38]. Fungal fragments $> 1$ μM in aerodynamic diameter have been reported to occur at between 5 and 300% of the numbers of fungal spores observed in indoor air samples [39–41]. Allergens are also present in these mycelial fragments and

their small size makes their presence relevant for human health [39].

Studies of allergens of *S. chartarum* have been reported in the US. Barnes *et al.* found that 49% of the serum samples collected from a general population in Kansas had IgG, and 9% had IgE, immunoglobulins to *S. chartarum* proteins [42]. These proteins were reported as having molecular weights in the range of 34 and 52 kDa and were present in the spores and mycelia. Similar antigens were reported by Halsey *et al.*, who found that IgE and IgA responses to *S. chartarum* antigens in healthy patients were rare, but occurred in *S. chartarum*-exposed patients [43]. The antigens were identified using sera collected from patients in different locations in the USA. The 34-kDa protein is one of several serine proteases (determined by a functional assay) found in the spores and mycelia of *S. chartarum* from both chemotypes (Miller *et. al.*, unpublished data). Antibodies to the 34-kDa serine protease do not materially cross-react with such proteins in some other building-associated fungi (Jensen *et al.*, unpublished data). Proteins with notionally similar molecular weights have been found using sera collected in Finland [44], although at the time of writing it is not clear whether the proteins are in fact the same. These data demonstrate the presence of antibodies to *S. chartarum* antigens in human sera.

*Stachybotrys chartarum* produces three major classes of secondary metabolite, each with varying biological activities. The predominant class, the one always produced, consists of spirocyclic drimanes and closely related triprenyl phenolics (e.g. stachybotrylactones and stachybotrylactams) (Fig. 1). The spirocyclic drimanes were first described by Japanese workers

Table 1 Percentage of different spore sizes and mean aerodynamic diameters of air dried spores from different strains of *Stachybotrys chartarum*

| Strain | Diameter (μm) | | | | Average aerodynamic diameter (μm) |
|---|---|---|---|---|---|
| | 2.2–3.3 | 3.3–4.7 | 4.7–7.0 | > 7 | |
| SA1 | 1 | 12 | 48 | 38 | $6.2 \pm 0.56$ |
| SA2 | 4 | 26 | 57 | 13 | $5.3 \pm 0.32$ |
| SA3 | 1 | 22 | 51 | 27 | $5.2 \pm 0.26$ |
| SA4 | 3 | 37 | 45 | 16 | $6.1 \pm 0.57$ |
| SA5 | 1 | 21 | 59 | 18 | $5.6 \pm 1.06$ |
| SA6 | 2 | 20 | 51 | 27 | $5.1 \pm 0.33$ |
| SA7 | 2 | 28 | 58 | 12 | $5.5 \pm 0.27$ |
| SA8 | 4 | 32 | 48 | 16 | $5.2 \pm 0.43$ |
| SA9 | 2 | 23 | 46 | 29 | $5.7 \pm 0.61$ |
| SA10 | 1 | 23 | 58 | 18 | $5.7 \pm 0.42$ |
| SA11 | < 1 | 26 | 64 | 9 | $5.7 \pm 0.26$ |
| SA12 | < 1 | 13 | 63 | 24 | $5.8 \pm 0.27$ |



**Fig. 1** (a) Alveolar macrophage in saline-treated mouse lung. Note filipodia (arrows) and cytoplasm lacking debris-filled phagolysosomes. N, nucleus. ( × 12 500 magnification). (b) Activated alveolar macrophage in *Stachybotrys chartarum*-spore-impacted mouse lung. Note lobopodia (arrows) and cytoplasm with numerous debris-filled phagolysosomes (PH). N, nucleus. ( × 12 500 magnification). (c) Alveolar capillary with single erythrocyte (RBC) in saline-treated mouse lung. Note that the endothelial surface lining the capillary lumen lacks evidence of vesicularization. ( × 12 500 magnification). (d) Alveolar capillary in *Stachybotrys chartarum*-spore-impacted mouse lung. Note the marked vesicularization of the endothelial surface lining the capillary lumen (arrows). ( × 12 500 magnification).

[45] who attempted to develop them as immunosuppressants (US Patent 4 229 466; 21 October 1980). In addition to their immunosuppressant properties, spirocyclic drimanes from different organisms have been reported as being endothelin receptor antagonists [46], protease inhibitors [47], cholesterol esterase inhibitors [48], inositol monophosphatase inhibitors [49], antiviral components [50] and cytotoxins [51]. The spirocyclic drimanes always appear in cultures of *S. chartarum* grown on building materials [12] as well as in *S. chartarum*-contaminated building materials from mouldy homes and buildings.

The concentrations of spirocyclic drimanes present in spores are not known. Spore concentrations of some of the macrocyclic trichothecenes that may be present have been the subject of very limited study [52,53]. In culture and on building materials, spirocyclics are present at levels typically an order of magnitude higher than the macrocyclic trichothecenes [54].

The class of *S. chartarum* toxins studied most extensively is the trichothecenes. *S. chartarum* produces a variety of macrocyclic trichothecenes in addition to several less toxic simple trichothecenes and trichoverroids (Table 2). Satratoxin H and related macrocyclic trichothecenes (Fig. 2) are held as responsible for the acute toxicity associated with stachybotryotoxicosis in animals.

Chemical analyses of a large number of *S. chartarum* strains isolated from building materials and suspect animal feed from around the world have made clear that: (1) the pattern of mycotoxin production by *S. chartarum* is independent of region, and (2) about one-third of these isolates produce macrocyclic trichothecenes [12,13,54,55]. *S. chartarum* isolates that do not produce macrocyclic trichothecenes typically produce the simple trichothecenes trichodermol and trichodermin.

Studies of metabolite production by the less cytotoxic strains have shown that they consistently produce diterpenes called atranones [51,56]. The atranones are related in structure to the dolabellanes, secondary metabolites produced by marine animals [57]. To date,

**Table 2** Trichothecene mycotoxins produced by *Stachybotrys chartarum*

| Simple Trichothecenes | Trichoverroids | Macrocyclic Trichothecenes |
|---|---|---|
| Verrucarol | Trichoverrins A & B | Roridins E, isoE, L-2 |
| Trichodermol | Trichoverrols A & B | Verrucarins B & D |
| Trichodermin | | Satratoxins F, isoF, G, isoG, H and isoH |

eleven atranones (A–K) and two dolabellanes [56] have been described for *S. chartarum* (Fig. 3). Dolabellanes exhibit modest cytotoxicity [57,58]. Atranones are not cytotoxic and do not induce inflammatory mediators in cultured macrophages [59]. At the time of writing, nothing is known about their toxicity nor their presence or absence in *S. chartarum* spores.

A number of additional metabolites occur in *S. chartarum* spores. As with other fungi, the spores contain β-1,3-D-glucan [60; Miller *et al.*, unpublished data]. Beta-1,3-glucan is a potent inflammatory agent [61] that produces a variety of symptoms from inhalation exposure in human volunteers including headache [62,63]. Indirect evidence has been reported indicating that *S. chartarum* produces hydroxylamine-type siderophores [64], uncharacterized proteins with hemolytic activity [65] and proteinase [66]. The potently immunosuppressive cyclic peptide, cyclosporine, has been reported from a Japanese strain of *S. chartarum* [67]. Limited evidence exists for the production of this compound by North American strains (D. Dearborn, personal communication).

Since early reports of the growth of *S. chartarum* on building materials [68] to the most recent [69], it is its trichothecenes that have been found in such materials. At the time of writing, no investigations have systematically investigated the production of the spirocyclic compounds or the atranones produced on *S. chartarum*-damaged building materials. In addition to the normal problems associated with measuring low levels of chemicals, the matrix in which these compounds are found is often very difficult to extract efficiently. For example, when the mycotoxin standards of the simple trichothecenes, T-2 toxin and trichodermin, roridin A (a macrocyclic trichothecene) and sterigmatocystins are added in dichloromethane solution to building materials, they cannot be detected in organic solvent extracts of that material [70]. Although there are no data comparing distribution of mycotoxins produced in indoor environments in spores (and other fungal particles, such as mycelial fragments) with building material-related particles, it is very likely that substantial amounts of the mycotoxins can find their way from spores to building materials. *S. chartarum* exports trichothecenes to the spore surface where they are readily solubilized in water [71], and presumably can be washed onto building material. In this same regard, toxicological studies in which *S. chartarum* spores, prior to being administered to animals, had been washed with aqueous solutions [52,72] are somewhat flawed, in that > 50% of the trichothecene toxins had been extracted before animal exposure [71].

© 2003 ISHAM, *Medical Mycology*, **41**, 271–291



**Fig. 2** (a) Distal lung area in saline-treated mouse lung inflated at 18 cm $H_2O$ pressure. AS, alveolar space. ($\times$ 400 magnification). (b) Distal lung area of *Stachybotrys chartarum*-spore-impacted mouse lung inflated at 18 cm $H_2O$ pressure. Note the lack of alveolar space surrounding *S. chartarum* spore (arrow) in granuloma tissue. ($\times$ 400 magnification). (c) Collagen-IV-labelled mouse lung granuloma tissue (GT) from a *Stachybotrys chartarum*-spore-exposed animal (48 h post exposure). Note the apparent lack of labelling in granuloma tissue surrounding spores (arrows) with labeled alveolar walls. AS, alveolar space. ($\times$ 400 magnification). (d) Distribution of stachylysin surrounding *Stachybotrys chartarum* spores (arrows) in mouse lung granuloma tissue. ($\times$ 400 magnification).

© 2003 ISHAM, *Medical Mycology*, **41**, 271–291

## Human and animal diseases linked to *S. chartarum*

### *Occupational environments*

In Russia and Hungary during the late 1920s through the 1940s, there were outbreaks of a disease in livestock, especially horses. Symptoms reported included irritation of the mouth, throat and nose leading to hemorrhage, shock, decrease in resistance, septicemia and death [73; Jarmay 1929, cited in 74]. In 1938, Russian scientists determined that the disease was associated with *S. chartarum* growing on the straw and grain fed to the animals. Intensive studies then resulted in the first demonstrated toxicity of *S. chartarum* to animals. When horses were fed cultures of the fungus, material from one Petri dish resulted in sickness and from 30 others resulted in death of individual horses. By 1945, extracts of cultures were shown to contain a toxic principle. That trichothecenes were responsible was not discovered until 1973. Eppley and Bailey reported that a strain from the US Army Quartermaster Laboratories collection, originally isolated from cardboard in Finland, produced satratoxin H [75]. Unsurprisingly, outbreaks were associated with hay or feed stored under wet conditions. The syndrome stachybotryotoxicosis was subsequently reported in a deer in France [76], horses in North Africa [77], sheep in Hungary [74] and South Africa [78], cows in Bosnia Herzegovina [79] and pigs in Hungary [74].

It is often said that the cases of animal toxicosis offer no information on building-related exposures to *S. chartarum* because the animals consumed the hay. It is obvious that the animals had their noses directly on and above the mouldy hay, so that part of their exposure must have been by inhalation. Oral exposure to toxins is different from inhalation exposure. The bioavailability of fungal toxins is usually greater by inhalation than by oral ingestion. This is the case for trichothecenes [80,81]. In ruminants such as cows and sheep, it is known that trichothecenes are modified by rumen bacteria and, in comparison to swine, both species are resistant to the agriculturally important trichothecenes [82,83]. This is reflected in guidelines on the amount of the trichothecene deoxynivalenol permitted in feed in the US and Canada. Lungs do not have the barriers to toxins offered by the gut microflora and intestinal cells. Regardless, because the toxicological descriptions of bovine or ovine stachybotryotoxicosis have been weak, it is impossible to comment on the relative impact of oral ingestion versus inhalation exposures in the historical case. Fortunately, there is a modern case report from South Africa [78,84].

The South African report [78,84] is a detailed toxicological picture of ovine stachybotryotoxicosis by the pathologist, Kriek, and the mycologist/mycotoxicologist, Marasas. The disease was characterized by hemorraghic septicemia, anemia and leukopenia. Observations during the first phase of the disease included elevated body temperature, listlessness and intermittent hemorrhagic diarrhea, followed by a progressively worsening anemia and leukocytopenia, followed by death. Opportunistic bacterial infections were noted. On autopsy, the primary findings included purpuric hemorrhage on serosal and mucosal surfaces and in most of the organs, enterorrhagia, severe pulmonary congestion and edema. On histological examination, atrophy and necrosis of the lymphoid tissue, aplastic anemia and a 'markedly' impaired inflammatory response. The authors determined that the cultures of *S. chartarum* isolated contained trichothecenes (see figures in original report).

A feature of this detailed pathology report was severe pulmonary congestion and edema. The oral toxicology of trichothecenes is very well known [80,85]. Edema is a feature of oral and inhalation exposure at lethal doses of trichothecenes, because at high doses heart damage occurs. In experimental oral exposure to lethal doses of trichothecenes, severe pulmonary congestion has not been reported [85], even in studies with swine [80], which offer a good model for the toxic effects of trichothecenes in humans. This indicates that part of the pathology observed in animal stachybotryotoxicosis is due to inhalation exposure to fungal particles and dusts containing trichothecenes.

For the Russian cases from the 1930s and 1940s, there are contemporary reports of illnesses in people who handled hay or feed grain infested with *S. chartarum* or who slept on straw-filled mattresses. Claims appear in these reports that the straw was black from fungal growth. Symptoms included skin and mucous membrane irritation, dermatitis, pain and inflammation of the mucous membranes of the mouth and throat, conjunctivitis, a burning sensation of the eyes and nasal passages, tightness of the chest, cough, bloody rhinitis, fever, headache and fatigue. Symptoms developed within days of exposure. The mortality rate was reported to be high. When Russian scientists investigating this disease rubbed their skin with the fungus, this induced local and systemic symptoms similar to those observed on farms [73,86].

There are modern case reports of human stachybotryotoxicosis that has arisen from handling straw by farm workers from Hungary [74,87] and Bosnia Herzegovina [Ozegovia *et al.* 1970, cited in 74], and from France among stable workers [88,89] who handled

'highly' contaminated straw. Symptoms were reported to be similar to those described in Russia. In the more recent Hungarian cases, *S. chartarum* was cultured from scrapings of symptomatic areas of the skin and from samples taken from the nose and throat. Most workers recuperated when they stopped handling the infested straw. In the French cases, precipitins were not found in the serum of the workers [89].

The French researchers handled a portion of highly contaminated straw from a 300-kg round bale for 5 s in an experimental chamber. Air samples were taken after 3, 9, 13, 27 and 81 min with an Andersen cascade sampler. At 3 min, spore clouds in excess of $10^7$ spores per m$^3$ air were measured, decaying to around half that value by 15 min, with some spores still in the air at 81 min. (Recco *et al.* [89] only assessed intact spores and did not include substrate dusts, which would have contained fungal toxins, endotoxin and allergens.) From the results, they estimated that a stable worker would inhale 3–5 mg of spores alone. They judged that when the strains were good producers of cytotoxins, this would pose a direct toxic hazard, but it is to be remembered that when Le Bars and Le Bars wrote their paper, the existence of the atranone chemotype was not known [88].

Workers at a horticultural facility in Germany developed painful inflamed lesions on their fingertips, followed by peeling skin, after handling pots made from recycled paper colonized by *S. chartarum* [90].

In both the earlier and the newer reports, symptoms in humans and animals were recorded as appearing after some delay and involved a mixture of inflammatory and toxic responses. Farm workers exposed to organic dust can experience Organic Toxic Dust Syndrome (ODTS), a non-allergic disease [91]. The acute inflammatory response is produced on exposure to endotoxin, fungal spores and components of fungal spores including $\beta$-1,3-D-glucan (and other materials). These particles mainly affect macrophages, which then secrete inflammatory mediators, particularly polyclonal cell activators. This results in the release of plasma from the lung capillaries into the alveolar and lung tissue, and also in the invasion of these cells by neutrophils. Blood–air diffusion capacity may be reduced and there may be an increase in the number of white blood cells. Symptoms such as fever, general malaise, headache, chills, body aches, cough and shortness of breath are seen. Antibodies to the agents concerned are usually absent. ODTS is not an allergic disease, hence is usually characterized by a higher attack rate than hypersensitivity pneumonitis, and is not considered fatal [91–93].

In the human cases, farm exposure produced ODTS-like symptoms along with toxic symptoms consonant with exposure to trichothecenes, particularly immunological and skin/mucosal irritation and hemorrhage [85,94,95]. There is, then, unambiguous evidence that occupational exposure in the order of $10^3$–$10^7$ spores/m$^3$ air results in symptoms of OTDS and trichothecene toxicosis.

## Built environment

Perhaps the first indication that mould damage in US buildings where *S. chartarum* was amongst the fungi isolated, can be found in Kozak *et al*. [96]. The focus of that study was on the allergy-related symptoms that are acknowledged today. Exposure to *S. chartarum* toxins as a potential cause of human disease indoors was first noted from a case in a house in Chicago [68]. What is known is that *S. charatarum* was growing on debris in the heating/air conditioning system of the house and on a bedroom ceiling. Trichothecenes were measured in the colonized debris. No other environmental information was reported. No clear case report of the symptoms of the family exists and none of authors of the published report was a clinician. Symptoms were said to have disappeared after the house was cleaned but this was not documented. Symptoms reported in the Croft *et al.* paper included headaches, sore throat, general malaise, diarrhoea and fatigue, which have been characterized as 'consistent with chronic trichothecene exposure' [97]. Symptoms of human exposure to trichothecenes include vomiting (because of neurotoxicity), hemorrhage and skin lesions. In contrast, the reported symptoms are more consistent with the symptoms from living or working in a mouldy environment [98]. This widely cited case provides no clear information as to whether *S. chartarum* toxins contributed to the symptoms reported.

The so-called New York *S. chartarum* cluster [99–101] could more fairly be described as two clusters. The group initially presenting to the New York Mount Sinai Clinic involved three workers who, without personal protection, had been cleaning and removing mouldy cardboard boxes for 2 or 3 days [100] in a sub-basement that had had recurrent flooding [99]. They suffered an acute response and sought medical attention. The attending physician noted throat irritation, fatigue, fever, muscle aches, stomach aches and, importantly, skin rash on the hands (E. Johanning, personal communication). Bulk sampling of wallboard and books indicated massive contamination of these surfaces with *S. chartarum*. In addition, one of its trichothecene toxins was found in bulk samples of

contaminated material [100]. Area measurements of the affected location resulted in estimated airborne concentrations of the order of $10^5$ viable spores per $m^3$ [99,101], which could possibly translate into much greater total airborne *S. chartarum* spore loads. Measurements by others of airborne levels of *S. chartarum* spores arising from handling contaminated materials have been reported to be in the range of $7 \times 10^5$ per $m^3$ [102]. In addition, preliminary data suggest that the concentrations in the breathing zone of workers carrying such materials are higher than area measurements (unpublished report; D Hamlin, Center for Toxic Environmental Health, University of Texas). Several of these workers established claims with the New York State workers' compensation system. The workers were diagnosed with chronic laryngitis, sinusitis, bronchitis, asthma, allergy and toxic encephalopathy [103]. It is reasonable to assume that these workers were exposed to spore concentrations associated with agricultural stachybotryotoxicosis. The time of onset, the fever and the skin symptoms are consistent with ODTS plus exposure to the potent dermal toxins of *S. chartarum* trichothecenes.

After unspecified remediation steps had been taken [100], a case–control study was conducted on some of the original cases and an additional group of approximately 50 workers from the same workplace, together with 21 matched controls without contact with the problem site [101]. This group was exposed to damp-building fungi, including *S. chartarum*, perhaps in quantity at the time of handling the uncontained contaminated materials. In this study, immune modulation and respiratory and non-respiratory symptoms of the type associated with living or working in mouldy environments were reported [98].

This incident, which can be more fairly characterized as two separate situations, provides limited evidence of a toxic effect consequent on handling *S. chartarum*-damaged materials in buildings. The consequences for the remaining building inhabitants, certainly by the time the larger formal study was conducted, are hard to distinguish from those reported in studies of damp buildings.

Finally, *S. chartarum* has been associated in six locations with infant pulmonary hemosiderosis. Most cases on the public record have been reported in Cleveland, but other cases have been reported in Texas [104], Kansas City [105], Belgium [N. Nolard, cited in 59] and in Quebec (P. Auger, personal communication).

Physicians at the Rainbow Babies and Childrens' Hospital in Cleveland recognized that there was an unusually high number of cases of idiopathic pulmonary hemosiderosis between January 1993 and December 1994. Ten were diagnosed during this time-period, compared to only three in the previous 10 years. They were clustered within a zone of 9.5-km radius in an area prone to flooding because of drainage from other parts of the city. A case–control study was conducted with the 10 diagnosed during their first 6 months of life and 30 age-matched controls living within 9.5 km of these cases, who were mostly black people, in low-income families, living in poorly maintained older homes with water damage [106–108]. Odds ratios were 9 for male sex, 16 for water damage and, 10, it was subsequently reported, for high levels of *Stachybotrys* in the home. Parental smoking was also a potentially important contributing factor.

The hypothesis that exposure to high levels of *S. chartarum* contributed to the development of pulmonary hemosiderosis in the Cleveland infants was challenged because of the discovery of serious problems with the exposure assessments [109]. The scientific reports noted water damage, but this aspect was not adequately characterized. The authors of the present review have each examined one or more of these houses. The basements had often suffered repeated flooding and severe mould growth on beams, and sometimes on debris on dirt floors, was seen. Mould growth on wood is uncommon in housing because mould requires a wood moisture content 15% upwards by weight. An idiosyncratic configuration of the forced-air heating system is also common among houses in these Cleveland neighborhoods: the return spills directly onto the basement floor. This means that contamination of whatever kind can be returned to the house during the heating season.

The clinical data on the Cleveland infants were evaluated and the disease remained idiopathic in the sense that all known risk factors for infant hemosiderosis in these children were examined and none was found. Most presented with severe pulmonary symptoms requiring intensive support, but a few cases had less severe haemorrhage. Three-quarters of the patients required ventilator support and blood transfusions. Removal from the damp home reduced lower respiratory rebleeding in the surviving infants. Several patients continued low-grade haemorrhage for months, even after removal from their original home [110].

The CDC review of the original epidemiology [109] noted that the hypothesis that *S. chartarum* toxins contributed to the disease observed could not be excluded. This assessment was based on evidence of nasal and tracheal bleeding in highly exposed adult humans and animals and the pathophysiology of the toxins. Direct evidence of personal exposure to *S. chartarum* has not been obtained in the reported

Cleveland cases; the evidence that the toxins from this fungus or the fungus itself were involved remains inferential. In a recent unreported case, *S. chartarum* DNA from lavage was detected by the EPA laboratory (D. Dearborn, R. Haugland, S.Vesper *et al.*, personal communication). CDC created three working groups to develop better protocols for investigation of future clusters, and has begun a surveillance program in conjunction with the USA [111]. In 2002, the CDC published a case definition of idiopathic pulmonary hemosiderosis which will be used here as part of the analysis of the published cases. The CDC working group noted that cases of acute idiopathic pulmonary hemorrhage in infants (AIPHI) are characterized by the sudden onset of pulmonary hemorrhage in a previously healthy infant. Evidence of pulmonary hemorrhage includes hemoptysis, and finding blood in the nose or airway with no evidence of upper respiratory or gastrointestinal bleeding. Patients present with acute, severe respiratory distress or failure requiring mechanical ventilation and often demonstrate bilateral infiltrates on chest radiograph. A clinically confirmed case is illness in a previously healthy infant aged < 1 year with a gestational age of > 32 weeks and no history of neonatal medical problems that could cause an episode of pulmonary hemorrhage meeting all of the following three criteria: (1) abrupt or sudden onset of overt bleeding or patent evidence of blood in the airway; (2) a severe condition progressing to acute respiratory distress or failure that results in hospitalization with intubation and mechanical ventilation in a pediatric intensive care unit; and (3) diffuse, bilateral pulmonary infiltrates on chest radiograph or computerized tomography of the chest [112]. Only the few premature babies considered by Dearborn *et al.* do not meet this new case definition [110].

At the time of writing, there have been two published reports of additional geographic locations where idiopathic pulmonary hemorrhage in young children has occurred in environments where *S. chartarum* was found. Water damage leading to high airborne *Aspergillus* and *Penicillium* counts, as well as *S. chartarum* spores, was found in the room of an infant case in Kansas. The baby was admitted with pulmonary hemorrhage and the clinical work-up [105] was similar to that in Cleveland (D. Dearborn, personal communication) and meets the new CDC case definition. A third case occurred in Delaware, where a 2-week-old infant was admitted to intensive care with pulmonary hemorrhage [29]. Again the clinical work-up was similar to that in Cleveland and meets the CDC case definition. The environmental assessment report in this case is weak, but the building was reported as having

unremediated storm damage, something that can result in serious mould growth. *S. chartarum* was not recorded for the limited number of samples tested, but in subsequent undescribed samples examined by the method of Haugland *et al.* [25] *S. chartarum* DNA was detected.

A case of pulmonary hemorrhage also associated with *Stachybotrys* was reported in a 7-year-old child in Texas. The child underwent a bronchial lavage within hours of hospitalization and viable *S. chartarum* spores were recovered from the lavage [104]. The identification of the fungus was confirmed by D. Malloch. For this case, both the circumstantial and personal exposure evidence is sufficient enough to be able to say that exposure to *S. chartarum* contributed to the disease observed.

## Exposure to *S. chartarum* via the lung in laboratory animals

### Preliminary reports

A crude allergen extract of *S. chartarum* induced allergic asthma-like responses in the BALB/c murine model [113]. It was only relatively recently that it was recognized that spores of toxigenic fungi contain high concentrations (1–650 μg/g) of one or more species-specific toxins, including in some cases, spore-specific toxins. Moulds have been shown to contain mixtures of the toxins associated with the species. These include: *Fusarium graminearum* (DON), *F. sporotrichioides* (T-2), *F. verticillioides* (fumonisin), *S. chartarum* (satratoxins), *Penicillium expansum* (citrinin), *P. chrysogenum* (roquefortine C), *P. brevicompactum* (mycophenolic acid), *Aspergillus versicolor* (sterigmatocystin), *A. flavus/parasiticus* (aflatoxins), *A. fumigatus* (fumitremorgen B, verruculogen) [53,114–118]. It is often overlooked that the concentrations in spores range up to the mm levels.

Experimental inhalation exposure to the pure trichothecene T-2 toxin have been studied in mice, rats, guinea-pigs and swine. The $LD_{50}$ is typically one order of magnitude less by inhalation than by systemic administration [80,81]. The macrocyclic trichothecenes are highly toxic compounds, being among the most potent inhibitors of protein synthesis known [94,119]. Trichothecenes cause membrane damage in proportion to the diphosphatidylcholine concentration of the membrane type [120,121]. Yang *et al.* reported that satratoxin G was the most cytotoxic of eight trichothecenes tested on mammalian cells [122]. Other researchers have also reported the high toxicity of satratoxins

compared with that of other trichothecenes. The $LD_{50}$ in mice for satratoxins is < 1 mg/kg [84,123].

## Towards the no adverse effect level (NOAEL)

In rodents, intratracheal or intranasal installation of *Stachybotrys* spores can result in massive lung damage and acute lethality, both in mice [52,124,125] and in rats [30]. The experiments reported are not particularly informative because they were conducted at rates above the maximum tolerated dose, generally using doses in the range 3000–30 000 spores/g bdy wt. However, they have shown that such exposures can result in a variety of biochemical, anatomical and gross pathological lung changes, and in dose-, time- and spore-strain-dependent ways. These experiments have also provided evidence that exposure to high *S. chartarum* spore loads can cause disease signs in rodents that accord with those reported with agricultural exposure of domestic animals, farm workers and with high exposure from the built environment.

At the biochemical level, alveolar type II cells and alveolar macrophages (AM) appear to be particularly sensitive. Mason *et al.* [126,127], Macrae *et al.* [128] and Sumarah *et al.* [129] have shown that *S. chartarum* spore and isosatratoxin F exposure induces significant changes in the phospholipid composition of pulmonary surfactant in bronchoalveolar lavage fluid (BALF). *S. chartarum* spores and isosatratoxin F induce changes in regulation of both the secretion and synthesis of pulmonary surfactant, and in the pattern of phospholipid targeting the pulmonary surfactant pools in mice [126]. These agents alter the activity of convertase responsible for the conversion of the surface-active to the metabolically used surfactant fraction [127]. The surfactant changes in mice may be due to an increase in pulmonary surfactant phospholipids associated with alveolar type II cell damage [128]. *S. chartarum* spore or toxin exposure induces other changes in lung surfactant phospholipid composition, including depressed disaturated phosphatidylcholine (DSPC) [129], which is the major phospholipid responsible for maintaining surface-tension properties of lung surfactant. Hastings *et al.* have recently shown that depressed DSPC synthesis in *S. chartarum* spore exposed mice is probably related to modulation of a key enzyme, CTP:cholinephosphate cytidylyltransferase (CPCT), in the phosphatidylcholine synthesis pathway [130].

These experiments have also shown that intratracheal exposure of rats and mice to *S. chartarum* spores causes a significantly elevated protein content, particularly albumin, in the BALF. This accords with the acute inflammation response seen in several reports

[72,127,131,132]. These differential effects of *Stachybotrys* spores were almost eliminated in the case of methanol-extracted spores [132]. In mice, exposure to single doses of spores from two different *S. chartarum* isolates stimulated pro-inflammatory cytokine (IL-1, IL-6, TNFα) and other responses (total protein, albumin, LDH). These responses are significantly elevated even at doses as low as 30 spores/g bdy wt compared to saline and *Cladosporium cladosporioides*-spore-treated animals. (*C. cladosporioides* is the most common fungal spore in outdoor air.) The pattern of responses in mice was dependent on dose, time and strain differences in the toxicity of the spores [131]. These authors estimated the NOAEL for pro-inflammatory cytokine production to be in the range of 10–15 spores/g bdy wt. Rosenblum *et al.* also revealed that mice exhibited dose-dependent pulmonary responses to *S. chartarum* spore loads [133]. Again, the degree of response to exposure was also dependent on mouse strain used: strain Balb/C mice exhibit the most, while C57bl/6J show the least inflammation and injury.

There is clear *in vivo* evidence that intratracheal exposure of mice and rats to *S. chartarum* spores results in a variety of micro-anatomical (Fig. 4a–d), histopathological and gross pathological changes. Transmission electron microscopy (TEM) combined with stereology has shown that exposure to *S. chartarum* spores and isosatratoxin F in mice results in significant alveolar type II cell changes *in vivo* different to those associated with exposure to the same concentrations of *C. cladosporioides* [125]. These changes included condensed mitochondria with separated cristae, scattered chromatin and poorly defined nucleolus, cytoplasmic rarefaction, and distended lamellar bodies with irregularly arranged lamellae. These cytological changes are consistent with apoptosis and parallel results of some of the *in vitro* studies. For example, Pertola *et al.* reported mitochondrial swelling as a cytological lesion in boar spermatozoa exposed to *S. chartarum* spores and T-2 toxin [134]. Okumura *et al.* found that exposure of a mouse cell line to T-2 toxin caused mitochondrial condensation [135]. However, the latter study suggested that the cellular changes observed in mouse cell lines exposed to T-2 toxin may be linked to apoptosis. Yang *et al.* also provided molecular evidence *in vitro* that other trichothecenes derived from *S. chartarum* isolates induce apoptosis [122].

At the histopathological level, *Stachybotrys* spores instilled in the lungs of neonate Sprague–Dawley rats resulted in extensive hemorrhage with an $LD_{50}$ of $10^5$/g bdy wt and growth of surviving animals was impaired in a dose-dependent fashion. Histology of the lungs revealed fresh hemorrhage, hemosiderin-laden macro-

phages and evidence of inflammation, including thickened alveolar septa infiltrated by lymphocytes and mononuclear cells and intra-alveolar macrophages. None of these effects were observed in animals instilled with spores treated with ethanol to remove the toxins [118]. Similar pathological changes have been reported in mice [52,124,125]. Amongst the most consistent histopathological features described in both rats and in mice are granuloma formation (Fig. 5a, 5b), hemorrhage and hemosiderin deposition.

Nikulin *et al.* showed that intranasal instillation of spores of a relatively non-toxic and a toxic *S. chartarum* strain into NMRI mice resulted in a variety of histopathological features that were dependent on spore dose and the relative toxicity of spores [52]. They also revealed that despite the often massive lung changes in mice, spleen, thymus and intestinal tissues showed little apparent damage. This suggested that inhalant response to *S. chartarum* spores and their toxins is different from that associated with inhalant exposure to pure *S. chartarum* toxins, something observed in the South African case of ovine stachybotryotoxicosis [78]. Rand *et al.* showed that intratracheal exposure to *C. cladosporioides* and *S. chartarum* conidia stimulated granuloma formation in the lungs of Carworth Farms White (CFW) mice [125]. Hemorrhage, erythrocyte accumulation in the alveolar air space, dilated capillaries engorged with erythrocytes and hemosiderin accumulation at spore impaction sites were features associated with *S. chartarum* spore exposure but not *C. cladosporioides* spore exposure. Quantitative light microscopy showed that granulomatous lesions were more severe and persistent in *S. chartarum*- than in *C. cladosporioides*-spore-treated animals. Erythrocyte abundance in *S. chartarum*- but not in *C. cladosporioides*-spore-treated animals also exhibited significant time-dependent accumulation in the alveolar space. None of these effects were observed in the lungs of untreated, saline- or isosatratoxin-F-treated animals, suggesting it is the spore exposure, not exposure to pure toxin, that stimulates inflammatory tissue reactions.

Marked differences in inflammatory response in lungs of *S. chartarum*-spore- and isosatratoxin-F-impacted animals are also manifest as BALF biochemical changes and in gross pathology of lungs. For example, total protein content in the BALF from spore-impacted lungs is significantly higher than in that of the toxin-impacted lungs, which is not different from concentrations recovered from control animals (Rand, unpublished data). Additionally, lungs of spore-exposed animals often appear abnormally pale and mottled with hemorrhagic foci at sites of spore impac-

tion, while toxin-exposed lungs appear uniformly pink and similar in appearance to those of the control animals (Rand, unpublished observations). These observations indicate that the magnitude of tissue reaction and seriousness of disease outcome in *S. chartarum*-spore-impacted lungs is far greater than it is in lungs exposed to pure toxin.

A number of other *in vivo* studies have reported a lack of an inflammatory lung response in animals exposed to pure mycotoxins [80,81,136–139]. Pang *et al.* [138] have suggested that lack of an apparent tissue response to T-2 toxin exposure may be a consequence of its lipophilic nature, making it rapidly absorbed from lung tissue, whereupon it is metabolized and excreted. However, results of immunohistology and immunocytochemistry studies do not support the rapid clearance of *S. chartarum* metabolites, including trichothecenes, from spore-impacted mouse and rat lungs. To the contrary, they indicate that spores act as time-release capsules – liberating their metabolites into the extracellular space relatively slowly.

Using immunocytochemistry, Gregory *et al.* evaluated the distribution of the trichothecene, satratoxin G, in spores and mycelia of *S. chartarum* and in lung tissues of intratracheally exposed mice [140]. Heavy satratoxin G labelling was observed predominantly in AM, particularly in the lysosomes, heterochromatin and rough endoplasmic reticulum, even 48 h post-exposure. Alveolar type II cell heterochromatin and endoplasmic reticulum showed only modest presence of the toxin. These observations indicated that spore-derived satratoxin G was relatively long lived in tissues, and that it displayed a high degree of cellular specificity with respect to its uptake in mouse lung tissues, and that AM appear to play an important role in providing cellular defence against trichothecene toxins. In a separate study, Gregory *et al.* [141] described the distribution of stachylysin, which causes lysis of red blood cells *in vitro* [64,65,142]. Granulomatous lesions enclosing spores in rat and mouse lungs, labeled lightly for stachylysin at 24 h and more heavily for stachylysin after 72 h exposure. This indicated that stachylysin production/release is a relatively slow process. They also reported localization of stachylysin in AM phagolysosomes and suggested that AM may be involved with its inactivation and clearance from the lung environment. Localization of the satratoxin G in lysosomes in the AM, and stachylysin in the phagolysosomes (Fig. 5d) suggests that there are probably different strategies for the sequestration, detoxification and clearance of these substances from the lung.

Animal experiments have indicated that the slow disappearance of *S. chartarum* spores from lung tissue

has other consequences. Using antibodies to collagen IV, lung tissue in untreated mice, and saline-, isosatratoxin-F- and *C. cladosporioides*-spore-treated animals labels heavily for collagen IV. Collagen IV is the important basement membrane material that lends structural and functional support to the basal surface of all epithelial lining cells. It also labels heavily in alveoli not directly impacted by *S. chartarum* spores (Fig. 5c). However, in granulomas surrounding *S.*

*chartarum* spores in mice exposed for 24–96 h post-inoculation, there is reduced labeling. Kordula *et al.* [66] and Yike *et al.* [118] showed that *S. chartarum* spores produce extracellular proteases that hydrolyse collagens (I, IV, X). Changes in the expression and distribution of extracellular ground substances such as collagens I, II and IV in lung tissue, due to exposure to proteases sequestered in *S. chartarum* spores in the lungs, may have several effects. The integrity of lung

Table 3  Summary of demonstrated or suspected* effects of *Stachybotrys chartarum* spore components on rodent lung biology†

| Component | Effect |
|---|---|
| Spore particle, 3000 spores/g bdy wt | Gross pulmonary injury (hemorrhage) |
| | Granuloma formation |
| | Reduced pulmonary function |
| | Hemodynamic adjustments(vasodilation/constriction) |
| | BALF eosinophilia |
| | Alveolar macrophage activation/ phagocytosis |
| | Hemodynamic adjustments (transpulmonary pressure changes)* |
| 30 spores/g bdy wt | BALF IL-1, IL-6 cytokine production |
| Multiple exposures *S.c.* allergen extract | Increased BALF cell abundance |
| | BALF Neutrophilia |
| | BALF Eosinophilia |
| | BALF IgE production |
| | BALF Total protein production |
| | BALF LDH accumulation |
| $\beta1,3$ glucan, 2.1 ng/g bdy wt | BALF Lymphophilia |
| | TNF$\alpha$ production |
| | Immunomodulation* |
| $\beta1,3$ glucan, 0.02 ng/g bdy wt | TNF$\alpha$ release |
| Serine proteinases in 3000 spores/g bdy wt | Tissue damage |
| | Depressed collagen IV expression |
| | Pulmonary "Convertase" perturbation* |
| | Alveolar capillary vascular permeability changes (increased BALF total protein/albumin content)* |
| | Alveolar type II cell necrosis* |
| | Alveolar capillary wall vesicularization* |
| | Increased BALF LDH concentration* |
| | Hemorrhage* |
| Serine proteinases, 30 spores/g bdy wt | Alveolar capillary vascular permeability changes (increased BALF total protein/albumin content)* |
| | Increased BALF LDH production |
| Hemolysin in 3000 spores/g bdy wt | Incorporation into phagolysosomes |
| | Erythrocyte plasmalemma binding |
| | Hemosiderosis* |
| Satratoxin, 2.1 ng/g bdy wt | Alveolar type II cell damage |
| | Pulmonary surfactant homeostasis perturbation |
| | Depressed CTP:cholinephosphate cytidylytransferase |
| | Lamellar body perturbation |
| | Mitochondrial damage |
| | Plasma membrane vesicularization |
| | Alveolar macrophage: |
| | Incorporation into lysosomes |
| | Incorporation into heterochromatin |
| | Ribosomal binding |

†See text for further detail.

© 2003 ISHAM, *Medical Mycology*, **41**, 271–291

granuloma tissue surrounding *S. chartarum* spores could be affected by depressing collagen IV synthesis in the alveolar capillary endothelium basement membrane. This in turn could weaken alveolar capillary lining cells making them susceptible to rupture during cough spasm.

None of these experiments has produced a biomarker that might document an effect of toxin exposure in human tissues. They have, however, produced an emerging picture of the complexity of potential damage resulting from inhalation of *S. chartarum* spores, mycelial fragments and substrate dusts. Table 3 summarizes the effects noted in the above experiments, making an effort to account for the known or suspected cause of the damage observed. Although it has been noted for years that any effects of inhalation exposure to moulds would represent the combined effects of the chemicals present in the spores, most authors have chosen to focus only on the trichothecene toxins.

## Observations and conclusions

Living or working in a mouldy building can cause building-associated asthma, is associated with exacerbation of asthma and increased rates of upper respiratory diseases (e.g. [3,4]). In damp or water-damaged buildings, *S. chartarum* is often associated with other hydrophilic species and a variety of other species that grow on progressively drier materials [34]. The evidence reviewed in this paper is that *S. chartarum* contributes both to the allergic and to the non-allergic components of the human diseases seen in damp buildings. As is the case for essentially all building-associated fungi, it is currently impossible to assess the individual contribution of any building-associated fungus or indeed all such fungi on a population health basis [4].

Nevertheless, every cognizant authority review since the first New York Guidelines [143] has explicitly acknowledged that exposure to some species of building-associated fungi, including *S. chartarum*, represents



**Fig. 3** Structures of spirocyclic drimanes and related compounds.



Salratoxin H

Trichodermol: R = H
Trichodermin: R = Ac

Trichoverrols

Roridin E

Verrucarin J

Trichoverrins

**Fig. 4** Structures of trichothecenes.

an increased hazard compared to other fungi and to the high levels of fungi in outdoor air. We found that this position is well supported by the information we found on the properties of *S. chartarum*. The reasons for this can be briefly summarized as follows. Because *S. chartarum* requires near water saturation for growth on cellulose-derived materials in nature, its growth implies that some part of the building has been very wet. Wet buildings can become highly contaminated by fungi.

Handling contaminated materials generates total spore concentrations capable of causing severe disease in humans for several reasons, including the presence of agents such as cytotoxins, organic material, allergens and endotoxin. However, the symptoms documented from handling materials contaminated with *S. chartarum* indicate a greater hazard than that for organic materials in general, including that for materials damaged by other moulds. The weight of evidence from agricultural exposure and the so-called first cluster of the New York cases suggests that the disease observed is partially a consequence of exposure to the

potently cytotoxic macrocyclic trichothecenes present in the spores and substrate dusts associated with *S. chartarum*-contaminated straw and building materials. In the two cases where personal exposure to *S. chartarum* spores was documented (first in a child in Texas, by isolating a spore in lung lavage, and second in an infant in Cleveland, by DNA), it is reasonable to conclude that at least part of the symptoms seen resulted from exposure to macrocyclic trichothecenes, because such symptoms are similar to those seen in experimentally exposed laboratory animals. It must be noted that even in these cases, no evidence of toxin-associated injury was measured biochemically.

In a regulatory sense, all of the conditions necessary to make a public health recommendation have been met in terms of hazard identification. The allergens and toxins of *S. chartarum* can result in disease in humans as well as in domestic and laboratory animals. The mechanisms that result in cell damage in animals apply to humans. Handling materials naturally contaminated by *S. chartarum* is relatively dangerous. Living in a building where it is possible to recover *S. chartarum* spores or even DNA from lung lavage is also apparently dangerous, and is probably more dangerous to infants and children than to adults. For several reasons, we cannot describe what this might mean in terms of the extent of mould damage required to produce those conditions, except to note that, at least twice, they have been met.

Several authors have characterized the risk of toxin-associated disease from exposure to *S. chartarum* in building materials as low. We feel that it is too soon to draw such a conclusion because many data are missing. Perhaps foremost, there is no reliable theory on the nature of exposure, except to say that spores, mycelial fragments and substrate dusts are involved. As noted above, spores of *S. chartarum* are produced in a range of sizes; however, spore and mycelial fragments are known to be an important component of the exposure yet are virtually never measured, and substrate dusts containing fungal toxins and perhaps allergens have never been measured in a building. These shortcomings prevent a reasoned assessment of the potential exposure that at the present time can only be inferred, typically from measurements of the area of substratum bearing intact spores or, less usefully, viable propagules.

Some of the laboratory studies reported above show that fairly modest intratracheal exposure in a number of mouse strains results in clear adverse effects on critical aspects of lung biology and damage. The presence of trichothecenes in the spores used for such experiments explains some of the effects seen, but the potential effects of other concurrent components of the

© 2003 ISHAM, *Medical Mycology*, **41**, 271–291

Fig. 5  Structures of atranones and dolabellanes.

exposure measured (including other metabolites such as glucan, allergen, haemolytic factors and proteases) have neither been individually attributed nor, perhaps, measured. Although there is much speculation about the effect of systemic exposure to trichothecene mycotoxins, such an effect is unlikely, despite non-lung consequences of lung damage [116]. The effects of inhalation exposure to *S. chartarum* on lung mediators such as endothelins [144] or alveolar macrophage-derived neurotransmitters [145] have not been assessed. Headaches have been reported in investigations of mouldy buildings with or without reports of *Stachybotrys* [61,98,146]. As noted above, headaches were reported by volunteers exposed to glucan [63]. One abstract suggested that neurocognitive damage resulted from *Stachybotrys* exposure [147] although no mechanism for this was suggested and none are immediately obvious.

The most useful studies on the impact of trichothecene-containing spores of *S. chartarum* are those that have involved a number of different strains of experimental mice. Mice are more resistant to the toxic effects of trichothecenes than are non-human primates [94].

Whether the consequences of *S. chartarum* exposures would be greater when other fungal materials, endotoxin and building dusts are present remains unknown.

Further risk characterization cannot be reliably made without obtaining one or more of the following advancements. (1) Better characterization of the total exposure (spores, spore and mycelial fragments), such that nose-only inhalation experiments can be carried out, is needed. (2) A better understanding of the relative roles of the chemicals present in an exposure arising from *S. chartarum*-contaminated building materials (trichothecenes, atranones, sporocyclics, protease, allergen, cyclosporine) needs to be obtained from several animal models. (3) Biomarkers of the impact of one or more *S. chartarum* need to be developed and applied to human tissue.

It appears that the outcome of very high exposure to *S. chartarum* can differ from that of exposure to other building-associated fungi. It is evident that there is a NOAEL of exposure to *S. chartarum* in the built environment, but this may differ according to age, medical history and concurrent exposures. Much needs to be done to clarify the risk. That said, the public

policy in several countries is that living or working in damp buildings is unacceptable. Perhaps this will in the end render the question of the hazard of *S. chartarum* irrelevant.

## References

1 Miller JD. Global significance of mycotoxins. In: Miraglia M, van Egmond M, Brera C, Gilbert J (eds). *Mycotoxins and Phycotoxins – Developments in Chemistry, Toxicology and Food Safety*. Fort Collins, CO: Alaken Press, 1998: 1–9.

2 Miller JD. Mycotoxins. In: Francis FJ (ed.). *Encylopedia of Food Science and Technology*. New York, NY: John Wiley, 1999: 1698–1706.

3 Health Canada. *Indoor Molds*. Ottawa, ON: Health Canada, 2003.

4 NAS. *Clearing the Air*. Washington, DC: National Academy Press, 2000.

5 Jong SC, Davis EE. Contribution to the knowledge of *Stachybotrys* and *Memnoniella* in culture. *Mycotaxon* 1976; 3: 409–485.

6 Koster B, Scott J, Wong B, Malloch D, Straus N. A geographically diverse set of isolates indicates two phylogenetic lineages within *Stachybotrys chartarum*. *Can J Bot* 2003 (in press).

7 Andersen B, Nissen N. Evaluation of media for detection of *Stachybotrys* and *Chaetomium* species associated with water-damaged buildings. *Int Biodeter Biodeg* 2000; 46: 111–116.

8 Tsai SM, Yang CS, Heinsohn P. Comparative studies of fungal media for the recovery of *Stachybotrys chartarum* from environmental samples. In: Johanning E (ed.). *Bioaerosols, Fungi and Mycotoxins: Health Effects, Assessment, Prevention and Control*. Albany, NY: Eastern New York Occupational and Environmental Health Center, 1999.

9 Bisby GR. *Stachybotrys*. *Trans Br Mycol Soc* 1943; 26: 133–143.

10 Hughes SJ. Revisiones Hyphomycetum aliquot cum appendice de nominibus rejeciendis. *Can J Bot* 1958; 36: 727–836.

11 Miller JD, Greenhaigh R, Wang YZ, Lu M. Mycotoxin chemotypes of three *Fusarium* species. *Mycologia* 1991; 83: 121–130.

12 Andersen B, Nielsen KF, Jarvis BB. Characterization of *Stachybotrys* from water-damaged buildings based on morphology, growth and metabolite production. *Mycologia* 2002; 94: 392–403.

13 Jarvis B, Sorenson WG, Hintikka E, *et al*. Study of toxin production by isolates of *Stachybotrys chartarum* and *Memnoniella echinata* isolated during a study of pulmonary hemosiderosis in infants. *Appl Environ Microbiol* 1998; 64: 3620–3625.

14 Cruse M, Telerant R, Gallagher T, Lee T, Taylor J. Cryptic species in *Stachybotrys chartarum*. *Mycologia* 2002; 94: 814–822.

15 Zuck RK. Isolates intermediate between *Stachybotrys* and *Memnoniella*. *Mycologia* 1946; 38: 69–76.

16 Smith G. Some new and interesting species of microfungi. *Trans Br Mycol Soc* 1962; 45: 387–394.

17 Kendrick WB, Carmichael JW. Hyphomycetes. In: Ainsworth GC, Sparrow FK, Sussman AS (eds). *The Fungi*, vol. IVa. New York: Academic Press, 1973: 323–509.

18 Barron G. *The Genera of Hyphomycetes from Soil*. Baltimore: Williams & Wilkins, 1968.

19 Carmichael JW, Kendrick WB, Conners IL, Sigler L. *Genera of Hyphomycetes*. Calgary: University of Alberta Press, 1980.

20 Li D-W, Yang CS, Haugland R, Vesper S. A new species of *Memnoniella*. *Mycotaxon* 2003; 85: 253–257.

21 Haugland RA, Vesper SJ, Harmon S. Phylogenetic relationships of *Memnoniella* and *Stachybotrys* species inferred from ribosomal DNA sequences and evaluation of morphological features for *Memnoniella* species identification. *Mycologia* 2001; 93: 54–65.

22 Peltola J, Niessen L, Nielsen KF, *et al*. Toxigenic diversity of two different RAPD groups of *Stachybotrys chartarum* isolates analyzed by potential for trichothecene production and for boar sperm cell motility inhibition. *Can J Microbiol* 2002; 48: 1017–1029.

23 Jarvis BB, Zhou Y, Wang S, *et al*. Toxigenic molds in water-damaged buildings: Dechlorogriseofulvins from *Memnoniella echinata*. *J Nat Prod* 1996; 59: 553–54.

24 Ellis MB. *Dematiaceous Hyphomycetes*. Wallingford, UK: CAB International, 1971.

25 Haugland RA, Vesper SJ, Wymer LJ. Quantitative measurement of *Stachybotrys chartarum* conidia using real time detection of PCR products with the TaqManTM fluorogenic probe system. *Mol Cel Probes* 1999; 13: 329–340.

26 Roe JD, Haugland RA, Vesper SJ, Wymer LJ. Quantification of *Stachybotrys chartarum* conidia in indoor dust using real time, fluorescent probe-based detection of PCR products. *J Exp Analyt Environ Epidemiol* 2001; 11: 12–20.

27 Miller JD. Mycological investigations of indoor environments. In: Flannigan B, Samson RA, Miller JD (eds). *Microorganisms in Home and Indoor Work Environments: Diversity, Health Impacts, Investigation and Control*. London: Taylor & Francis, 2001: 231–246.

28 Vesper S, Dearborn DG, Yike I, *et al*. Evaluation of *Stachybotrys chartarum* in the house of an infant with pulmonary hemorrhage: quantitative assessment before, during and after remediation. *J Urb Health: Bull NY Acad Med* 2000; 77: 68–85.

29 Weiss A, Chidekel AS. Acute pulmonary hemorrhage in a Delaware infant after exposure to *Stachybotrys atra*. *Delaware Med J* 2002; 74: 363–368.

30 Yike I, Miller MJ, Tomashefski J, Walenga R, Dearborn D. Infant rat model of *Stachybotrys chartarum* induced mycotoxicosis. *Mycopathologia* 2002; 154: 139–152.

31 Denziel T, Jarvis B, Onions AHS, *et al*. A catalogue of potentially biodeteriogenic fungi in the culture collection of CBS, CINI and QM. *Int Biodeter Bull* 1974; 10: 3–23.

32 Ayerst G. The effects of moisture and temperature on growth and spore germination in some fungi. *J Stored Prod Res* 1969; 5: 127–141.

33 Grant C, Hunter CA, Flannigan B, Bravery AF. Water activity requirements of moulds isolated from domestic dwellings. *Int Biodeter* 1989; 25: 258–284.

34 Flannigan B, Miller JD. Microbial growth in indoor environments. In: Flannigan B, Samson RA, Miller JD (eds). *Microorganisms in Home and Indoor Work Environments: Diversity, Health Impacts, Investigation and Control*. London: Taylor & Francis, 2001: 35–67.

35 Siu RGH. *Microbial Decomposition of Cellulose*. New York: Rinhold, 1951.

36 Sorenson WG, Jarvis BB, Zhou Y, *et al*. Toxine im Zusammenhang mit *Stachybotrys* und *Memnoniella* in Häusern mit Wasserschäden. In: Gareis M, Scheuer R (eds). *Mykotoxin Workshop*. Kulmbach, Germany: Institut für Mikrobiologie und Toxicologie der Bundesanstalt für Fleischforschung, 1996: 207–214.

37 Madelin TM, Johnson HE. Fungal and actinomycete spore aerosols measured at different humidities with an aerodynamic particle sizer. *J Appl Bacteriol* 1992; **72**: 400–409.

38 Phalen RF, Oldham MJ. Methods for modeling particle deposition as a function of age. *Resp Physiol* 2001; **128**: 119–130.

39 Gorny RL, Reponen T, Willeke K, *et al*. Fungal fragments as indoor air biocontaminants. *Appl Environ Microbiol* 2002; **68**: 3522–3531.

40 Li D-W, Kendrick B. A year-round comparison of fungal spores in indoor and outdoor air. *Mycologia* 1995; **87**: 190–195.

41 Robertson LD. Monitoring viable fungal and bacterial bioaerosol concentrations to identify acceptable levels for common indoor environments. *Indoor Built Environ* 1997; **6**: 295–300.

42 Barnes C, Buckley S, Pacheco F, Portnoy J. IgE-reactive proteins from *Stachybotrys chartarum*. *Ann Aller Asth Immunol* 2002; **89**: 29–33.

43 Halsey JF, Jensen JT, Miller JD. Immunological responses to *Stachybotrys chartarum*. *Aller Clin Immunol* 2000; **107**: S317.

44 Raunio P, Karkkainen M, Virtanen T, Rautiainen J, Pasanen A-L. Preliminary description of antigenic components characteristic of *Stachybotrys chartarum*. *Environ Res Sect* 2001; **A85**: 256–255.

45 Kaise H, Shinohara, M, Miyazaki, W, *et al*. Structure of K-76, a complement inhibitor produced by *Stachybotrys complementi* nov.sp. K-76. *J Chem Soc Chem Commun* 1979; 726–727.

46 Roggo BE, Petersen F, Sills M, *et al*. Novel spirodihydrobenzofuranlactams as antagonists of endothelin and as inhibitors of HIV-1 protease produced by *Stachybotrys* sp. I. Fermentation, isolation and biological activity. *J Antibiot* 1995; **49**: 13–19.

47 Kaneto R, Dobashi K, Kojima I, *et al*. Mer-NF5003B, E and F, novel sesquiterpeneoids as avian myeloblastosis virus protease inhibitors produced by *Stachybotrys* sp. *J Antibiot* 1994; **47**: 727–730.

48 Sakai K, Watanabe K, Masua K, *et al*. Isolation, characterization and biological activities of novel triprenyl phenois as pancreatic cholesterol esterase inhibitors produced by *Stachybotrys* sp. F-1839. *J Antibiot* 1995; **48**: 447–456.

49 Stefanelli S, Sponga F, Ferrari P, *et al*. Inhibitors of myo-inositol monophosphatase, ATCC 20928 factors A and C isolation, physicochemical characterization and biological properties. *J Antibiot* 1996; **49**: 611–616.

50 Minagawa K, Kouzuki S, Tani H, *et al*. Novel stachyflin derivatives from *Stachybotrys* sp. RF-7260. *J Antibiot* 2002; **55**: 239–248.

51 Hinkley SF, Jiang J, Mazzola EP, Jarvis BB. Atranones: Novel diterpenoids from the toxigenic mold *Stachybotrys atra*. *Tetrahedron Lett* 1999; **40**: 2725–2728.

52 Nikulin M, Reijula K, Jarvis B, Veijalainen P, Hintikka E-L. Effects of intranasal exposure to *Stachybotrys atra*. *Fund Appl Toxicol* 1997; **35**: 182–188.

53 Sorenson WG, Frazer DG, Jarvis B, Simpson J, Robinson VA. Trichothecene mycotoxins in aerosolized conidia of *Stachybotrys atra*. *Appl Environ Microbiol* 1987; **53**: 1370–1375.

54 Jarvis BB, Hinkley FF, Nielsen KF. *Stachybotrys*: an unusual mold associated with water-damaged buildings. *Mycotoxin Res* 2000; **16A**: 105–108.

55 Jarvis BB, Lee Y-W, Yatawara SN, Cömezoglu CS. Trichothecenes produced by *Stachybotrys atra* from Eastern Europe. *Appl Environ Microbiol* 1986; **51**: 915–918.

56 Hinkley SF, Mazzola EP, Fettinger JC, Lam Y-F, Jarvis BB. Atranones A-G: a unique series of metabolites from the toxigenic mold *Stachybotrys chartarum*. *Phytochemistry* 2000; **55**: 663–673.

57 Rodriguez AD, González E, Ramírez C. The structural chemistry, reactivity, and total synthesis of dolabellane diterpenes. *Tetrahedron* 1998; **54**: 11683–11729.

58 Iwashima M, Matsumoto Y, Takenaka Y, Iguchi K, Yamori T. New marine diterpenoids from the Okinawan soft coral *Clavularia koellikeri*. *J Nat Prod* 2002; **65**: 1441–1446.

59 Nielsen KF, Huttunen K, Hyvaerinen A, *et al*. Metabolite profiles of *Stachybotrys* isolates from water-damaged buildings and their induction of inflammatory mediators and cytotoxicity in macrophages. *Mycopathologia* 2002; **154**: 201–205.

60 Fogelmark B, Rylander R. (1,3)-β-D-glucan in some indoor air fungi. *Indoor Built Environ* 1997; **6**: 291–294.

61 Rylander R, Lin R-H. (1,3)-β-D-glucan – relationship to indoor air-related symptoms, allergy and asthma. *Toxicology* 2000; **152**: 47–52.

62 Thorn J, Beijer L, Rylander R. Effects after inhalation of (1,3)-beta-D-glucan in healthy humans. *Mediat Inflamm* 2001; **10**: 173–178.

63 Rylander R. Experimental exposures to 1,3 beta-D-glucan. *ASHRAE Trans* 1993: 338–340.

64 Vesper SJ, Dearborn DG, Elidemir O, Haugland RA. Quantification of siderophore and hymolsin from *Stachybotrys chartarum* strains, including a strain isolated from the lung of a child with pulmonary hemorrhage and hemosiderosis. *Appl Environ Microbiol* 2000; **a66**: 2678–2681.

65 Vesper SJ, Magnuson ML, Dearborn DG, Yike I, Haugland RA. Initial characterization of the hemolysin stachylysin from *Stachybotrys chartarum*. *Infect Immun* 2001; **69**: 912–916.

66 Kordula T, Banbula A, Macomson J, Travis J. Isolation and properties of stachyrase A, chymotrypsin-like serine proteinase from *Stachybotrys chartarum*. *Infect Immun* 2002; **70**: 419–421.

67 Kazutoshi S, Eisaku T, Miyauchi M, *et al*. FR901459, a novel immunosuppressant isolated from *Stachybotrys chartarum* no. 19392. *J Antibiot* 1993; **46**: 1788–1798.

68 Croft WA, Jarvis BB, Yatawara CS. Airborne outbreak of trichothecene toxicosis. *Atmos Environ* 1986; **20**: 549–552.

69 Nielsen KF. Mould growth on building materials. PhD Thesis, Technical University of Denmark, Lyngby, 2002.

70 Nielsen KF, Thrane U, Larsen TO, Nielsen PA, Gravesen S. Production of mycotoxins on artificially inoculated building materials. *Int Biodeter Biodeg* 1998; **42**: 9–16.

71 Hinkley SF, Jarvis BB. Method for *Stachybotrys* toxins. In: Trucksess MW, Pohland AE (eds). *Methods in Molecular Biology: Mycotoxin Protocols*, vol. 157. Totowa, N.J.: Humana Press, 2000: 173–194.

72 Rao CY, Burge HA, Brain JD. The time course of responses to intratracheally instilled toxic *Stachybotrys chartarum* spores in rats. *Mycopathologia* 2000; **b149**: 27–34.

73 Drobotko VG. Stachybotryotoxicosis: A new disease of horses and humans. *Am Rev Sov Med* 1945; **2**: 238–242.

74 Szathmary CI. Toxicosis and natural occurrence in Hungary. In: Ueno Y (ed.). *Trichothecenes: Chemical Biological and Toxicological Aspects*. New York: Elsevier, 1983: 229–250.

75 Eppley RM, Bailey WJ. 12,13-Epoxy-delta 9-trichothecenes as the probable mycotoxins responsible for stachybotryotoxicosis. *Science* 1973; **181**: 758–60.

76 Le Bars J, Gerard JP, Michel C. Demonstration of stachybotryotoxicosis in France: a case of acute intoxication in deer. *Ann Nutr Alimen* 1977; **31**: 509–517.

77 Tantaoui-Elaraki A, Mekouar SL, El-Hamidi M, Senhaji M. Toxigenic strains of *Stachybotrys atra* associated with poisonous straw in Morocco. *Vet Hum Toxicol* 1994; **36**: 93–96.

78 Kriek NPJ, Marasas WFO. Trichothecene research in South Africa. In: Ueno Y (ed.). *Trichothecenes: Chemical Biological and Toxicological Aspects*. New York: Elsevier, 1983: 273–284.

79 Pepeljnjak S. Trichothecene problems in Yugoslavia. In: Ueno Y (ed.). *Trichothecenes: Chemical Biological and Toxicological Aspects*. New York: Elsevier, 1983: 265–272.

80 Creasia DA, Lambert RJ. Acute respiratory tract toxicity of the trichothecene mycotoxin T-2 toxin. In: Beasley VR (ed.). *Trichothecene Mycotoxin Mycotoxins: Pathophysiologic Effects*, vol. 1. Boca Raton, FL: CRC Press, 1989: 162–170.

81 Creasia DA, Thurman JD, Wannemacher RW, Bunner DL. Acute inhalation toxicity of T-2 mycotoxin in the rat and guinea pig. *Fund Appl Toxicol* 1990; **14**: 54–59.

82 Cote LM, Beasley VR, Bratich PM, Swanson SP, Buck WB. Excretion of Deoxynivalenol and its metabolite in milk, urine and feces of lactating dairy cows. *J Anim Sci* 1968; **69**: 2416–2423.

83 Prelusky DB, Rotter BA, Rotter RG. Toxicology of mycotoxins. In: Miller JD, Trenholm HL (eds). *Mycotoxins in Grain: Compounds Other Than Aflatoxin*. St Paul, MN: Eagan Press, 1994: 359–404.

84 Schneider DJ, Marasas WFO, Kuys JCD, Kriek NPJ, Van Schalkwyk GC. A field outbreak of suspected stachbotryotoxicosis in sheep. *J SA Vet Assoc* 1979; **50**: 73.

85 Beasley VR. *Trichothecene Mycotoxin Mycotoxins: Pathophysiologic Effects*, vol. 1 and 2. Boca Raton, FL: CRC Press, 1989.

86 Hintikka EL. Human Stachybotrytoxicosis. In: Wyllie TD, Morehouse LG (eds). *Mycotoxigenic Fungi, Mycotoxins, Mycotoxicoses: An Encyclopedic Handbook*, vol. 3. New York: Marcel Dekker, 1978: 87–89.

87 Andrassy K, Horvath I, Lakos T, Toke Z. Mass incidence of mycotoxicoses in Hajdu-Bihar county. *Mykosen* 1980; **23**: 130–133.

88 Le Bars J, Le Bars P. Etude du nuage de spores de *Stachybotrys atra* contaminant des pailles; risques d'inhalation. *Bull Soc Fr Mycol Méd* 1985; **14**: 321–324.

89 Recco P, Servantie J, De Graeve P, *et al.* A propos d'une stachybotrytoxicose d'allure endemique dans un club hippique de la région Toulousaine: approche épidémiologique, clinique et diagnostique. *Bull Soc Fr Mycol Med* 1986; **15**: 233–236.

90 Dill I, Trautmann C, Szewzyk R. Mass development of *Stachybotrys chartarum* on decomposable plant-pots made of recycling paper. *Mycoses* 1997; **40**: 110–114.

91 Sorenson WG, Lewis DM. Organic dust toxic syndrome. In: Howard D, Miller JD (eds). *The Mycota*, vol. VII. Berlin: Springer-Verlag, 1996: 159–172.

92 NIOSH. Preventing organic dust toxic syndrome. DHHS publication 94-102. Cincinnati, OH: NIOSH, 1994.

93 Rylander R. The clinical panorama. In: Rylander R, Jacobs RR (eds). *Organic Dusts*. Boca Raton, FL: Lewis Publishers, 1994: 117–126.

94 Ueno Y. *Trichothecenes: chemical, biological and toxicological aspects*. New York: Elsevier, 1983.

95 Snijders CHA, Samson RA, Hoekstra ES, *et al.* Analysis of *Fusarium* causing dermal toxicosis in marram grass planters. *Mycopathologia* 1997; **135**: 119–128.

96 Kozak PP Jr, Gallup J, Cummins LH, Gillman SA. Currently available methods for home mold surveys. II. Examples of problem homes surveyed. *Ann Aller* 1980; **45**(3): 167–176.

97 ACGIH. Assessment and control of bioaerosols in the indoor environment. American Conference of Government Industrial Hygienists, Cincinnati, OH, 1999.

98 Dales RE, Miller JD. Building-related illness: epidemiological and case-related evidence. In: Flannigan B, Samson RA, Miller JD (eds). *Microorganisms in Home and Indoor Work Environments: Diversity, Health Impacts, Investigation and Control*. London: Taylor & Francis, 2001: 217–230.

99 Johanning E, Morey PR, Jarvis BB. Clinical–epidemiological investigation of health effects caused by *Stachybotrys atra* building contamination. *Proc 1AQ 93* 1993; **1**: 225–230.

100 Johnanning E. Health problems related to fungal exposure- the example of toxigenic *Stachybotrys charatum* (atra). In: Johnanning E, Yang CS (eds). *Fungi and Bacteria in Indoor Air Environments*. Latham, NY: Eastern New York Occupational Health Program, 12110, 1995: 169–182.

101 Johanning E, Biagini R, Hull D, *et al.* Health and immunology study following exposure to toxigenic fungi (*Stachybotrys chartarum*) in a water-damaged office environment. *Int Arch Occup Environ Health* 1996; **68**: 207–218.

102 Morey P. Cleaning procedures for mold. *Proc Health Build* 1995; **95**(3): 1–12.

103 Johanning E. *Stachybotrys* revisited. *Clin Toxicol* 1998; **36**: 629–631.

104 Elidemir O, Colasurdo GN, Rossmann SN, Fan LL. Isolation of *Stachybotrys* from the lung of a child with pulmonary hemosiderosis. *Pediatrics* 1999; **104**: 964–966.

105 Flappan SM, Portnoy J, Jones P, Barnes C. Infant pulmonary hemorrhage in a suburban home with water damage and mold (*Stachybotrys atra*). *Environ Health Perspect* 1999; **107**: 927–930.

106 Montaña E, Etzel RA, Allans T, Horgan TE, Dearborn DG. Environmental risk factors associated with pediatric idiopathic pulmonary hemorrhage and hemosiderosis in a Cleveland community. *Pediatrics* 1997; **99**: 1–8.

107 Etzel R, Montaña E, Sorenson W, Kullman G, Allan T, Olson D. Acute pulmonary hemorrhage in infants associated with exposure to *Stachybotrys atra* and other fungi. *Arch Pediatr Adolesc Med* 1998; **152**: 757–762.

108 Dearborn DG, Yike I, Sorenson WG, Miller MJ, Etzel RA. Overview of investigations into pulmonary hemorrhage among infacts in Cleveland, Ohio. *Environ Health Perspect* 1999; **107(S)**: 495–499.

109 CDC. Update: Pulmonary hemorrhage/hemosiderosis among infants – Cleveland, Ohio, 1993–1996. *Morbid Mortal Weekly Rep* 2002; **49**: 180–184.

110 Dearborn DG, Smith PG, Dahms BB, *et al*. Clinical profile of 30 infants with acute pulmonary hemorrhage in Cleveland. *Pediatrics* 2002; **110**: 627–637.

111 CDC. Notice to readers: availability of case definition for acute idiopathic pulmonary hemorrhage in infants. *Morbid Mortal Weekly Rep* 2001; **50**: 494–495.

112 CDC. Pulmonary hemorrhage in infants. *Morbid Mortal Weekly Rep* 2002; **49**: 180–184.

113 Viana ME, Coates NH, Gavett SH, *et al*. An extract of *Stachybotrys chartarum* causes allergic asthma-like responses in a BALB/c mouse model. *Toxicol Sci* 2000; **70**: 98–109.

114 Land CJ, Lundstrom H, Werner S. Production of tremorgenic mycotoxins by isolates of *Aspergillus fumigatus* from sawmills in Sweden. *Mycopathologia* 1993; **124**: 87–93.

115 Larsen TO, Frisvad JC. Production of volatiles and mycotoxins in conidia of common indoor *Penicillium* and *Aspergillus* species. In: Samson R, Flannigan B, Flannigan M, Graveson S (eds). *Health Implications of Fungi in Indoor Environments*. Amsterdam: Elsevier, 1994: 251–279.

116 Miller JD. Fungi as contaminants in indoor air. *Atmos Environ* 1992; **26**: 2163–2172.

117 Wicklow DT, Shotwell OL. Intrafungal distribution of aflatoxins among conidia and sclerotia of *Aspergillus flavus* and *Aspergillus parasiticus*. *Can J Microbiol* 1983; **29**: 1–5.

118 Yike I, Rand TG, Dearborn D. Proteases from the spores of toxigenic fungus *Stachybotrys chartarum*. *Am J Resp Crit Care Med (American Thoracic Society Abstracts)* 2002; **165**(Suppl.): A537.

119 Feinberg B, MacLaughlin CS. Biochemical mechanism of action of trichothecene mycotoxins. In: Beasley VR (ed.). *Trichothecene Mycotoxin Mycotoxins: Pathophysiologic Effects*, vol. 1. Boca Raton, FL: CRC Press, 1989: 27–36.

120 Gyonggyossy-Issa MIC, Card RT, Fergusson DJ, Khachatourians GC. Prehaemolytic erythrocyte deformability changes caused by trichothecene T-2 toxin. *Blood Cell* 1986; **11**: 393–403.

121 Khachatourians GC. Metabolic effects of the trichothecene T-2 toxin. *Can J Physiol Pharmacol* 1990; **68**: 1004–1008.

122 Yang G-H, Jarvis BB, Chung Y-J, Pestka JJ. Apoptosis induction by the satratoxins and other trichothecene mycotoxins: relationship to ERK, p38 MAPK, and SAPK/JNK activation. *Toxicol Appl Pharmacol* 2000; **164**: 149–160.

123 Jarvis BB. Macrocyclic trichothecenes. In: Sharma RP, Salunkhe DK (eds). *Mycotoxins and Phytoalexins in Human and Animal Health*. Boca Raton, FL: CRC Press, 1991: 361–421.

124 Nikulin M, Reijula K, Jarvis BB, Hintikka E-L. Experimental lung mycotoxicosis in mice induced by *Stachybotrys atra*. *Int J Exp Path* 1996; **77**: 213–218.

125 Rand TG, Mahoney M, White K, Oulton M. Microanatomical changes associated with alveolar type II cells in juvenile mice exposed to *Stachybotrys chartarum* and isolated toxin. *Toxicol Sci* 2002; **65**: 239–245.

126 Mason CD, Rand TG, Oulton M, MacDonald JM, Scott JE. Effects of *Stachybotrys chartarum* (*atra*) conidia and isolated toxin on lung surfactant production and homeostasis. *Nat Toxin* 1998; **6**: 27–33.

127 Mason C, Rand TG, Oulton M, MacDonald J. The effect of *Stachybotrys chartarum* spores and an isolated trichothecene, isosatratoxin F, on convertase activity in mice. *Toxicol Appl Pharmacol* 2001; **172**: 21–28.

128 MaCrae KC, Rand TG, Shaw RA, *et al*. Analysis of pulmonary surfactant by Fourier-transform infrared spectroscopy following exposure to *Stachybotrys chartarum* (*atra*) spores. *Chem Phys Lipid* 2001; **110**: 1–10.

129 Sumarah MW, Rand TG, Mason CD, *et al*. Effects of *Stachybotrys chartarum* spores and toxin on mouse lung surfactant phospholipid composition. In: Johanning E (ed.). *Bioaerosols, Fungi and Mycotoxins: Health Effects, Assessment, Prevention and Control*. Albany, NY: Eastern New York Occupational and Environmental Health Center, 1999: 444–452.

130 Hastings C, Rand TG, Bergen HT *et al*. *Stachybotrys chartarum* alters surfactant-related phosphoiipid synthesis and CTP:cholinephosphate cytidylytransferase activity in isolated fetal rat type II cells. *Toxicol Lett* 2002 (in press).

131 Flemming J, Hudson B, Rand TG. Lung inflammatory responses in juvenile mice after intratracheal instillation of Stachybotrys chartarum spores. *Exper Toxicol Pathol* 2002 (in press).

132 Rao CY, Brain JD, Burge HA. Reduction of pulmonary toxicity of *Stachybotrys chartarum* spores by methanol extraction of mycotoxins. *Appl Environ Microbiol* 2000; **a66**: 2817–2821.

133 Rosenblum JH, Molina RM, Donaghey TC, Brain JD. Murine pulmonary responses to *Stachybotrys chartarum* have genetic determinants. *Am J Resp Crit Care Med (American Thoracic Society Abstracts)* 2002; **165**(Suppl. 8): A537.

134 Peltola J, Andersson M, Mikkola R, Mussalo-Rauhamaa H, Salkinoja-Salonen M. Membrane toxic substances in water-damaged construction materials and fungal pure cultures. In: Johanning E (ed.). *Bioaerosols, Fungi and Mycotoxins: Health Effects, Assessment, Prevention and Control*. Albany, NY: Eastern New York Occupational and Environmental Health Center, 1999: 432–443.

135 Okumura H, Yoshino N, Sugiura Y, *et al*. Trichothecenes as potent inducers of apoptosis. In: Johanning E (ed.). *Bioaerosols, Fungi and Mycotoxins: Health Effects, Assessment, Prevention and Control*. Albany, NY: Eastern New York Occupational and Environmental Health Center, 1999: 221–231.

136 Creasia DA, Thurman JD, Jones LJ, Neally ML, York CG, Wannamacher RW, Bunner DL. Acute inhalation toxicity of t-2 mycotoxin in mice. *Fund Appl Toxicol* 1987; **8**: 230–235.

137 Marrs TC, Edginton JAG, Price PN, Upshall DG. Acute toxicity of T2 mycotoxin to the guinea pig by inhalation and subcutaneous routes. *Br J Exp Path* 1986; **67**: 259–268.

138 Pang VF, Lambert RJ, Felsberg PJ, *et al*. Experimental T-2 toxicosis in swine following inhalation exposure: clinical sign and effects on haematology, serum biochemistry, and immune response. *Fund Appl Toxicol* 1998; **11**: 100–109.

139 Thurman JD, Creasia DA, Trotter RW. Mycotoxicosis caused by aerosolized T-2 toxin administered to female mice. *Am J Vet Res* 1988; **49**: 1928–1931.

140 Gregory L, Rand TG, Dearborn D, Pestka J. Localization of satratoxin-G in *Stachybotrys chartarum* spores and spore-impacted mouse lung tissues using immunocytochemistry. *Toxicol Pathol* 2003 (in press).

141 Gregory L, Rand TG, Dearborn D, Yike I, Vesper S. Immunocyto-chemical localization of a hemolysin-like protein in *Stachybotrys chartarum* spores and spore-impacted mouse and rat lung tissues. *Mycopathologia* 2002; **56**: 77–85.

142 Vesper SJ, Dearborn DG, Yike I, Sorenson WG, Haugland RA. Hemolysis, toxicity, and randomly amplified polymorphic DNA analysis of *Stachybotrys chartarum* strains. *Appl Environ Microbiol* 1999; **65**: 3175–3181.

143 NYC. Guidelines on assessment and remediation of *Stachybotrys atra* in indoor environments. In: Johnanning E, Yang CS, eds. *Fungi and Bacteria in Indoor Air Environments*. Latham, NY: Eastern New York Occupational Health Program, 1995, 201–207.

144 Brook RD, Brook JR, Urch B, *et al*. Inhalation of fine particulate air pollution and ozone causes acute arterial vasoconstriction in healthy adults. *Circulation* 2002; **105**: 1534–1537.

145 Kirkpatrick CJ, Bittinger F, Unger R, *et al*. The non-neuronal cholinergic system in the endothelium: evidence and possible pathobiological significance. *Jpn J Pharmacol* 2001; **85**: 24–28.

146 Johanning E, Landsbergis P, Gareis M, *et al*. Clinical experience and results of a Sentinel Health Investigation related to indoor fungal exposure. *Env Health Perspect* 1999; **107**(S3): 489–94.

147 Gordon WA, Johanning E, Haddad L. Cognitive impairment associated with exposure to toxigenic fungi. In: Johnanning E (ed.). *Bioaerosols, Fungi and Mycotoxins: Health Effects, Assessment, Prevention and Control*. Latham, NY: Eastern New York Occupational Health Program, 1999: 94–98.